# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                         )
CHARLES B. RANGEL,                       )
                                         )
                 Plaintiff,              )
                                         )
        v.                               )     Civil Action No. 1:13-cv-00540-JDB
                                         )
JOHN BOEHNER, et al.,                    )
                                         )
                 Defendants.             )
_____)

## DEFENDANTS' MOTION TO DISMISS

Pursuant to Federal Rule of Civil Procedure 12(b)(1), (6), and for all the reasons set forth in the accompanying Memorandum of Points and Authorities, Defendants John A. Boehner, Karen L. Haas, Jo Bonner, Zoe Lofgren, Michael T. McCaul, K. Michael Conaway, Charles W. Dent, Gregg Harper, R. Blake Chisam, C. Morgan Kim, and Stacey Sovereign, by and through their respective counsel, respectfully move for an order dismissing this action with prejudice.

A proposed order is submitted herewith and oral argument is not requested.

1

Respectfully submitted,

*/s/ Kerry W. Kircher*
KERRY W. KIRCHER, D.C. Bar #386816
General Counsel
Kerry.Kircher@mail.house.gov
WILLIAM PITTARD, D.C. Bar #482949
Deputy General Counsel
William.Pittard@mail.house.gov
CHRISTINE DAVENPORT
Senior Assistant Counsel
Christine.Davenport@mail.house.gov
TODD B. TATELMAN
Assistant Counsel
Todd.Tatelman@mail.house.gov
MARY BETH WALKER, D.C. Bar #501033
Assistant Counsel
MaryBeth.Walker@mail.house.gov
ELENI M. ROUMEL
Assistant Counsel
Eleni.Roumel@mail.house.gov

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

*Counsel for Defendants John A. Boehner, Karen L.*
*Haas, Jo Bonner, Zoe Lofgren, Michael T. McCaul, K.*
*Michael Conaway, Charles W. Dent, and Gregg Harper*

*/s/ John M. Faust*
JOHN M. FAUST, D.C. Bar #433553
John@johnfaustlaw.com
LAW OFFICE OF JOHN M. FAUST, PLLC
1325 G Street, N.W., Suite 500
Washington, D.C. 20005
(202) 449.7707 (telephone)
(202) 449.7701 (facsimile)

*Counsel for Defendant R. Blake Chisam*

_/s/ Richard A. Sauber_
RICHARD A. SAUBER, D.C. Bar #385070
rsauber@robbinsrussell.com
ROBBINS, RUSSELL, ENGLERT, ORSECK,
    UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411L
Washington, D.C. 20006
(202) 775.4506 (telephone)
(202) 775.4510 (facsimile)

*Counsel for Defendants C. Morgan Kim and Stacey Sovereign*

July 12, 2013

**CERTIFICATE OF SERVICE**

I certify that on July 12, 2013, I served the foregoing Defendants' Motion to Dismiss by

CM/ECF and by electronic mail, .pdf format, on the following:

> Jay Goldberg, Esquire
> JAY GOLDBERG, P.C.
> 250 Park Avenue, Suite 2020
> New York, NY 10177
> office@jaygoldberg.com

> */s/ Kerry W. Kircher*
> Kerry W. Kircher

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CHARLES B. RANGEL, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:13-cv-00540-JDB |
| JOHN BOEHNER, et al., | ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Kerry W. Kircher, General Counsel
William Pittard, Deputy General Counsel
Christine Davenport, Sr. Assistant Counsel
Todd B. Tatelman, Assistant Counsel
Mary Beth Walker, Assistant Counsel
Eleni M. Roumel, Assistant Counsel
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)
kerry.kircher@mail.house.gov

*Counsel for Defendants John A. Boehner,
Karen L. Haas, Jo Bonner, Zoe Lofgren,
Michael T. McCaul, K. Michael Conaway,
Charles W. Dent, and Gregg Harper*

John M. Faust
LAW OFFICE OF JOHN M. FAUST, PLLC
1325 G Street, N.W., Suite 500
Washington, D.C. 20005
(202) 449-7707 (telephone)
(202) 449-7701 (facsimile)
john@johnfaustlaw.com

*Counsel for Defendant R. Blake Chisam*

Richard A. Sauber
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411L
Washington, D.C. 20006
(202) 775-4506 (telephone)
(202) 775-4510 (facsimile)
rsauber@robbinsrussell.com

*Counsel for Defendants C. Morgan Kim and
Stacey Sovereign*

July 12, 2013

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ....................................................................................1

LEGAL FRAMEWORK ...........................................................................4

FACTUAL BACKGROUND. ......................................................................4

    I. Misconduct Allegations Concerning Congressman Rangel. ..............................4

    II. Investigative Subcommittee Proceedings.........................................6

    III. Adjudicatory Subcommittee Proceedings.........................................8

    IV. Ethics Committee Sanction Hearing..............................................10

    V. House Floor Proceedings on Censure Resolution..............................10

    VI. Approval of the Journal. ........................................................12

    VII. Post-Censure Proceedings. ....................................................12

    VIII. Congressman Rangel's Committee Service and Electoral Successes...........14

ARGUMENT ........................................................................................15

    I. Defendants Are Immune from Suit Under the Speech or Debate Clause. .........15

        A. Brief Overview of Speech or Debate Clause Law. ...............................15

            1. History and Purpose of the Clause.............................................15

            2. Scope of the Clause...............................................................16

            3. Protections of the Clause. .......................................................19

        B. Defendants Are Immune from Suit Here Because Congressman
           Rangel's Claims Are Predicated on Conduct to Which the
           Speech or Debate Clause Plainly Applies...........................................21

        C. The Non-Evidentiary-Use Component of the Clause Also
           Requires That Congressman Rangel's Suit Be Dismissed. .................25

        D. Defendants' Speech or Debate Clause Protections Have Not Been
           Waived. .............................................................................26

II. Congressman Rangel's Claims Raise Non-Justiciable Political Questions. .....29

    A. The Discipline Clause Authority Is Textually Committed to the
       House Alone.....................................................................................30

    B. The Journal Clause Authority Is Textually Committed to the
       House Alone.....................................................................................32

    C. Any Judicial Resolution of Congressman Rangel's Claims Would
       Manifest a Lack of the Respect Due a Coordinate Branch of
       Government....................................................................................33

III. This Court Lacks Jurisdiction Because Congressman Rangel Lacks
    Standing. .......................................................................................36

    A. Congressman Rangel Has Not Alleged, and Cannot Establish,
       an Article III Injury-in-Fact. .................................................37

    B. Even If Congressman Rangel Had Alleged an Article III
       Injury-in-Fact, Defendants Did Not Cause That Injury. .....................41

    C. Even If Congressman Rangel Had Alleged an Article III
       Injury-in-Fact, That Injury Would Not Be Redressed by a
       Decision Favorable to the Congressman.............................................45

IV. The Complaint Fails to State a Claim.................................................46

    A. The Constitutional Rights Congressman Rangel Seeks to
       Vindicate Do Not Apply in the Context of House Disciplinary
       Clause Proceedings. ............................................................................47

    B. Congressman Rangel Has Stated No Due Process Claim Because
       He Has Not Pled the Deprivation of a Protected Liberty Interest........47

    C. The Allegations That the House and Committee Rules Were
       Violated Are Insufficient as a Matter of Law. .....................................50

    D. Compliance with House and Committee Rules Is Not a Predicate
       to the House's Imposition of Discipline on Its Members. ...................51

V. The Court Should Exercise Its Discretion to Refuse to Adjudicate
    Congressman Rangel's Claims. .........................................................52

    A. The Court Should Exercise Its Declaratory Judgment Act
       Discretion to Decline to Reach the Merits...........................................52

    B. The Equitable Discretion Doctrine Also Counsels in Favor of
       the Court Declining to Reach the Merits. .............................................54

CONCLUSION ................................................................................................................ 55

CERTIFICATE OF SERVICE

ADDENDUM

EXHIBITS

# TABLE OF AUTHORITIES[*]

**Cases**

*Advanced Mgmt. Tech., Inc. v. FAA*,
    211 F.3d 633, 636-37 (D.C. Cir. 2000)..............................................................38

* *Allen v. Wright*,
    468 U.S. 737 (1984)..............................................................................................43

*ASARCO Inc. v. Kadish*,
    490 U.S. 605 (1989)..............................................................................................45

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................................15

* *Baker v. Carr*,
    369 U.S. 186 (1962)........................................................................................29, 34

*Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*,
    793 F. Supp. 2d 124 (D.D.C. 2011).....................................................................53

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................15

*Bender v. Williamsport Area Sch. Dist.*,
    475 U.S. 534, 541 (1986)......................................................................................36

* *Boehner v. McDermott*,
    No. 98-cv-0594 (D.D.C. Aug. 20, 2002) (ECF No. 53) .................................17, 30

*Brown & Williamson Tobacco Corp. v. Williams*,
    62 F.3d 408 (D.C. Cir. 1995)...........................................................................20, 28

*Brown v. Hansen*,
    973 F.2d 1118 (3d Cir. 1992)................................................................................34

*Bush v. Kucinich*,
    236 F. Supp. 2d 1 (D.D.C. 2002).........................................................................30

*Carnessale v. U.S. Senators Alan Cranston & Pete Wilson*,
    No. 90-5245 (C.D. Cal. Jan. 25, 1991) ...............................................................18

*Chapman v. Space Qualified Sys. Corp.*,
    647 F. Supp. 551 (N.D. Fla. 1986).......................................................................21

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

*City of Waukesha v. EPA,*
    320 F.3d 228 (D.C. Cir. 2003) ................................................................37

*Clapper v. Amnesty Int'l USA,*
    133 S. Ct. 1138 (2013) ........................................................................42

*CNN v. Anderson,*
    723 F. Supp. 835 (D.D.C. 1989) ....................................................17, 22

*Comm. on the Judiciary v. Miers,*
    558 F. Supp. 2d 53 (D.D.C. 2008) ........................................................53

*Consumer's Union of U.S., Inc. v. Periodical Correspondent's Ass'n,*
    515 F.2d 1341 (D.C. Cir. 1975) ....................................................17, 33

*Ctr. for Biological Diversity v. Jackson,*
    815 F. Supp. 2d 85 (D.D.C. 2011) ........................................................15

\* *Doe v. McMillan,*
    412 U.S. 306 (1973) ..............................................................16, 19, 22

*Doe v. U.S. Dep't of Justice,*
    753 F.2d 1092 (D.C. Cir. 1985) ..........................................................48

\* *Eastland v. U.S. Servicemen's Fund,*
    421 U.S. 491 (1975) ......................16, 17, 18, 19, 20, 22, 23, 25, 49

*El-Shifa Pharm. Indus. Co. v. United States,*
    607 F.3d 836 (D.C. Cir. 2010) ............................................................29

*Faibisch v. Univ. of Minn.,*
    304 F.3d 797 (8th Cir. 2002) ................................................................6

*FEC v. Wright,*
    777 F. Supp. 525, 530 (N.D. Tex. 1991) ............................................17

*Fields v. Office of Eddie Bernice Johnson,*
    459 F.3d 1 (D.C. Cir. 2006) ..........................................................18, 24

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ............................................................................37

*Gen. Elec. Co. v. Jackson,*
    610 F.3d 110 (D.C. Cir. 2010) ............................................................48

*Gordon v. Nat'l Youth Work Alliance,*
    675 F.2d 356 (D.C. Cir. 1982) ............................................................15

*Gov't of Virgin Islands v. Lee*,
   775 F.2d 514 (3d Cir. 1985).............................................................................19

\* *Gravel v. United States*,
   408 U.S. 606 (1972)................................................16, 17, 18, 19, 20, 22, 23, 24, 25

*Grocery Mfrs. Ass'n v. EPA*,
   693 F.3d 169 (D.C. Cir. 2012)......................................................................37

*Haase v. Sessions*,
   835 F.2d 902 (D.C. Cir. 1987)...................................................................15, 37

\* *Hanes Corp. v. Millard*,
   531 F.2d 585 (D.C. Cir. 1976)..................................................................52, 53

*Harrington v. Bush*,
   553 F.2d 190 (D.C. Cir. 1977).......................................................................33

*Hastings v. U.S. Senate, Impeachment Trial Comm.*,
   716 F. Supp. 38 (D.D.C. 1989)...................................................................17, 35

*Helstoski v. Meanor*,
   442 U.S. 500 (1979)..................................................................................16

*In re Grand Jury Subpoenas*,
   571 F.3d 1200 (D.C. Cir. 2009).....................................................................17

*In re Req. for Access to Grand Jury Materials*,
   833 F.2d 1438 (11th Cir. 1987) ....................................................................17

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
   478 U.S. 221 (1986)..................................................................................29

*Jewish War Veterans of the U.S.A., Inc. v. Gates*,
   506 F. Supp. 2d 30 (D.D.C. 2007) ...............................................................18, 24

*Judicial Watch, Inc. v. U.S. Senate*,
   432 F.3d 359 (D.C. Cir. 2005).......................................................................43

*Kilbourn v. Thompson*,
   103 U.S. 168 (1880)..................................................................................16

\* *Leach v. Resolution Trust Corp.*,
   860 F. Supp. 868 (D.D.C. 1994).....................................................................55

*Lee v. Biden*,
   No. 88-2090 (C.D. Cal. July 15, 1988)..............................................................17

*Lovelace v. Software Spectrum Inc.*,
    78 F.3d 1015 (5th Cir. 1996) ...................................................................6

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).................................................15, 36, 37, 38, 42

*Made in the USA Found. v. United States*,
    242 F.3d 1300 (11th Cir. 2001) ...........................................................30

*Magritz v. Ozaukee Cnty.*,
    894 F. Supp. 2d 34 (D.D.C. 2012) .........................................................6

\* *Marshall Field & Co. v. Clark*,
    143 U.S. 649 (1892)..............................................................25, 32, 33

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)...............................................................................29

*Mazaleski v. Treusdell*,
    562 F.2d 701 (D.C. Cir. 1977) ..............................................................48

*McGhee v. Draper*,
    639 F.2d 639 (10th Cir. 1981) ..............................................................48

*McGrain v. Daugherty*,
    273 U.S. 135 (1927)...............................................................................18

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007)...............................................................................52

*Meese v. Keene*,
    481 U.S. 465 (1987)...............................................................................38

\* *Metzenbaum v. FERC*,
    675 F.2d 1282 (D.C. Cir. 1982)..............................................34, 35, 52

*Miller v. Transamerican Press, Inc.*,
    709 F.2d 524 (9th Cir. 1983) ................................................................19

\* *MINPECO, S.A. v. Conticommodity Servs., Inc.*,
    844 F.2d 856 (D.C. Cir. 1988).........................................19, 20, 21, 22

*Monserrate v. N.Y. State Senate*,
    599 F.3d 148 (2d Cir. 2010)..................................................................48

*Morgan v. United States*,
    801 F.2d 445 (D.C. Cir. 1986)..............................................................30

*Morrissey v. Brewer,*
    408 U.S. 471 (1972)..............................................................................47

*Nixon v. U.S. Senate,*
    887 F.2d 332 (D.C. Cir. 1989)............................................................35

*Nixon v. United States,*
    506 U.S. 224 (1993)........................................................................35, 51

*Paul v. Davis,*
    424 U.S. 693 (1976)........................................................................48, 49

*Pentagen Techs. Int'l, Ltd. v. Comm. on Appropriations of U.S. House of Representatives,*
    20 F. Supp. 2d 41 (D.D.C. 1998).........................................................20

*Pettingell v. Exec. Comm. of Correspondents,*
    No. 1:85-cv-2742, 1986 WL 8569 (D.D.C. Mar. 31, 1986)..................17

*Pietrangelo v. U.S. Senate,*
    No. 1:99-cv- 323 (N.D. Ohio Mar. 17, 1999)......................................17

*Pittston Coal Grp., Inc. v. Int'l Union, UMWA,*
    894 F. Supp. 275 (W.D. Va. 1995)......................................................28

*POM Wonderful LLC v. F.T.C.,*
    894 F. Supp. 2d 40 (D.D.C. 2012).................................................53, 54

*Powell v. McCormack,*
    395 F.2d 577 (D.C. Cir. 1968).............................................................31

*Powell v. McCormack,*
    395 U.S. 486 (1969)............................................................................30

*Pub. Citizen v. U.S. Dist. Court for D.C.,*
    486 F.3d 1342 (D.C. Cir. 2007)..........................................................33

*Raines v. Byrd,*
    521 U.S. 811 (1997)................................................................37, 42, 55

*Ray v. Proxmire,*
    581 F.2d 998 (D.C. Cir. 1978)......................................................17, 20

*Roth v. D.C. Courts,*
    160 F. Supp. 2d 104, 110 (D.D.C. 2001)............................................54

*Schneider v. Kissinger,*
    412 F.3d 190 (D.C. Cir. 2005)............................................................29

*Schreibman v. Holmes,*
　　No. 1:96-cv-1287, 1997 WL 527341 (D.D.C. Aug. 18, 1997)............................17

\* *Simon v. E. Ky. Welfare Rights Org.,*
　　426 U.S. 26 (1976) ........................................................................................43

*Smith v. Eagleton,*
　　455 F. Supp. 403 (W.D. Mo. 1978) ...................................................................17

*Stahl v. U.S. Dep't of Agric.,*
　　327 F.3d 697 (8th Cir. 2003) .............................................................................6

*Steel Co. v. Citizens for a Better Env't,*
　　523 U.S. 83 (1998).................................................................................37, 41

*Swish Mktg., Inc. v. F.T.C.,*
　　669 F. Supp. 2d 72 (D.D.C. 2009) ..............................................................53, 54

*Tenney v. Brandhove,*
　　341 U.S. 367 (1951)......................................................................................16

*United States v. Ballin,*
　　144 U.S. 1 (1892).........................................................................................42

\* *United States v. Brewster,*
　　408 U.S. 501 (1972)..........................................................................19, 28, 30, 47

*United States v. Dowdy,*
　　479 F.2d 213 (4th Cir. 1973) .............................................................................19

*United States v. Durenberger,*
　　No. 3-93-65, 1993 WL 738477 (D. Minn. Dec. 3, 1993) ......................................17

*United States v. Eilberg,*
　　465 F. Supp. 1080 (E.D. Pa. 1979) ...................................................................17

*United States v. Hansen,*
　　No. 1:83-cr-00075 (D.D.C. Mar. 9, 1984).........................................................17

\* *United States v. Helstoski,*
　　442 U.S. 477 (1979)........................................................16, 19, 20, 25, 26, 27, 28

\* *United States v. Johnson,*
　　383 U.S. 169 (1966)...................................................15, 16, 18, 19, 20, 24, 25, 28

*United States v. McDade,*
　　No. 92-cr-249 (E.D. Pa. June 5, 1996)...............................................................17

*United States v. Munoz-Flores,*
    495 U.S. 385 (1990)......................................................................................29

*United States v. Rayburn House Office Bldg.,*
    497 F.3d 654 (D.C. Cir. 2007)......................................................................20

*United States v. Zucker,*
    161 U.S. 476 (1896)......................................................................................47

*Vander Jagt v. O'Neill,*
    524 F. Supp. 519 (D.D.C. 1981)...................................................................34

\* *Vander Jagt v. O'Neill,*
    699 F.2d 1166 (D.C. Cir. 1983).............................................................33, 55

*Velez v. Levy,*
    401 F.3d 75 (2d Cir. 2005)............................................................................48

*Walker v. Jones,*
    733 F.2d 923 (D.C. Cir. 1984).......................................................................33

*Webster v. Sun Co.,*
    561 F. Supp. 1184 (D.D.C. 1983)..................................................................21

*Wilderness Soc'y v. Norton,*
    434 F.3d 584 (D.C. Cir. 2006)..................................................................45, 46

*Wilton v. Seven Falls Co.,*
    515 U.S. 277 (1995)......................................................................................52

## Constitutional Provisions

U.S. Const. art. I, § 2, cl. 5.................................................................................17

U.S. Const. art. I, § 3, cl. 6...........................................................................17, 35

U.S. Const. art. I, § 5, cl. 1.................................................................................30

U.S. Const. art. I, § 5, cl. 2..........................................................1, 17, 30, 33, 34

U.S. Const. art. I, § 5, cl. 3....................................................................2, 32, 35

U.S. Const. art. I, § 6, cl. 1.............................................................................4, 24

U.S. Const. art. I, § 7, cl. 2.................................................................................32

U.S. Const. art. II, § 2, cl. 2 ..............................................................................17

U.S. Const. art. III, § 2 ...................................................................................29

U.S. Const. amend. VI .....................................................................................47

**Statutes**

44 U.S.C. § 713 .................................................................................................2

26 U.S.C. § 8002 .............................................................................................14

28 U.S.C. § 2201 .............................................................................................52

28 U.S.C. § 2202 .............................................................................................52

**Legislative Authorities**

156 Cong. Rec.......................................................................................1, 11, 12

Asher C. Hinds, Hinds' Precedents (1907).............................................13, 14

Constitution, Jefferson's Manual, & Rules of the House of Representatives,
   H. Doc. 111-157, § 542 (2011) ................................................................32

H. Res. 7, 113th Cong. (2013) .........................................................................14

H. Res. 31, 112th Cong. (2011) ..................................................................14, 39

H. Res. 1737, 111th Cong. (2010) ........................................................1, 10, 12

H. Rep. No. 63-570 (1914) .............................................................................31

Journal of the House of Representatives, 111th Cong., 2d Sess. (Dec. 2, 2010)...........2, 12

Karen L. Haas, Clerk, Final Edition, List of Standing Comms. . . Together with
   Joint Committees of the Congress . . ., One Hundred Twelfth Congress
   (112th Cong.) (Dec. 27, 2012) ................................................................14

Karen L. Haas, Clerk, List of Standing Comms. . . Together with Joint Comms. of the
   Congress . . ., One Hundred Thirteenth Congress (113th Cong.) (June 5, 2013)..14

Karen L. Haas, Clerk, Statistics of the Congressional Election of Nov. 2, 2010
   (Corrected to June 3, 2011)......................................................................14

Karen L. Haas, Clerk, Statistics of the Presidential & Congressional Election of
   Nov. 6, 2012 (Corrected to Feb. 28, 2013) .............................................14

Letter from the Hon. Charles B. Rangel to the Hon. Nancy Pelosi (Mar. 3, 2010)...........14

Lewis Deschler, Deschler's Precedents of the U.S. House of Representatives,
H. Doc. 94-661, 94th Cong. 2d Sess. (1979) .................................................. 31, 35

Rep. on the Legislative & Oversight Activities of the Comm. on Ways & Means
During the 112th Congress (Comm. Print May 31 2012) .............................. 40, 44

Rep. of the Comm. on Standards of Official Conduct, *In the Matter of Rep.*
*Charles B. Rangel*, H. Rep. No. 111-661 (Nov. 29, 2010) ........................... *passim*

Rep. Charles Rangel, Comms. & Caucuses,
http://rangel.house.gov/about-me/committees-and-caucuses
(last visited July 9, 2013) ..................................................................................... 15

Rules of the House of Representatives (112th Cong.)

Rule X.5 .................................................................................................. 39

Rules of the House of Representatives (111th Cong.)

Rule I.1 ................................................................................................ 12, 35

Rule II.2 .................................................................................................... 2

Rule V.2 ................................................................................................... 26

Rule XI.4 ................................................................................................. 26

Rule XIII.2 ............................................................................................... 32

Rules of the House of Representatives (110th Cong.)

Rule X.5 .................................................................................................... 7

Rules of the Committee on Ethics (113th Cong.)

Rule 24 ...................................................................................................... 2

Rules of the Committee on Standards of Official Conduct (111th Cong.)

Rule 5 ..................................................................................................... 26

Rule 8 ..................................................................................................... 50

Rule 12 .................................................................................................... 26

Rule 23 ...................................................................................................... 8

Rule 24 ...........................................................................................................2

Rules of the Committee on Standards of Official Conduct (110th Cong.)

Rule 19 ...........................................................................................................7

Rules of the Comm. on Ways & Means (112th Cong.)

Rule 9 .......................................................................................................39, 40

Statement of the Chair and Ranking Republican Member of the [Ethics] Committee
(Feb. 10, 2009)...........................................................................................7

William R. Martin & Kerry Brainard Verdi, Rep. of the Outside Counsel to the Comm.
on Ethics in the Matter of Representative Maxine Waters (Sept. 25, 2012) .........13

Wm. Holmes Brown, Charles W. Johnson, & John V. Sullivan, House Practice:
A Guide to the Rules, Precedents & Procedures of the House (2011) .................35

## Other Authorities

10B Charles Alan Wright & Arthur R. Miller, Fed. Practice & Proc.
§ 2759 (3d ed. Supp. 2013)........................................................................54

Carl McGowan, *Congressmen in Court: The New Plaintiffs*,
15 Ga. L. Rev. 241, 262 (1981) ...............................................................55

Christopher Lee, *Rangel's Pet Cause Bears His Own Name*,
Washington Post (July 15, 2008)................................................................5

C-Span Video Library, *Debate on Censure of Rep. Charles Rangel* (Dec. 2, 2010),
http://www.c-spanvideo.org/program/Rangl .......................................26

C-Span Video Library, *Rep. Charles Rangel Ethics Inquiry* (Nov. 18, 2010),
http://www.c-spanvideo.org/program/EthicsCharg ...............................26

C-Span Video Library, *Rep. Charles Rangel Ethics Inquiry*, Day 2 (Nov. 16, 2010),
http://www.c-spanvideo.org/program/InquiryDa .................................26

C-Span Video Library, Rep. *Charles Rangel Ethics Inquiry*, Part I (Nov. 15, 2010),
http://www.c-spanvideo.org/program/AgainstCha ...............................26

Daphne Retter, *Big Wheel Benz the Rules*,
New York Post (Sept. 18, 2008)................................................................6

David Kocieniewski, *For Rangel, Four Rent-Stabilized Apartments*,
New York Times (July 11, 2008) ..............................................................5

Isabel Vincent & Susan Edelman, *Tricky Charlie's Carib "Hideaway,"*
New York Post (Aug. 31, 2008) ............................................................................6

John Bresnahan, *Did ethics staff taint Maxine Waters Probe?*,
Politico (July 18, 2011) ......................................................................................12

Luther Stearns Cushing, The Law and Practice of Legislative Assemblies
(Boston, Little, Brown & Co. 1856) ...................................................................31

Patricia Murphy, *Charlie Rangel's Toughest Battle:  Trying to Win a Majority Latino
District*, The Daily Beast (May 31, 2012) ...........................................................41

This case arises out of the exercise by the U.S. House of Representatives ("House") of its constitutional authority to "punish [one of] its Members for disorderly Behavior," U.S. Const. art. I, § 5, cl. 2, the Member in question being the Honorable Charles B. Rangel, the plaintiff. Congressman Rangel asks this Court to review the House's exercise of its Discipline Clause authority, and effectively to set aside the discipline the House imposed on him for ethical misconduct in which the Congressman himself does not deny he engaged.  The Court should reject, on jurisdictional and other grounds discussed below, Congressman Rangel's unprecedented and audacious invitation to the Court to disregard fundamental separation of powers principles and immerse itself in policing the most internal of House proceedings.

## INTRODUCTION

Congressman Rangel is the U.S. Representative for New York's 13th congressional district.  He was first elected to the House in 1970; he was re-elected in every subsequent biennial congressional election (including in 2010 and 2012); and he currently is the third-longest serving Member of the House.

On December 2, 2010, as the 111th Congress (Jan. 3, 2009 – Jan. 3, 2011) was drawing to a close, the institution in which Congressman Rangel then had served for nearly 40 years censured him for ethical misconduct by a vote of 333-79.  156 Cong. Rec. H7898-99 (daily ed. Dec. 2, 2012) (vote on H. Res. 1737, 111th Cong. (2010)); *id.* at H7891-97 (debate on H. Res. 1737). That vote was the culmination of more than two years of investigatory and adjudicatory proceedings by the House Committee on Standards of Official Conduct ("Committee" or "Ethics Committee") concerning allegations that Congressman Rangel had violated applicable standards of official conduct.  Rep. of the Comm. on Standards of Official Conduct, *In the Matter of Rep. Charles B. Rangel*, H. Rep. No. 111-661, vol. I, at 1-3, 6-14 (Nov. 29, 2010) ("Ethics Committee Report"), *available – along with volumes II and III – at* http://ethics.house.gov/committee-

report/matter-representative-charles-b-rangel (detailing Committee's misconduct findings; recommending that House censure Congressman Rangel).[2]

Pursuant to the Journal Clause, U.S. Const. art. I, § 5, cl. 3 ("Each House shall keep a Journal of its Proceedings, and from time to time publish the same . . . ."), a report of the December 2, 2010 floor proceedings concerning Congressman Rangel was included in the House Journal for that day.  *See* Journal of the House of Representatives, 111th Cong., 2d Sess. ¶ 116.25 – .27 (Dec. 2, 2010), attached as Ex. 1.  Subsequently, the House Journal for the relevant time period was printed; hard copies were distributed widely (including to state legislatures, state executives, the State Department, congressional offices, and libraries); and an electronic copy was made available online for download and printing.[3]

Now, more than two after the censure vote, Congressman Rangel seeks to enlist this Court in collaterally attacking that vote, even while tacitly acknowledging that there was "clear and convincing evidence of [his] wrongdoing."  Compl. ¶ 72 (Apr. 22, 2013) (ECF No. 2).  As best we can tell, Congressman Rangel asserts that:

- certain constitutional protections applied to him in the Rangel disciplinary proceedings, *id*. ¶ 74 (referring to "[d]ue process and fundamental constitutional

---

[2]  Short of expulsion, censure was then, and still is, the most severe form of discipline the House may impose on one of its Members.  *See* Rule 24(e), Rules of the Committee on Standards of Official Conduct (111th Cong.) ("111th Ethics Committee Rules"), *available at* http://ethics.house.gov/sites/ethics.house.gov/files/111th_Rules_Amended_June_2009.pdf; Rule 24(e), Rules of the Committee on Ethics (113th Cong.), *available at* http://ethics.house.gov/sites/ethics.house.gov/files/Committee%20Rules%20for%20113th%20Congress.pdf

[3]  *See* 44 U.S.C. § 713 ("There shall be printed of the Journals of the Senate and House of Representatives . . . copies, which shall be distributed as [specified].");  Rule II.2(c)(4), Rules of the House of Representatives (111th Cong.) ("111th House Rules"), *available at* http://clerk.house.gov/legislative/Rules111/111th.pdf ("The Clerk shall – . . . send a copy of the Journal to the executive of and to each branch of the legislature of every State as may be requested by such State officials.");  U.S. Gov't Printing Office, Additional Government Publications, http://www.gpo.gov/fdsys/browse/collection.action?collectionCode=GPO&browsePath=Journal+of+the+House+of+Representatives%2F2010&isCollapsed=false&leafLevelBrowse=false&isDocumentResults=true&ycord=398 (last visited July 9, 2013) (scroll to "Journal of the House of Representatives"; select "2010").

rights, including the right to confrontation, cross-examination and a fair trial");

- applicable House and Ethics Committee Rules afforded him those constitutional protections, *id*. ¶ 37;[4]

- compliance with applicable House and Ethics Committee Rules was a predicate to the House's imposition of discipline on him, *id*. ¶¶ 57, 96, 100;[5]

- some Defendants did not follow the Rules, *see id*. ¶¶ 5, 12-26;[6]

- he, therefore, has a justiciable cause of action to seek, in effect, to have his censure set aside, *id*. ¶ 100 (requesting specific declaration that, while grammatically incoherent, contemplates some statement that Congressman's rights were violated); *id*. ¶ 103 (seeking injunction requiring "Defendants to take all necessary steps to vacate, strike and remove the recording of censure, as voted on by the House and as set forth in The Journal"); *id*. ¶ 108 (seeking "Order or Writ in the nature of mandamus" requiring Speaker and Clerk of the House "to cause to be removed

---

[4] *See also* Letter from Jay Goldberg, Esq., to the Hon. Jo Bonner, Chairman, the Hon. Linda T. Sanchez, Ranking Member, and Dan Schwager, Chief Counsel/Staff Director, Comm. on Ethics at 1, 2 (Oct. 14, 2011) ("October 14 Goldberg Letter") (Ex. J to Compl.) ("The Rules [themselves] are not the subject of any dispute, for they do not ignore Constitutional limitations or violate fundamental rights. . . . [The Rules] are accepted as consistent with due process and fundamental rights."); Letter from Jay Goldberg, Esq., to the Hon. Jo Bonner, Chairman, the Hon. Linda T. Sanchez, Ranking Member, and Dan Schwager, Chief Counsel/Staff Director, Comm. on Ethics at 1 (Oct. 28, 2011) ("October 28 Goldberg Letter") (Ex. J to Compl.) ("We have never challenged the Rules of Proceedings . . . ."); Letter from Jay Goldberg, Esq., to the Hon. Jo Bonner, Chairman, the Hon. Linda T. Sanchez, Ranking Member, and Dan Schwager, Chief Counsel/Staff Director, Comm. on Ethics at 1 (Oct. 31, 2011) ("October 31 Goldberg Letter") (Ex. J. to Compl.) ("[T]he Rules of [the House's] Proceedings were proper and met the test of fundamental fairness and Due process . . . .").

[5] *See also* Oct. 14 Goldberg Letter at 1 ("Adherence to the[] Rules is a pre-requisite to the imposition of any punishment of [the House's] Members."); Oct. 31 Goldberg Letter at 1 ("Adherence to the Rules is a constitutional prerequisite to any discipline.").

[6] *See also* Oct. 14 Goldberg Letter at 5 ("Rules of the [House's] Proceedings were not followed . . . ."); Oct. 28 Goldberg Letter at 1 ("Committee staff, in effect, broke the law by acting in violation of the Rules of Proceedings."); Oct. 31 Goldberg Letter at 1 ("Our claim is that . . . there was a breach of the said Rules by some Members of the Adjudicatory Subcommittee.").

from The Journal of the House's Proceedings, any reference to the fact that Plaintiff had been censured").

In collaterally attacking the censure vote, the Congressman has not sued the institution that actually censured him.  Instead, he has sued (i) the current Speaker and Clerk of the House, *id.* ¶¶ 9-11; (ii) the Chairwoman and Ranking Member of the Ethics Committee during the 111th Congress (Congresswoman Zoe Lofgren and Congressman Jo Bonner, respectively), *id.* ¶¶ 12, 13; (iii) four of the eight other Members of the Ethics Committee during the 111th Congress (Congressmen Michael T. McCaul, K. Michael Conaway, Charles W. Dent, and Gregg Harper), *id.* ¶¶ 21-26; and (iv) three staffers who worked for the Ethics Committee during the 111th Congress (R. Blake Chisam, C. Morgan Kim, and Stacey Sovereign), *id.* ¶¶ 14-20.

The Complaint is specious, and the Court should dismiss it forthwith for the following reasons.  *First*, the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1 ("for any Speech or Debate in either House, they [Senators and Representatives] shall not be questioned in any other Place"), renders each Defendant absolutely immune from suit.  *Second*, Congressman Rangel's claims raise non-justiciable political questions.  *Third*, Congressman Rangel lacks Article III standing.  Fourth, the Complaint fails to state a claim upon which relief can be granted.  *Fifth*, even if the Court did have jurisdiction (which it does not), and even if the Complaint did state a claim (which it does not), the Court should exercise its discretion to not reach the merits.

## LEGAL FRAMEWORK

Pertinent constitutional provisions and pertinent House and Ethics Committee Rules are set forth in the Addendum.

## FACTUAL BACKGROUND

**I.  Misconduct Allegations Concerning Congressman Rangel.**  Beginning in 2008, while Congressman Rangel was serving as Chairman of the House Ways and Means Committee,

several national newspapers ran stories that questioned his conduct.  For example, in July 2008, the New York Times reported:

> Mr. Rangel . . . uses [one of four rent-stabilized apartments in upper Manhattan] . . . as a campaign office, despite state and city regulations that require rent-stabilized apartments to be used as a primary residence. . . .  Mr. Rangel . . . paid a total rent of $3,894 monthly in 2007 for the four apartments . . . .  The current market-rate rent for similar apartments in Mr. Rangel's building would total $7,465 to $8,125 a month . . . .

David Kocieniewski, *For Rangel, Four Rent-Stabilized Apartments*, New York Times (July 11, 2008), *available at*

http://www.nytimes.com/2008/07/11/nyregion/11rangel.html?_r=0&pagewanted=print.

Later that same month, the Washington Post reported:

> [Chairman] Rangel is soliciting donations from corporations with business interests before his panel, hoping to raise $30 million for a new academic center that will house his papers when he retires. [He] has penned letters on congressional stationery and has sought meetings to ask for corporate and foundation contributions for the Charles B. Rangel Center for Public Service at the City College of New York . . . .

Christopher Lee, *Rangel's Pet Cause Bears His Own Name*, Washington Post (July 15, 2008), *available at* http://www.washingtonpost.com/wp-dyn/content/article/2008/07/14/AR2008071402546.html.

The next month the New York Post reported:

> For 20 years, [Congressman] Rangel has owned a beachfront villa in a sun-drenched Dominican Republic resort, yet has only sporadically declared income on the property in federal filings. While the villa was rented to paying guests for the past two years, for instance, Rangel reported no income from it in 2006 and 2007. . . .  [He] owns "casita" No. 412 on the Caribbean Sea at the Punta Cana Hotel on the lush eastern tip of the country . . . . But Rangel's financial disclosure forms, which Members of Congress must file annually to the clerk of the House of Representatives, checks "none" for income from the property for 2006 and 2007.

Isabel Vincent & Susan Edelman, *Tricky Charlie's Carib "Hideaway,"* New York Post (Aug. 31, 2008), *available at*

http://www.nypost.com/f/print/news/international/item_cXe9yAZie9WuqSWasoovZI#axzz2Wb3 KVGT3.

> And, in September 2008, the New York Post further reported:

> > [Congressman Rangel] was . . . hit with a flood of questions after The Post reported that he had failed to disclose in his federal filings income that he'd earned from renting out the luxury villa in the Dominican Republic, which he has owned for 20 years.  He was forced to admit that he never paid taxes on $75,000 in rental income he'd received on the property over 20 years.

Daphne Retter, *Big Wheel Benz the Rules*, New York Post (Sept. 18, 2008), *available at*

http://www.nypost.com/f/print/news/regional/item_muRKo9Cq7sP0ZMSULGyw4I#axzz2Wb3K VGT3.[7]

**II.  Investigative Subcommittee Proceedings.**  In response, Congressman Rangel asked the Ethics Committee to investigate the allegations that had been leveled against him.  *See* Ethics Comm. Rep., vol. I, at 258, 266, 644.[8]  The Committee acceded to that request.  On September 24, 2008 (during the 110th Congress), it established a four-Member investigative subcommittee ("Rangel-ISC") consisting of two Members each from the majority and minority parties: Defendant Bonner and Congressmen Gene Green, Robert Scott and Doc Hastings.  *See id.* at 258,

---

[7]  We note these articles only to provide the Court with necessary context for the Ethics Committee and House actions about which the Congressman complains.  *See, e.g., Magritz v. Ozaukee Cnty.*, 894 F. Supp. 2d 34, 40 n.1 (D.D.C. 2012) ("For the purposes of background, the Court takes judicial notice of several news articles"); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) ("Judicial notice may be taken at any stage of the proceeding."; "[A] court may consider the contents of relevant public . . . documents.").

[8]  The Ethics Committee Report, as well as other House and Committee documents referred to in this Memorandum, are publicly available government documents and, accordingly, may be considered by the Court in ruling on the Motion to Dismiss.  *See, e.g., Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) ("The district court may take judicial notice of public records and may thus consider them on a motion to dismiss." (citing *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 802-03 (8th Cir. 2002))).

428-29; *see generally* Addendum ("Add.") at A-2-5  (setting forth rules applicable to investigative subcommittees).[9]

In February 2009, shortly after the commencement of the 111th Congress, the Committee reauthorized an investigative subcommittee to continue the Rangel investigation begun in the prior Congress, and it reappointed the same four Members to the Rangel-ISC for the 111th Congress. *See* Statement of the Chair and Ranking Republican Member of the [Ethics] Committee (Feb. 10, 2009), *available at*

http://ethics.house.gov/sites/ethics.house.gov/files/documents/press_statement_rangel_subcomm_2009.pdf.

On June 17, 2010, the Rangel-ISC – after (i) conducting "49 formal interviews of 41 witnesses [including of Congressman Rangel], as well as additional informal interviews," Ethics Comm. Rep., vol. I, at 145, (ii) reviewing "over 28,000 pages of documents and testimony," *id.* at 145, 267, 284, and (iii) holding "more than 60 investigative subcommittee meetings," *id.* – adopted a 13-count Statement of Alleged Violation ("SAV"), *id.* at 287, 428.  The SAV

> relate[d] to four general subject matters:  (1) solicitations and donations to the Rangel Center . . . ; (2) errors and omission on [Congressman Rangel]'s Financial Disclosure Statements; (3) use of a rent-stabilized residential apartment by [Congressman Rangel]'s campaign committees; and (4) failure to report and pay taxes on rental income on [Congressman Rangel]'s Punta Cana beach villa.

*Id.* at 147, 267.  One Rangel-ISC Member (Congressman Scott) dissented in part.  *See id.* at 506-09, 512-79.

---

[9]  At the time the Rangel-ISC was established, Congressmen Green and Bonner were Committee Members, while Congressmen Scott and Hastings are not; they were chosen to serve on the Rangel-ISC pursuant to Rule X.5(a)(4)(A), Rules of the House of Representatives (110th Cong.), *available at* http://www.webharvest.gov/congress110th/20081212012112/http://www.rules.house.gov/ruleprec/110th.pdf and Rule 19(a), Rules of the Committee on Standards of Official Conduct (110th Cong.), *available at* http://ethics.house.gov/sites/ethics.house.gov/files/110th%20Committee%20Rules.pdf.

**III.  Adjudicatory Subcommittee Proceedings.**  On July 22, 2010, the Rangel-ISC transmitted the SAV to the full Committee, *see* Ethics Comm. Rep., vol. I, at 144, 259, and, that same day, Defendant (and Committee Chairwoman) Lofgren, pursuant to Committee Rule 23(a), designated an adjudicatory subcommittee ("Rangel-ASC") to consider the SAV.  The Rangel-ASC was composed of Defendants Lofgren, McCaul, Conaway, Dent, and Harper, and three additional Committee Members not named as defendants here (Congressmen G.K. Butterfield and Peter Welch, and Congresswoman Kathy Castor).  *Id.* at 357.  Like the Rangel-ISC, the Rangel-ASC was divided evenly between majority and minority party Members.  *See generally* Add. at A-4-5 (setting forth rules applicable to adjudicatory subcommittees).

The Rangel-ASC organized itself on July 29, 2010, *see* Ethics Comm. Rep., vol. I, at 255-335, and, on October 7, 2010, announced that it would hold an adjudicatory hearing on November 15, 2010, *see id.* at 6, 394, 397.  On October 12, 2010, Defendant (and Rangel-ASC Chairwoman) Lofgren sent a letter to Congressman Rangel that (i) confirmed the hearing date; (ii) committed to providing the Congressman, by October 19, 2010, with the evidence the Rangel-ASC planned to consider at the hearing; (iii) affirmed that the Congressman's objections, if any, to the consideration of that evidence, and his designation of additional evidence for Rangel-ASC consideration, if any, were due by October 26, 2010; and (iv) described in detail various hearing procedures and process protections for the Congressman.  *See id.* at 363-67.

After certain schedule adjustments, *see, e.g.*, *id.* at 370-74, the Rangel-ASC, on October 22, 2010, provided to Congressman Rangel the evidence it planned to consider at the adjudicatory hearing, *see id.* at 407-15, 456-57; *see also id.* at 418-25 (notifying Congressman of limited additional, exculpatory evidence and Rangel-ASC's intention to offer affidavits rather than live testimony from certain witnesses).  Congressman Rangel did not object to any of the evidence

provided to him or to the procedures specified, nor did he designate any additional evidence for

Rangel-ASC consideration.  *See id.* at 456-57.

On November 15, 2010, at the commencement of the adjudicatory hearing, Rangel-ASC

Chairwoman Lofgren provided the following overview of the proceeding:

> The role of an adjudicatory subcommittee is to determine at a
> hearing whether any count of the Statement of Alleged Violation has
> been proven by clear and convincing evidence.  The purpose of this
> adjudicatory hearing is to do that.  *However, it is important to bear
> in mind that the proceeding is a hearing, not a trial.*  Attorneys from
> the committee's nonpartisan professional staff are the moving party
> in these proceedings.  Their role is to make a case for the Statement
> of Alleged Violation adopted by the investigative subcommittee.  At
> the adjudicatory hearing, the burden of proof rests with committee
> counsel to establish the facts alleged in each count of the Statement
> of Alleged Violation by clear and convincing evidence.
>
> Representative Rangel will have an opportunity to present his side
> of the story should he wish to do so.  A respondent is not required to
> present a case in his defense.  And should Representative Rangel
> choose not to present a case, the subcommittee will not and may not
> draw a negative inference from that fact.

*Id.* at 429-30 (emphasis added).  In response, Congressman Rangel made a statement regarding his

appearance at the hearing without counsel, at the conclusion of which he declined to move to

continue the hearing.  *See id.* at 435-42.  The Rangel-ASC then considered on its own whether to

continue the matter, but ultimately decided the proceedings should move forward.  *See id.* at 447-

53.  In the midst of that discussion, Congressman Rangel left the hearing and did not return, *id.* at

446-47, at which point Rangel-ASC Chairwoman Lofgren commented as follows:

> We recognize that Mr. Rangel has indicated that he does not intend
> to participate, and it is his right not to participate in this matter.  As
> mentioned earlier, no conclusion as to the fact of this matter can be
> drawn by the fact that Mr. Rangel has decided not to participate in
> this hearing.

*Id.* at 450.

The Rangel-ASC then approved the introduction of certain evidence, *see id*. at 454-55, and, after questioning Committee counsel, determined that the record contained "no genuine issue of material fact with respect to any of the counts in the [SAV]," *id.* at 456-99.  It then returned to executive session to consider the SAV in light of the record evidence.  *See id.* at 7, 398, 499, 604.

The next day, November 16, 2010, the Rangel-ASC determined that 11 of the 13 counts in the SAV – Counts I-II, IV, and VI-XIII – were established by "clear and convincing evidence." *Id*. at 2, 6-14, 396-405, 603-08; *see also id.* at 1 (summarizing Rangel-ASC conclusions regarding Congressman Rangel's violations of "House Rules, the Code of Ethics for Government Service, New York city and state laws and regulations, federal laws, and other applicable standards," all in connection with "his solicitation of donations on behalf of the City College of New York for the Rangel Center for Public Service, his use of a rent-stabilized apartment for his campaign committees, and his failure to file accurate Financial Disclosure Statements and federal tax returns in numerous years").  Later that same day, the Rangel-ASC sent its report, including its conclusions, to the full Committee.  *See id.* at 396-405.

**IV.  Ethics Committee Sanction Hearing.**  On November 18, 2010, the full Committee held a hearing to consider what sanction, if any, to recommend that the House adopt in light of the Rangel-ASC's determinations.  *See id*. at 2, 616-89.  Congressman Rangel and Committee counsel presented arguments, and Committee Members questioned both.  *See id.*  The Committee then adopted, by a vote of 9-1, its proposed sanction (censure) and an accompanying report.  *See id.* at 2, 680-81.  On November 29, 2010, the Committee submitted to the full House its proposed sanction in the form of a proposed resolution (H. Res. 1737), along with an accompanying report (the Ethics Committee Report).  *See id.* at III.

**V.  House Floor Proceedings on Censure Resolution.**  On December 2, 2010, the full House took up H. Res. 1737, which provided as follows:

> *Resolved*, That (1) Representative Charles B. Rangel of New York
> be censured; (2) Representative Charles B. Rangel forthwith present
> himself in the well of the House for the pronouncement of censure;
> (3) Representative Charles B. Rangel be censured with the public
> reading of this resolution by the Speaker; and (4) Representative
> Rangel pay restitution to the appropriate taxing authorities or the
> U.S. Treasury . . . .

156 Cong. Rec. H7891 (daily ed. Dec. 2, 2010). Defendant (and Committee Chairwoman)

Lofgren opened the debate, summarizing the case against Congressman Rangel as follows:

> In this matter, we found that Representative Rangel engaged in
> misconduct in four areas.
>
> Mr. Rangel improperly solicited individuals and entities with
> businesses and interest[s] before the House to fund the Charles B.
> Rangel Center for Public Service at City College of New York. He
> misused official resources to make these solicitations for millions of
> dollars. He improperly solicited funds from lobbyists.
>
> He failed to file full and complete financial disclosure statements for
> 10 years.
>
> He accepted a favor or benefit related to his use of a residential,
> rent-stabilized apartment as a campaign office under circumstances
> that created an appearance of impropriety.
>
> He failed to report and pay taxes for years on income he received
> from a property he owns in the Dominican Republic.

*Id*. Defendant (and Committee Ranking Member) Bonner also spoke during the debate in favor of

the resolution, as did Defendant McCaul and Congressman Doc Hastings (both Members of the

Rangel-ISC), *see id*. at H7892-93.

Congressman Rangel spoke against the resolution, *id*. at H7893, as did several other

Members including Congressman Scott (a Member of the Rangel-ISC), Congressman Butterfield

(a Member of the Rangel-ASC), Congresswoman Lynn Woolsey, and Congressmen Peter King,

John Tanner, Leonard Boswell, Charles Gonzalez, and Jerrold Nadler. *See id*. at H7893-96. None

of these Members, including Congressman Rangel himself, denied that the misconduct the

Rangel-ASC determined had occurred, had in fact occurred.  Rather, each pressed for a lesser form of discipline known as a reprimand.  *See id*.

At the conclusion of the debate, the House defeated an amendment offered by Congressman Butterfield which, in pertinent part, would have substituted "be reprimanded" for "be censured" in H. Res. 1737.  *See id*. at H7897-98 (amendment defeated by vote of 146-267).  The House then voted 333-79 to adopt H. Res. 1737.  *See id*. at H7898-99.  Pursuant to H. Res. 1737, Congressman Rangel then stood in the well of the House and then-Speaker Nancy Pelosi read the text of the Resolution.  *See id.* at H7899.

**VI.  Approval of the Journal.**  Following the conclusion of floor proceedings on December 2, 2010, the Clerk, in the normal course of her duties, prepared a report of that day's proceedings for inclusion in the House Journal, and the Office of the House Parliamentarian, in the normal course of its duties, reviewed that report for parliamentary accuracy.  The report included a description of the proceedings regarding the House's censure of Congressman Rangel.  *See* Journal of the House of Representatives ¶ 116.25 – .27 (Dec. 2, 2010) (Ex. 1).

On December 3, 2010, Speaker pro tempore Eliot L. Engel approved the Journal.  *See* 156 Cong. Rec. H8033 (daily ed. Dec. 3, 2010) ("The SPEAKER pro tempore. The Chair has examined the Journal of the last day's proceedings and announces to the House his approval thereof.  Pursuant to clause 1, rule I, the Journal stands approved.").  Although any Member could have called for a vote on the approval of the Journal, none did, as a result of which the approval was deemed agreed to.  *See* 111th House Rules, Rule I.1.

**VII.  Post-Censure Proceedings.**  In July 2011, a memorandum written by Defendant Chisam became public.  *See, e.g.*, John Bresnahan, *Did ethics staff taint Maxine Waters Probe?*, Politico (July 18, 2011), *available at* http://www.politico.com/news/stories/0711/59225.html.  The Chisam Memorandum (Ex. A to Compl.) is not dated but its content – which principally concerns

certain alleged staff communications in the Rangel disciplinary matter and another disciplinary

matter concerning Congresswoman Maxine Waters – suggests that it was written in late November

2010 when Chisam was the Ethics Committee Staff Director/Chief Counsel.  The Chisam

Memorandum does not concern the evidence considered by the Rangel-ASC.[10]  Shortly thereafter,

on August 9, 2011, Congressman Rangel, exclusively on the basis of the Chisam Memorandum,

moved the Committee to "withdraw its actions" in the Rangel disciplinary matter.  Combined

Affirmation Mem. of Law at 1 (Aug. 9, 2011) (Ex. G to Compl.).[11]

On December 19, 2012, the Committee rejected Congressman Rangel's arguments:

> After careful consideration and discussion with the full Committee,
> it is the unanimous opinion of the Committee that there is no legal or
> factual basis supporting a conclusion that you have been deprived of
> any constitutional rights in your proceedings before the [Ethics]
> Committee . . . or the entire House of Representatives in the One
> Hundred and Eleventh Congress.  Nor is there any basis upon which
> the current Committee on Ethics believes that any further comment
> or action related to your closed matter is warranted by the
> Committee.

Letter from the Hon. Jo Bonner, Chairman, and the Hon. Linda T. Sanchez, Ranking Member,

Comm. on Ethics at 1 (Dec. 19, 2012) (Ex. I to Compl.).

Congressman Rangel never has sought relief from the full House, even though there is

precedent for such relief.  *See* 4 Asher C. Hinds, Hinds' Precedents § 2792 (1907) ("Hinds'

---

[10]  On July 19, 2011, the Ethics Committee retained an outside attorney to consider certain issues raised by Congresswoman Waters in connection with the Waters disciplinary proceeding.  *See* William R. Martin & Kerry Brainard Verdi, Rep. of the Outside Counsel to the Comm. on Ethics in the Matter of Representative Maxine Waters at 12-13 (Sept. 25, 2012) ("Martin Report"), *available at* http://ethics.house.gov/sites/ethics.house.gov/files/Appendix%20B%20Report%20of%20the%20Outside%20Counsel.pdf.  The Martin Report addressed, among other issues, the issue raised by the staff communications referred to in the Chisam Memorandum.  *See id.* at 13, 51-60.

[11]  *See also* Letter from Jay Goldberg, Esq., to the Hon. Jo Bonner, Chairman, the Hon. Linda T. Sanchez, Ranking Member, and Dan Schwager, Chief Counsel/Staff Director, Comm. on Ethics (Aug. 22, 2011) (Ex. J to Compl.); Letter from Jay Goldberg, Esq., to Dan Schwager, Chief Counsel/Staff Director, Comm. on Ethics (Sept. 23, 2011) (Ex. J to Compl.); Oct. 14 Goldberg Letter; Oct. 28 Goldberg Letter; Oct. 31 Goldberg Letter.

Precedents") (43rd Congress adopted resolution rescinding 37th Congress's censure of Rep. Simon Cameron and ordering words "rescission" entered in Journal's margin); *id.* § 2793 (44th Congress adopted resolution rescinding 43rd Congress's censure of Rep. John Young Brown).

**VIII.  Congressman Rangel's Committee Service and Electoral Successes.**  On March 3, 2010, while the Rangel-ISC investigation was underway, Congressman Rangel stepped down as Chairman of the Ways and Means Committee,[12] although he remained a Member of that committee.  On November 2, 2010, the Congressman was reelected to a seat in the 112th Congress (Jan. 3, 2011 – Jan. 3, 2013),[13] during which he again served as a Member of the Ways and Means Committee, *see* H. Res. 31, 112th Cong. (2011), as well as the Joint Committee on Taxation.[14]  On November 6, 2012, the Congressman was reelected to a seat in the 113th Congress (Jan 3, 2013 – Jan. 3, 2015),[15] during which he again is serving as a Member of the Ways and Means Committee, *see* H. Res. 7, 113th Cong. (2013), as well as the Joint Committee on Taxation.[16]  The Congressman's congressional website states that "[a]s a senior member of the Commit[t]ee [on Ways and Means] and the Joint Committee on Taxation, [the Congressman] continues to wield influence over tax revenue legislation and oversight authority over the major issues of the day –

---

[12]  *See* Letter from the Hon. Charles B. Rangel to the Hon. Nancy Pelosi (Mar. 3, 2010), *available at* http://i2.cdn.turner.com/cnn/2010/images/03/03/0032.rangel.pdf.

[13]  *See* Karen L. Haas, Clerk, Statistics of the Congressional Election of Nov. 2, 2010 at 34 (Corrected to June 3, 2011), *available at* http://history.house.gov/Institution/Election-Statistics/2010election/.

[14]  *See* 26 U.S.C. § 8002(a)(2); Karen L. Haas, Clerk, Final Edition, List of Standing Comms. . . Together with Joint Comms. of the Congress . . ., One Hundred Twelfth Congress at 45 (112th Cong.) (Dec. 27, 2012), *available at* http://historycms.house.gov/WorkArea/DownloadAsset.aspx?id=15032389213.

[15]  *See* Karen L. Haas, Clerk, Statistics of the Presidential & Congressional Election of Nov. 6, 2012 at 43, 45 (Corrected to Feb. 28, 2013), *available at* http://history.house.gov/Institution/Election-Statistics/2012election/.

[16]  *See* 26 U.S.C. § 8002(a)(2); Karen L. Haas, Clerk, List of Standing Comms. . . Together with Joint Comms. of the Congress . . ., One Hundred Thirteenth Congress at 44 (113th Cong.) (June 5, 2013), *available at* http://clerk.house.gov/committee_info/scsoal.pdf.

economic policy, international trade, welfare, Social Security, Medicare, and health care."  Rep.

Charles Rangel, Comms. & Caucuses, http://rangel.house.gov/about-me/committees-and-caucuses

(last visited July 9, 2013).

## ARGUMENT

The Complaint should be dismissed for lack of subject matter jurisdiction (Section I, II and

III below),[17] for failure to state a claim (Section IV below),[18] and in the exercise of the Court's

discretion (Section V below).

## I.     Defendants Are Immune from Suit Under the Speech or Debate Clause.

### A.     Brief Overview of Speech or Debate Clause Law.

#### 1.     History and Purpose of the Clause.

The Speech or Debate Clause is rooted in the epic struggle for parliamentary independence

in 16th- and 17th-century England:  "Behind these simple phrases lies a history of conflict

between the Commons and the Tudor and Stuart monarchs during which successive monarchs

utilized the criminal and civil law to suppress and intimidate critical legislators.  *United States v.*

*Johnson*, 383 U.S. 169, 178 (1966).

> As Parliament achieved increasing independence from the Crown, its statement of the privilege grew stronger. . . . In 1689, the Bill of Rights declared in unequivocal language: "That the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament."

---

[17]  With respect to the Rule 12(b)(1) aspect of the Motion to Dismiss, Congressman Rangel bears the burden of persuasion.  *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Ctr. for Biological Diversity v. Jackson*, 815 F. Supp. 2d 85, 89 (D.D.C. 2011).  Moreover, in 12(b)(1) proceedings, it has been long accepted that the judiciary may make 'appropriate inquiry' beyond the pleadings to 'satisfy itself on authority to entertain the case.'"  *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) (quoting *Gordon v. Nat'l Youth Work Alliance*, 675 F.2d 356, 362-63 (D.C. Cir. 1982)).

[18]  With respect to the Rule 12(b)(6) aspect of the Motion to Dismiss, the Court must determine whether the Congressman has pled "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), which means "more than a sheer possibility that a defendant has acted unlawfully," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

*Tenney v. Brandhove*, 341 U.S. 367, 372 (1951) (citations omitted).  As a result of the English experience, "[f]reedom of speech and action in the legislature was taken as a matter of course" by the Founders, and reflected in the Speech or Debate Clause.  *Id.*

> The purpose of the Clause
>
>> is to insure that the legislative function the Constitution allocates to Congress may be performed independently.
>> . . . .
>> [T]he "central role" of the Clause is to "prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary . . . ."

*See, e.g.*, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975) (quoting *Johnson*, 383 U.S. at 181, and *Gravel v. United States*, 408 U.S. 606, 617 (1972)).  "In the American governmental structure the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders."  *Johnson*, 383 U.S. at 178; *see also United States v. Helstoski*, 442 U.S. 477, 491 (1979).

Because "the guarantees of th[e Speech or Debate] Clause are vitally important to our system of government," they "are entitled to be treated by the courts with the sensitivity that such important values require."  *Helstoski v. Meanor*, 442 U.S. 500, 506 (1979).  Accordingly, the Supreme Court has mandated that the courts "[w]ithout exception . . . read the Speech or Debate Clause broadly to effectuate its purposes."  *Eastland*, 421 U.S. at 501.  *See also Gravel*, 408 U.S. at 624; *Doe v. McMillan*, 412 U.S. 306, 311 (1973); *Johnson*, 383 U.S. at 179; *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880).

**2.      Scope of the Clause.**

The protections afforded to Members by the Speech or Debate Clause apply to all activities "within the 'legislative sphere,'" *McMillan*, 412 U.S. at 312 (quoting *Gravel*, 408 U.S. at 624-25), which includes all activities that are

> "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation *or with respect to other matters which the Constitution places within the jurisdiction of either House*."

*Eastland*, 421 U.S. at 504 (quoting *Gravel*, 408 U.S. at 625) (emphasis added).  This "scope" definition has two parts.

*First*, the definition makes clear that the protections of the Clause apply both (i) to the quintessentially legislative activity of "consideration and passage or rejection of proposed legislation," *and* (ii) to "other matters which the Constitution places within the jurisdiction of either House."  These "other matters which the Constitution places within the jurisdiction of either House" include Discipline Clause activities, U.S. Const. art. I, § 5, cl. 2;[19] Rulemaking Clause activities, *id.*;[20] Advice and Consent Clause activities, *id.* art. II, § 2, cl. 2;[21] and activities in furtherance of the Impeachment Clauses, *id.* art. I, § 2, cl. 5,[22] and § 3, cl. 6.[23]

---

[19]  *See, e.g.*, *In re Grand Jury Subpoenas*, 571 F.3d 1200, 1205 (D.C. Cir. 2009); *Ray v. Proxmire*, 581 F.2d 998, 1000 (D.C. Cir. 1978); Mem. Op. at 8, *Boehner v. McDermott*, No. 98-cv-0594 (D.D.C. Aug. 20, 2002) (ECF No. 53) (Hogan, C.J.), attached as Ex. 2 ("[O]ne such [other] matter is enforcement of standards of conduct [which] is placed within the exclusive jurisdiction of the two houses of Congress by the Rulemaking and Discipline Clauses . . . ."); Order at 2-3, *United States v. Hansen*, No. 1:83-cr-00075 (D.D.C. Mar. 9, 1984), attached as Ex. 3; *FEC v. Wright*, 777 F. Supp. 525, 530 (N.D. Tex. 1991); *United States v. Eilberg*, 465 F. Supp. 1080, 1083 (E.D. Pa. 1979); Order at 1 n.**, *United States v. McDade*, No. 92-cr-249 (E.D. Pa. June 5, 1996), *rev'd on other grounds*, Order, No. 96-1508 (3d Cir. July 12, 1996), attached collectively as Ex. 4; *United States v. Durenberger*, No. 3-93-65, 1993 WL 738477, at *2-3 (D. Minn. Dec. 3, 1993).

[20]  *See, e.g.*, *Consumer's Union of U.S., Inc. v. Periodical Correspondent's Ass'n*, 515 F.2d 1341, 1347-50 (D.C. Cir. 1975); *CNN v. Anderson*, 723 F. Supp. 835, 839-42 (D.D.C. 1989); *Schreibman v. Holmes*, No. 1:96-cv-1287, 1997 WL 527341, at *3-4 (D.D.C. Aug. 18, 1997); *Pettingell v. Exec. Comm. of Correspondents*, No. 1:85-cv-2742, 1986 WL 8569, at *1-2 (D.D.C. Mar. 31, 1986).

[21]  *See, e.g.*, Report and Recommendation of U.S. Magistrate, *Lee v. Biden*, No. 88-2090 (C.D. Cal. July 15, 1988), attached as Ex. 5 (Supreme Court appointment); *Smith v. Eagleton*, 455 F. Supp. 403, 405 (W.D. Mo. 1978) (treaty ratification).

[22]  *See, e.g.*, *In re Req. for Access to Grand Jury Materials*, 833 F.2d 1438, 1446 (11th Cir. 1987) ("The Speech [or] Debate Clause prevents us from questioning Congress about actions taken in the impeachment process.").

[23]  *See, e.g.*, *Hastings v. U.S. Senate, Impeachment Trial Comm.*, 716 F. Supp. 38, 42 (D.D.C.), *aff'd*, 887 F.2d 332 (D.C. Cir. 1989); Order, *Pietrangelo v. U.S. Senate*, No. 1:99-cv- 323 (N.D. Ohio Mar.

(*Continued . . .* )

*Second*, the definition makes clear that protected activities include all those activities that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings." While "delivering an opinion, uttering a speech, [and] haranguing in debate," *Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 10-11 (D.C. Cir. 2006), clearly are covered, the courts have broadly construed the Clause to include much more than just words spoken in debate. The cases "have plainly not taken a literalistic approach in applying the privilege." *Gravel*, 408 U.S. at 617. Committee investigations and hearings – including the issuance of subpoenas and the introduction of materials at Committee hearings – are aspects of the "deliberative and communicative processes" protected by the Clause, *Eastland*, 421 U.S. 491; *Fields*, 459 F.3d at 10-11, as is information gathering because "'[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change,'" *Eastland*, 421 U.S. at 504 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927)); as are such other matters as drafting and introducing bills and resolutions, voting on bills and resolutions, negotiating with other Members regarding bills and resolutions, and preparing and using legislative reports. *Fields*, 459 F.3d at 10-11; *Jewish War Veterans of the U.S.A., Inc. v. Gates*, 506 F. Supp. 2d 30, 53 (D.D.C. 2007).

Consistent with a broad construction of "legislative activity," the privilege also extends to preparations for specific protected activities. *See, e.g.*, *Gravel*, 408 U.S. at 629 (Speech or Debate Clause precluded questioning "concerning any act . . . performed by the Senator, or by his aides in the course of their employment, in preparation for the subcommittee hearing."); *Johnson*, 383 U.S.

---

17, 1999), *aff'd*, No. 99-3415 (6th Cir. Mar. 31, 2000), attached collectively as Ex. 6; Order Adopting Findings, Conclusions and Recommendations of U.S. Magistrate Judge, *Carnessale v. U.S. Senators Alan Cranston & Pete Wilson*, No. 90-5245 (C.D. Cal. Jan. 25, 1991), attached as Ex. 7.

at 173-76 (Speech or Debate privilege precluded inquiring into the motivations for, preparation of, and ingredients of speech delivered by Member on House floor); *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 861 (D.C. Cir. 1988) ("preparation of the statement for publication in the subcommittee report was part of the legislative process").

Finally, the Speech or Debate Clause also protects "'against inquiry into . . . the motivation for [legislative] acts.'" *Helstoski*, 442 U.S. at 489 (quoting *United States v. Brewster*, 408 U.S. 501, 525 (1972)); *see also Brewster*, 408 U.S. at 538 (whether legislative activity improperly motivated "'is precisely what the Speech or Debate Clause generally forecloses from executive and judicial inquiry'") (quoting *Johnson*, 383 U.S. at 180); *Johnson*, 383 U.S. at 184-85 (inquiry into Member's motives for engaging in legislative activities "necessarily contravenes the Speech or Debate Clause"); *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 530 (9th Cir. 1983) (Clause bars "questions about [Member's] motive or legislative purpose"); *Gov't of Virgin Islands v. Lee*, 775 F.2d 514, 522 (3d Cir. 1985) (same); *United States v. Dowdy*, 479 F.2d 213, 226 (4th Cir. 1973) (same).

### 3.    Protections of the Clause.

The Clause provides three broad protections to those to whom it applies. *First*, it renders Members immune from suits that are predicated on activities that fall "within the 'legislative sphere,' . . . even though the[] conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." *McMillan*, 412 U.S. at 312-13 (quoting *Gravel*, 408 U.S. at 624-25); *see also id.* at 311-12 (congressional defendants immune under Speech or Debate Clause from suit which sought damages for alleged invasion of privacy where suit predicated on compilation of House committee investigative report, referral of report to House, and vote for publication of report); *Eastland*, 421 U.S. at 501, 512 (actions of congressional defendants in investigating plaintiff organization and issuing subpoena for its bank

19

records "are protected by the Speech or Debate Clause . . . and [congressional defendants] are therefore immune from judicial interference"; remanding with directions that complaint, which sought to enjoin enforcement of subpoena, be dismissed); *Ray*, 581 F.2d at 1000 (affirming dismissal, on Speech or Debate grounds, of suit that charged Senator with libel where suit predicated on Senator's response to "Senate [Select Committee on Standards and Conduct] inquiry into an exercise of [the Senator's] official powers").

*Second*, the Clause provides a non-evidentiary use privilege that bars civil plaintiffs – and prosecutors in a criminal case – from using "information as to a legislative act" to advance their cases against Members, *Helstoski*, 442 U.S. at 489, 490; *see also Johnson*, 383 U.S. at 173.

*Third*, the Speech or Debate Clause provides a non-disclosure privilege which protects Members from having legislative materials seized from them, and from being compelled to testify about their legislative activities or being compelled to produce legislative documents. *See, e.g.*, *Gravel*, 408 U.S. at 615-16; *Helstoski*, 442 U.S. at 484-86; *United States v. Rayburn House Office Bldg.*, 497 F.3d 654, 660 (D.C. Cir. 2007), *cert. denied*, 128 S. Ct. 1738 (2008); *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 420-21 (D.C. Cir. 1995); *MINPECO,* 844 F.2d at 859-61; *Pentagen Techs. Int'l, Ltd. v. Comm. on Appropriations of U.S. House of Representatives*, 20 F. Supp. 2d 41, 43-44 (D.D.C. 1998), *aff'd*, 194 F.3d 174 (D.C. Cir. 1999) (per curiam).

The Supreme Court draws no distinctions among these three protections. Rather, it has stated unequivocally that when the Speech or Debate Clause applies, it is "absolute." *Eastland*, 421 U.S. at 501, 503, 507, 509-10, 509 n.16; *see also Gravel*, 408 U.S. at 623 n.14.

Importantly for purposes of this case, the protections of the Clause apply "not only to a Member but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself." *Gravel*, 408 U.S. at 618; *see also Eastland*, 421 U.S. at

507; *MINPECO*, 844 F.2d at 862; *Webster v. Sun Co.*, 561 F. Supp. 1184, 1189-90 (D.D.C. 1983), *vacated and remanded on other grounds*, 731 F.2d 1 (D.C. Cir. 1984); *Chapman v. Space Qualified Sys. Corp.*, 647 F. Supp. 551, 553-54 (N.D. Fla. 1986).

*     *     *

As we now show, the immunity-from-suit and non-evidentiary-use components of the Clause both require that Congressman Rangel's claims be dismissed. And, while the non-disclosure-privilege component of the Clause does not mandate dismissal, it would bar Congressman Rangel from taking the discovery he has indicated he wishes to take, even if the case were to survive Defendants' Motion to Dismiss. Finally, we explain why the Congressman's assertion that Defendants' Speech or Debate protections have been waived is incorrect.

> **B.    Defendants Are Immune from Suit Here Because Congressman Rangel's Claims Are Predicated on Conduct to Which the Speech or Debate Clause Plainly Applies.**

All of the alleged conduct of all eleven Defendants, upon which Congressman Rangel's suit is predicated, falls squarely within the "legislative sphere" to which the protections of the Speech or Debate Clause apply; all eleven Defendants therefore are immune from suit.

1. <u>Defendants Chisam, Kim, and Sovereign</u>. Congressman Rangel's claim, as against Defendant Chisam, is predicated on actions Mr. Chisam allegedly took as Ethics Committee Staff Director/Chief Counsel in connection with the proceedings of the Rangel-ASC, in particular, that he did not notify Congressman Rangel "of what had occurred prior to the Sanction Hearing." Compl. ¶ 14. Similarly, Congressman Rangel's claims, as against Defendants Kim and Sovereign, are predicated on actions they allegedly took as Ethics Committee staffers in connection with the

proceedings of the Rangel-ASC, in particular, that they communicated orally and in writing with certain Members of the Rangel-ASC about the Rangel disciplinary matter. *See id.* ¶¶ 18, 20.[24]

In *Eastland*, the plaintiffs sued a Senate subcommittee, individual Senators on the subcommittee, and the subcommittee's Chief Counsel to enjoin implementation of a subcommittee subpoena. 421 U.S. at 495. The Court held that the Subcommittee's investigative activities were within the legislative ambit protected by the Clause, *id.* at 503-07, and that the congressional defendants, therefore, were "immune from judicial interference," *id.* at 501. In so holding, the Court made clear that it "dr[e]w no distinction between the Members and the Chief Counsel. . . . '[T]he day-to-day work of such aides is so critical to the Members' performance that they must be treated as (the Members') alter egos.'" *Id.* at 507 (quoting *Gravel*, 408 U.S. at 616-17). *See also Gravel*, 408 U.S. at 629 (Speech or Debate Clause precluded questioning "concerning any act . . . performed by the [Senator's] aides in the course of their employment, in preparation for the subcommittee hearing."); *MINPECO*, 844 F.2d at 862 (Speech or Debate Clause protected staff activities undertaken in connection with Subcommittee investigation, notwithstanding allegations that staff altered witness statement prior to publication).

---

[24] What matters for purposes of the Court's Speech or Debate analysis is the *actual conduct* of Defendants that is alleged, fairly and neutrally considered, and stripped of Congressman Rangel's characterizations about the lawfulness or propriety of, or the motivation for, that conduct. This is so because the whole point of the Clause is to provide immunity from lawsuits for all actions "within the 'legislative sphere,' . . . *even though the[] conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes.*" *McMillan*, 412 U.S. at 312-13 (emphasis added) (quoting *Gravel*, 408 U.S. at 624-25). If the law were otherwise, the Speech or Debate Clause would have no meaning because every would-be plaintiff who wished to haul a Member, officer, or employee of the Legislative Branch into Court would simply allege that the challenged conduct was unconstitutional, unlawful, or motivated by some unworthy purpose. *See Eastland,* 421 U.S. at 508-09 ("If the mere allegation that a valid legislative act was undertaken for an unworthy purpose would lift the protection of the Clause, then the Clause simply would not provide the protection historically undergirding it."); *CNN*, 723 F. Supp. at 841 ("[A]n allegation [that the legislative actor violated the plaintiff's constitutional rights] is insufficient to overcome the broad coverage of the Speech or Debate Clause.").

So too here.  The protections of the Speech or Debate Clause apply to Mr. Chisam, Ms. Kim, and Ms. Sovereign because, like the Chief Counsel in *Eastland*, all three were acting in their capacities as aides to the Committee at all pertinent times, as the Complaint itself makes clear, Compl. ¶¶ 14-20, and because the actions they are alleged to have taken – not communicating with Congressman Rangel about his case, and communicating with certain Members of the Rangel-ASC in preparation for the Subcommittee hearing – plainly "would be a protected legislative act if performed by the [Committee it]self."  *Gravel*, 408 U.S. at 618.

2.  <u>Defendants McCaul, Conaway, Dent, and Harper</u>.  Congressman Rangel's claims, as against Defendant McCaul are predicated on actions Congressman McCaul took as the Ranking Member of the Rangel-ASC in connection with the proceedings of that Subcommittee in the Rangel disciplinary matter, in particular, that he received from Ms. Kim and Ms. Sovereign the communications referred to above.  *See* Compl. ¶ 22.  Similarly, Congressman Rangel's claims as against Defendants Conaway, Dent, and Harper are predicated on actions those three Members took as members of the Rangel-ASC in connection with the proceedings of that Subcommittee in the Rangel case, in particular, that they (i) received from Ms. Kim and Ms. Sovereign the communications referred to above, and (ii) did not disclose those communications to Congressman Rangel, to other Members of the Rangel-ASC, to other Members of the Ethics Committee, or to the full House.  *See id*. ¶¶ 24, 25, 26.

These four Members are immune here because the receipt of information from staff in connection with the Rangel disciplinary proceedings – and specifically in preparation for the Rangel-ASC hearing on November 15-16, 2010 – is self-evidently a legislative activity.  *See*, *e.g.*, *Gravel*, 408 U.S. at 629 (Speech or Debate Clause precluded questioning "concerning any act . . . performed by the Senator, or by his aides in the course of their employment, in preparation for the subcommittee hearing").  So too, are the decision of Congressmen Conaway, Dent and Harper to

communicate – or not communicate – with fellow Members about those staff communications. *See, e.g.*, *Fields*, 459 F.3d at 10-11; *Jewish War Veterans*, 506 F. Supp. 2d at 53.

      3. Defendants Lofgren and Bonner.  Congressman Rangel's claims as against Defendants Lofgren and Bonner are predicated on actions those two Members took as the Chair and Ranking Member, respectively, of the Ethics Committee in connection with the Committee's actions in the Rangel disciplinary matter, in particular, that they made certain statements (i) to the Ethics Committee at the Sanction Hearing, and (ii) to the House prior to the floor vote on the censure resolution.  *See* Compl. ¶¶ 12, 13.

      Congresswoman Lofgren and Congressman Bonner are immune from suit here because those sorts of statements to their fellow Members, in the course of formal Committee and House proceedings, are quintessentially legislative and protected.  *See* U.S. Const. art. I, § 6, cl. 1 ("for *any Speech* . . . in [the] House, [Congresswoman Lofgren and Congressman Bonner] shall not be questioned in any other Place") (emphasis added); *see also Gravel*, 408 U.S. at 616 ("Senator . . . may not be made to answer – either in terms of questions or in terms of defending himself . . . – for the events that occurred at the Subcommittee meeting."); *Johnson*, 383 U.S. at 184-85 (reversing conviction of Member where "indictment itself focused . . . upon motives underlying the making of the speech [on the floor of the House] and upon its contents").

      4. Defendants Boehner and Haas.  With respect to Defendants Boehner and Haas – the Speaker and Clerk of the House, respectively – Congressman Rangel's claim is predicated, not on any action either actually has taken, *see* Compl. ¶¶ 9-11, but rather on the notion that they can "cause to be removed from The Journal of the House's Proceedings, any reference to the fact that [Congressman Rangel] had been censured, and to remove any other records of the House reflecting that [Congressman Rangel] had been censured."  *Id*. ¶ 108.

The Speaker and Clerk are immune here because the maintenance of the Journal of the House – no less than the House's Discipline Clause and Rulemaking Clause activities – plainly is one of those "'other matters which the Constitution places within the jurisdiction of either House,'" *Eastland*, 421 U.S. at 504 (quoting *Gravel*, 408 U.S. at 625), to which the protections of the Speech or Debate Clause apply.  *Cf. Marshall Field & Co. v. Clark*, 143 U.S. 649, 671 (1892) (matters concerning Journal of House and Senate "left to the discretion of the respective houses of [C]ongress").  And logically and necessarily, the immunity component of the Clause applies to Speech or Debate protected actions that Congressman Rangel seeks to force the Speaker and Clerk to take in the future, just as it does to past predicate conduct of the other Defendants.

### C.     The Non-Evidentiary-Use Component of the Clause Also Requires That Congressman Rangel's Suit Be Dismissed.

The non-evidentiary-use component of the Clause also requires that Congressman Rangel's Complaint be dismissed.  This is so because (i) *all* the conduct that Congressman Rangel attributes to Defendants, *see* Compl. ¶¶ 9-26, is conduct that is legislative in nature, *see supra* p 6-13; (ii) the Complaint references no conduct of the Defendants that is not legislative in nature; and (iii) the Complaint makes clear that Congressman Rangel intends to rely on Defendants' legislative activities as the evidentiary basis for his claims in this case.  *See, e.g.*, Compl. ¶ 32 ("Rep. McCaul's statement that all Members of the Adjudicatory Subcommittee were to act as 'judges' is clearly admissible, as well as the opening statements of Chair Lofgren and the misleading statements made by then Chair Lofgren and Ranking Member Bonner on or about November 18, 2010 concerning how the pre-vote proceedings had been conducted.").

Accordingly, because the evidentiary framework for Congressman Rangel's case is constructed *entirely* of alleged activities that are legislative in nature, and because Congressman Rangel is constitutionally prohibited from using Defendants' legislative activities as evidence against them in this case, *see, e.g.*, *Helstoski*, 442 U.S. at 490; *Johnson*, 383 U.S. at 173-77,

Congressman Rangel's claims are insupportable as an evidentiary matter.  It necessarily follows that those claims must be dismissed.[25]

### D.     Defendants' Speech or Debate Clause Protections Have Not Been Waived.

The Complaint alleges, without more, that the "privilege providing for protection of speech or conduct under Article I, Section 6, was waived when the House chose to broadcast all proceedings on public television."  Compl. ¶ 32.  This peculiar, and factually imprecise, allegation appears to refer to C-Span's televising of the Rangel-ASC proceedings on November 15-16, 2012; the full Committee Sanction Hearing on November 18, 2012; and the December 2, 2012 House floor proceedings where the censure vote was taken.[26]  The C-Span coverage was not mandated by the House or Committee, but was authorized under generally applicable House and Committee rules.[27]  Accordingly, Congressman Rangel's waiver contention appears to rest on the notion that the House and Committee rules that permitted C-Span to broadcast these  proceedings effectuated some sort of institutional waiver of Defendants' Speech or Debate rights, a notion that is wholly inconsistent with *Helstoski*, 442 U.S. 477.

---

[25]  Congressman Rangel has indicated that he may try to take discovery of Defendants and/or the Ethics Committee.  *See* Compl. ¶¶ 40-42; Litigation Hold Notice (May 20, 2013), attached as Ex. 8 (demanding that Defendants, Committee, and others preserve documents concerning Rangel disciplinary matter).  Although this issue is not now before the Court, such discovery would be barred by the non-disclosure component of the Speech or Debate Clause.  *See supra* p. 20.

[26]  *See* C-Span Video Library, Rep. *Charles Rangel Ethics Inquiry*, Part I (Nov. 15, 2010), http://www.c-spanvideo.org/program/AgainstCha; *id.*, *Rep. Charles Rangel Ethics Inquiry*, Day 2 (Nov. 16, 2010), http://www.c-spanvideo.org/program/InquiryDa; *id.*, *Rep. Charles Rangel Ethics Inquiry* (Nov. 18, 2010), http://www.c-spanvideo.org/program/EthicsCharg; *id.*, *Debate on and Censure of Rep. Charles Rangel* (Dec. 2, 2010), http://www.c-spanvideo.org/program/Rangl.

[27]  *See* 111th House Rules, Rule V.2(a) ("The Speaker shall administer, direct, and control a system for complete and unedited audio and visual broadcasting and recording of the proceedings of the House."); *id.*, Rule XI.4(e) ("Whenever a hearing or meeting conducted by a committee or subcommittee is open to the public, those proceedings shall be open to coverage by audio and visual means."); 111th Ethics Comm. Rules, Rule 5(d) ("Any hearing held by an adjudicatory subcommittee or any sanction hearing held by the Committee shall be open to the public unless the Committee or subcommittee, by an affirmative vote of a majority of its members, closes the hearing to the public."); *id.*, Rule 12 (providing rules for broadcast of Committee and Subcommittee proceedings).

*Helstoski* involved a criminal indictment of a Member who voluntarily testified about his legislative activities before the grand jury on ten occasions, and voluntarily produced records of his legislative activities to the grand jury. *See Helstoski*, 442 U.S. at 480-82. The Congressman moved to dismiss the indictment on Speech or Debate grounds. The district court denied that motion, but held that the prosecution could not introduce at trial evidence of the Congressman's legislative activities. *Id*. at 484. The prosecution appealed that evidentiary ruling, and the Third Circuit affirmed, specifically rejecting the prosecution's argument that "Helstoski had waived his [Speech or Debate] privilege by testifying before the grand jury." *Id*. at 485; *see also id*. at 486.

Before the Supreme Court, the prosecution renewed its argument that Congressman Helstoski had waived his Speech or Debate rights "by testifying before the grand juries and voluntarily producing documentary evidence of legislative acts," *id*. at 490, but also introduced a new argument: that Congress had effectuated an institutional waiver by "the enactment of 18 U.S.C. § 201," the general bribery statute under which Congressman Helstoski had been charged. *Id*. at 490. The Supreme expressly, and vigorously, rejected both arguments.

With respect to the individual waiver argument, the Court ruled as follows:

> Like the District Court and the Court of Appeals, we perceive no reason to decide whether an individual Member may waive the Speech or Debate Clause's protection against being prosecuted for a legislative act. Assuming that is possible, we hold that waiver can be found only after explicit and unequivocal renunciation of the protection. The ordinary rules for determining the appropriate standard of waiver do not apply in this setting.

*Id*. at 490-91; *see also id*. at 492 ("Helstoski's words and conduct cannot be seen as an explicit and unequivocal waiver of this immunity . . . assuming such a waiver can be made.").

With respect to the institutional waiver argument, the Supreme Court expressed serious doubt that such an institutional waiver was even possible:

> [A]n argument can be made from precedent and history that Congress, as a body, should not be free to strip individual Members

27

> of the protection guaranteed by the Clause . . . .   The controversy over the Alien and Sedition Acts reminds us how one political party in control of both the Legislative and the Executive Branches sought to use the courts to destroy political opponents.
>
> The Supreme Judicial Court of Massachusetts noted in *Coffin* [*v. Coffin*, 4 Mass. 1 (1808)] that "the privilege secured . . . is not so much the privilege of the house as an organized body, as of each individual member composing it, who is entitled to this privilege, *even against the declared will of the house*."   4 Mass., at 27 (emphasis added).

*Id*. at 492-93; *see also Brewster*, 408 U.S. at 507.  The Court then proceeded to hold that:

> Assuming *arguendo*, that the Congress could constitutionally waive the protection of the Clause for individual Members, such waiver could be shown only by an explicit and unequivocal expression. There is no evidence of such a waiver in the language or the legislative history of § 201 or any its predecessors.

492 U.S. at 493.

It necessarily follows that the institutional waiver argument is wrong.  Assuming – for the sake of argument only – that the House as a body could waive Defendants' Speech or Debate protections, nothing in the generally applicable House and Committee Rules pursuant to which C-Span elected to cover the proceedings that concerned Congressman Rangel's ethics travails reflects an "explicit and unequivocal" House decision to effectuate such a waiver.[28]

---

[28]   Aside from *Helstoski*, we are aware of only three cases that have addressed the waiver issue in the Speech or Debate Clause context.  All addressed the question of individual waiver (as opposed to institutional waiver), and none found a waiver.  *See Johnson*, 383 U.S. at 173-77, 173 n.4 (prosecution violated Speech or Debate Clause by cross-examining Congressman about his legislative activities, and by introducing third-party witness testimony about those activities, notwithstanding Congressman's affirmative introduction of those legislative matters in his own defense at trial; implicitly holding no waiver); *Brown & Williamson*, 62 F.3d at 421 n.11 (Congressman did not waive protections of Speech or Debate Clause by "statements made [voluntarily] during a radio interview"); *Pittston Coal Grp., Inc. v. Int'l Union, UMWA*, 894 F. Supp. 275, 278 n.5 (W.D. Va. 1995) (rejecting plaintiff's assertion that Senator waived privilege by voluntarily disclosing certain records to defendant in litigation; characterizing plaintiff's argument as "meritless":  "Pittston [has] produced no evidence that Senator Rockefeller renounced his privilege, let alone made the 'explicit and unequivocal expression' required to waive it.").

## II.     Congressman Rangel's Claims Raise Non-Justiciable Political Questions.

The political question doctrine, which is "essentially a function of the separation of

powers," *Baker v. Carr*, 369 U.S. 186, 217 (1962), "excludes from judicial review those

controversies which revolve around policy choices and value determinations constitutionally

committed for resolution to the halls of Congress or the confines of the Executive Branch," *Japan*

*Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *see also United States v. Munoz-*

*Flores*, 495 U.S. 385, 394 (1990) ("doctrine is designed to restrain the Judiciary from

inappropriate interference in the business of the other branches of Government").

"That some governmental actions are beyond the reach of the courts reflects the

Constitution's limitation of the 'judicial power of the United States' to 'cases' or 'controversies.'"

*El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 840 (D.C. Cir. 2010) (quoting U.S.

Const. art. III, § 2).  "It is therefore familiar learning that no justiciable 'controversy' exists when

parties seek adjudication of a political question."  *Massachusetts v. EPA*, 549 U.S. 497, 516

(2007).

A claim presents a political question if it involves:

> [1] a textually demonstrable constitutional commitment of the issue
> to a coordinate political department; *or* [2] a lack of judicially
> discoverable and manageable standards for resolving it; *or* [3] the
> impossibility of deciding without an initial policy determination of a
> kind clearly for non-judicial discretion; *or* [4] the impossibility of a
> court's undertaking independent resolution without expressing lack
> of the respect due coordinate branches of government; *or* [5] an
> unusual need for unquestioning adherence to a political decision
> already made; *or* [6] the potentiality of embarrassment from
> multifarious pronouncements by various departments on one
> question.

*Baker*, 369 U.S. at 217 (emphases added).  "'To find a political question, [this Court] need only

conclude that one [of these] factor[s] is present, not all.'"  *El-Shifa Pharm. Indus.*, 607 F.3d at 841

(quoting *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005)); *see also Bush v. Kucinich*,

236 F. Supp. 2d 1, 15 (D.D.C. 2002) ("'[A]ny one of [these six *Baker*] characteristics may be sufficient to preclude judicial review' under the political question doctrine." (quoting *Made in the USA Found. v. United States*, 242 F.3d 1300, 1312 (11th Cir. 2001))).

As we now explain, the political question doctrine precludes this Court from considering Congressman Rangel's claims because the Discipline Clause and Journal Clause authority is textually committed to the House, and because any judicial consideration of the merits of the Congressman's claims would manifest a profound disrespect for the Legislative Branch of the federal government.

**A.      The Discipline Clause Authority Is Textually Committed to the House Alone.**

As explained above, Congressman Rangel's Complaint is, in substance and effect, a collateral attack on the discipline the House imposed on him on December 2, 2010. *See supra* p. 2-3. That renders his claim non-justiciable because the Constitution *textually* commits to "Each House" of Congress the authority to "punish its Members for disorderly Behaviour." U.S. Const. art. I, § 5, cl. 2. That authority is *exclusive* to the two houses of Congress:

> The process of disciplining a Member in the Congress . . . is not surrounded with the panoply of protective shields that are present in a criminal case. An accused Member is judged by no specifically articulated standards and is at the mercy of an almost unbridled discretion of the charging body . . . *from whose decision there is no established right of review*.

*Brewster*, 408 U.S. at 519 (emphasis added); *see also Powell v. McCormack*, 395 U.S. 486, 553 (1969) (Douglas, J., concurring) ("[I]f this were an expulsion case, I would think that no justiciable controversy were presented."); Mem. Op. at 8, *Boehner* (Ex. 2) ("[E]nforcement of standards of conduct . . . is placed within the exclusive jurisdiction of the two house of Congress by the Rulemaking and Discipline Clauses . . . ."); *cf. Morgan v. United States*, 801 F.2d 445, 447 (D.C. Cir. 1986) (textual commitment to "Each House" of Congress of authority to "be the Judges of the Elections, Returns and Qualifications of its own Members," U.S. Const. art. I, § 5, cl. 1,

deprived judiciary of jurisdiction to consider suit that challenged House's determination that one candidate in disputed congressional election had been lawfully elected to House).

As also described above, the House has implemented its Discipline Clause authority by adopting a Code of Official Conduct and creating and empowering the Ethics Committee to investigate allegations of misconduct, to make findings regarding such allegations, and to recommend appropriate sanctions for full House consideration.  *See* Add. at A-1-4.  The House's administration of its Discipline Clause authority is designed to protect the integrity and dignity of the House and its proceedings.[29]  Indeed, Congressman Rangel himself has acknowledged that "these rules are not there to punish; they are there to guide the Members, to protect the character and the integrity of this Congress."  Ethics Comm. Rep., vol. I, at 641 (Rep. Rangel).

The House has exercised its broad disciplinary authority over its Members in a consistent and exclusive manner.  For example, in the 63rd Congress, the House Judiciary Committee described the House's power to punish Members for disorderly behavior as "full and plenary," and one that "may be enforced by summary proceedings.  It is discretionary in character . . . [and] restricted by no limitation except in the case of expulsion the requirement of the concurrence of a two-thirds vote."  H. Rep. No. 63-570 at 1 (1914).

It should come as no surprise, therefore, that there are no judicial decisions – none – that purport to review or restrict in any way Congress's exercise of its authority under the Discipline Clause.  The House's exclusive authority in this realm requires that Congressman Rangel's claims be dismissed as non-justiciable political questions.

---

[29]  *See, e.g.*, Luther Stearns Cushing, The Law and Practice of Legislative Assemblies 250-51 (Boston, Little, Brown & Co. 1856); Lewis Deschler, Deschler's Precedents of the U.S. House of Representatives, H. Doc. 94-661, 94th Cong. 2d Sess. vol. 3, ch. 12, § 13 (1979) ("Deschler's Precedents") (internal disciplinary action "'rooted in the judgment of the House as to what was necessary or appropriate for it to do to assure the integrity of its legislative performance and its institutional acceptability to the people at large as a serious and responsible instrument of government'") (quoting *Powell v. McCormack*, 395 F.2d 577, 607 (D.C. Cir. 1968) (McGowan, concurring), *rev'd on other grounds* 395 U.S. 486 (1969)).

**B.      The Journal Clause Authority Is Textually Committed to the House Alone.**

As discussed above, the principal relief sought by Congressman Rangel in this action is modification of the Journal of the House.  *See* Compl. ¶¶ 103, 108.  However, the Constitution textually commits to "Each House" of Congress the responsibility to "keep a Journal of its Proceedings."  U.S. Const. art. I, § 5, cl. 3.  While the Constitution specifies certain information that must be included in the House and Senate Journals, *see id.* ("[T]he Yeas and Nays of the Members of either House on any question shall, at the Desire of one fifth of those Present, be entered on the Journal"); *id.* art. I, § 7, cl. 2, it otherwise leaves to "Each House" the authority to determine the content of its Journal.[30]

As with the Discipline Clause, matters relating to the Journal are "left to the discretion of the respective houses of congress," M*arshall Field*, 143 U.S. at 671.  *Marshall Field* addressed a challenge to a federal statute by importers who were attempting to have levies against them declared unconstitutional on the grounds that Congress had not properly enacted the Tariff Act of 1890.  *See* 143 U.S. at 662-69.  The importers argued that the Journal – and not the enrolled bill – was "the best, if not conclusive, evidence upon the issue as to whether a bill was, in fact, passed by the two houses of Congress."  *Id.* at 670.  The Court rejected this use of the Journal, and noted specifically that matters relating to the Journal are "left to the discretion of the respective houses of congress," *id.* at 671.

Ultimately, the *Marshall Field* Court declined to look behind the signatures affixed to an enrolled bill, a holding based in part on separation of powers concerns, specifically noting "the

---

[30]   Beyond the constitutionally required components of the Journal, the House has, by virtue of its constitutional authority to "determine the Rules of its Proceedings," required that its Journal contain numerous other records of its procedural activities, including, the title or subject of each committee report, *see* 111th House Rules, Rule XIII.2(a); the reports of managers of a conference committee, *see* Constitution, Jefferson's Manual, & Rules of the House of Representatives, H. Doc. 111-157, § 542 (2011), *available at* http://www.gpo.gov/fdsys/pkg/CDOC-111hdoc157/content-detail.html, and discipline administered to Members pursuant to order of the House, *see* 2 Hinds' Precedents § 1251.

respect due to a coordinate branch of the government," *id.* at 673, and explaining that "the

spectacle of examination of [congressional proceedings by the courts]" would "subordinate[ ] the

legislature, and disregard[ ] that coequal position in our system of the three departments of

government."  *Id.* at 676-77 (quotation marks omitted)); *see also Pub. Citizen v. U.S. Dist. Court*

*for D.C.*, 486 F.3d 1342, 1348 (D.C. Cir. 2007) (describing *Marshall Field* as political question

doctrine case:  "[B]ecause the Court based its holding in part upon separation of powers concerns,

the rule could be viewed as an application of the political question doctrine, which is derived from

Article III's controversy requirement" (citations and quotation marks omitted)).[31]

## C.   Any Judicial Resolution of Congressman Rangel's Claims Would Manifest a Lack of the Respect Due a Coordinate Branch of Government.

"In deference to the fundamental constitutional principle of separation of powers, the

judiciary must take special care to avoid intruding into a constitutionally delineated prerogative of

the Legislative Branch."  *Harrington v. Bush*, 553 F.2d 190, 214 (D.C. Cir. 1977); *see also Vander*

*Jagt v. O'Neill*, 699 F.2d 1166, 1181-82 (D.C. Cir. 1983) (Bork, J., concurring) ("If the courts

would not accept such invasions of their sphere, they ought not attempt the invasion of Congress'

sphere . . . .").

1.  For the reasons discussed above, Congressman Rangel's Complaint is effectively a

collateral attack on the House's exercise of its Discipline Clause authority – an authority that

belongs exclusively to the House.  For this court to review the House's disciplinary proceedings

would require an invasive inquiry into internal House operations that lie at the very heart of the

House's constitutional prerogatives.  Judicial intrusion into these matters would express a

---

[31]  The Constitution also textually commits to Congress the power to "determine the Rules of its Proceedings," U.S. Const. art. I, § 5, cl. 2.  The Rulemaking Clause is a "broad grant of authority," *Consumer's Union of U.S., Inc. v. Periodical Correspondent's Ass'n*, 515 F.2d 1341, 1343 (D.C. Cir. 1975), which sits at "the very core of our constitutional separation of powers," *Walker v. Jones*, 733 F.2d 923, 938 (D.C. Cir. 1984) (MacKinnon, J., concurring in part and dissenting in part).  As noted above, Congressman Rangel does not challenge any House or Committee Rule in this case.  *See supra* p. 3 n.3.

profound lack of respect for the House as a coordinate branch of the federal government.  *Cf.*

*Brown v. Hansen*, 973 F.2d 1118, 1122 (3d Cir. 1992) (per curiam) ("Absent a clear command

from some external source of law, we cannot interfere with the internal workings of the Virgin

Islands Legislature 'without expressing lack of the respect due coordinate branches of

government.'" (quoting *Baker*, 369 U.S. at 217)).

      The fact that Congressman Rangel contends (erroneously) that the Committee did not

follow applicable House and/or Committee Rules does not change the analysis.  Any judicial

policing of whether the Committee complied with its own Rules in the process of recommending

that the House discipline one of its Members, which is what Congressman Rangel advocates, most

certainly would "express[] [a] lack of the respect due [a] coordinate branch[] of [the]

government."  *Baker*, 369 U.S. at 217.

      This Circuit, in analogous circumstances, wisely has avoided the kind of judicial

encroachment Congressman Rangel promotes here.  For example, in *Vander Jagt v. O'Neill*, 524

F. Supp. 519 (D.D.C. 1981), *aff'd on other grounds*, 699 F.2d 1166 (D.C. Cir. 1983), this Court

refused to tell the House how to allocate committee seats under the Rules of the House.  *See id.* at

512 ("The actions of a caucus in the House are governed by the House Rules.  Art. I, § 5, cl. 2 of

the Constitution confers upon the House the power 'to determine the Rules of its Proceedings.'

This textual commitment of the issue to the House would oust the Court's jurisdiction . . . ."

(citing *Baker*, 369 U.S. at 217)).  And, in *Metzenbaum v. Federal Energy Regulatory Commission*,

675 F.2d 1282 (D.C. Cir. 1982), the Circuit Court refused on political question grounds to

consider a claim by several Senators and Representatives that a particular Public Law, which

waived certain sections of the Alaskan Natural Gas Transportation Act, was invalid because it

allegedly was adopted in violation of a particular parliamentary rule:

              To invalidate [the challenged public law] on the ground that it was
              enacted in violation of House rules would be to declare as erroneous

> the understanding of the House of Representatives of rules of its own making, binding upon it only by its own choice. We must assume that the House acted in the belief that its conduct was permitted by its rules, and deference rather than disrespect is due that judgment.

*Id*. at 1288; *see also Hastings*, 716 F. Supp. at 41 ("Courts in this District have regularly rejected other petitions seeking judicial supervision of Congressional proceedings."), *aff'd sub nom*. *Nixon v. U.S. Senate*, 887 F.2d 332 (D.C. Cir. 1989); *cf. Nixon v. United States*, 506 U.S. 224, 229, 238 (1993) (holding challenge to Senate impeachment procedures nonjusticiable under U.S. Const. art. I, § 3, cl. 6).

2.  The relief Congressman Rangel seeks also runs afoul of the "lack of respect" prong of *Baker* because the requested relief necessarily contemplates the editing by this Court of the House Journal, the constitutionally-mandated record of the House's proceedings.

The Rules of the House – in keeping with the Constitution, *see* U.S. Const. art. I, § 5, cl. 3 ("Each *House* shall keep a Journal of its Proceedings . . . .") (emphasis added) – vest the ultimate authority over the Journal and its contents with the entire House.  *See* 111th House Rules, Rule I.1 ("The Speaker's approval of the Journal shall be deemed agreed to unless a Member, Delegate, or Resident Commission demands a vote thereon.").  Requests for corrections or amendments to the Journal must be offered by motion and only may be for the Journal of the previous legislative day. *See* Deschler's Precedents, vol. 1, ch. 5, § 13.  Any attempt to alter the Journal from a legislative day other than the previous legislative day – essentially the relief Congressman Rangel seeks here – requires unanimous consent.  *See* Wm. Holmes Brown, Charles W. Johnson, & John V. Sullivan, House Practice:  A Guide to the Rules, Precedents & Procedures of the House, ch. 28, § 9 (2011), *available at* http://www.gpo.gov/fdsys/pkg/GPO-HPRACTICE-112/pdf/GPO-HPRACTICE-112.pdf.

Accordingly, an injunction requiring "Defendants to take all necessary steps to vacate, strike and remove the recording of censure, as voted on by the House and as set forth in the Journal," Compl. ¶ 103, and/or an "Order or Writ in the nature of mandamus" requiring the Speaker and Clerk of the House "to cause to be removed from The Journal of the House's Proceedings, any reference to the fact that Plaintiff had been censured," *id.* ¶ 108, would be meaningless not only insofar as Defendants Chisam, Kim, and Sovereign are concerned (each of whom, as former Committee staff members, have absolutely no authority or ability to alter the House Journal), but also as to the Clerk and the seven Member Defendants.  Indeed, as to the latter eight Defendants, any judicial directive along the lines of what Congressman Rangel demands likely would precipitate a constitutional crisis in that it would (i) conflict directly with the Rules and precedents of the House; (ii) place the Speaker, Clerk, and other Member Defendants in the untenable position of being judicially required to take an action not authorized by the House and in violation of the House's Rules and precedents; and (iii) purport to compel the Defendants to take certain legislative actions and/or cast votes in a certain manner.

Indeed, even if Defendants were to disregard applicable House Rules and attempt to alter the Journal on their own – a circumstance imaginable only as a *theoretical* possibility – the House easily could block that effort, and thereby precipitate a direct conflict with the Article III branch. It is hard to imagine a situation more fraught with lack of respect for a coordinate branch. Accordingly, the Court should dismiss the Complaint on political question grounds.

## III.     This Court Lacks Jurisdiction Because Congressman Rangel Lacks Standing.

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III," *Lujan*, 504 U.S. at 560, and, if Congressman Rangel lacks standing, the Court lacks subject matter jurisdiction, *see, e.g.*, *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541

(1986) (lack of standing constitutes defect in court's subject matter jurisdiction); *Haase*, 835 F.2d at 906 ("[D]efect of standing is a defect in subject matter jurisdiction.").

The Congressman, as "the party invoking federal jurisdiction, bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998); *accord Lujan*, 504 U.S. at 561; *City of Waukesha v. EPA*, 320 F.3d 228, 233 (D.C. Cir. 2003).   To discharge this burden, the Congressman must establish three elements:

> *First*, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.   *Second*, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Third*, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (emphases added; quotation marks, citations, ellipsis, and brackets omitted); *accord Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 174 (D.C. Cir. 2012).   Here, because "reaching the merits of [this] dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government" was inappropriate, Congressman Rangel must satisfy an "*especially rigorous*" inquiry into those three standing elements.   *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997) (emphasis added).

As we now explain, Congressman Rangel has not, and cannot, establish any of the three.

### A.   Congressman Rangel Has Not Alleged, and Cannot Establish, an Article III Injury-in-Fact.

In the "Standing" section of his Complaint, Congressman Rangel alleges that "[t]he House's action and the censure recorded in the permanent record of The Journal of the House's Proceedings . . . have and will cause Plaintiff reputational harm, plus public stigmatization . . . which is fairly and directly traceable to the [censure] action."   Compl. ¶ 86.   That is, as we

understand it, Congressman Rangel asserts that "reputational harm, plus public stigmatization" constitutes his Article III injury-in-fact. *Id.*

Claims of reputational injury, like all other Article III injury claims, must be "concrete and particularized." *Lujan*, 504 U.S. at 560; *see also, e.g.*, *Meese v. Keene*, 481 U.S. 465, 473-74 (1987) (finding Article III injury where "appellee submitted detailed affidavits . . . supporting the conclusion that his exhibition of films that ha[d] been classified as 'political propaganda' by the Department of Justice would substantially harm his chances for reelection and would adversely affect his reputation in the community"). Reputational injury claims that are vague or speculative will not suffice. *See, e.g.*, *Advanced Mgmt. Tech., Inc. v. FAA*, 211 F.3d 633, 636-37 (D.C. Cir. 2000) ("Standing cannot be inferred argumentatively but rather must affirmatively appear in the record. All that affirmatively appears here is [plaintiff's] vast exaggeration of the FAA's findings; . . . . AMTI has not begun to show the likelihood of [reputational] injury from the FAA's characterizations of its conduct. Charitably, the [alleged] injury is 'speculative' – the ultimate label for injuries too implausible to support standing.").

Cognizant of the need to do more than merely assert that his reputation was harmed, Congressman Rangel includes the following two allegations in his Complaint:

> [T]he following occurred after the censure: [1] in the 112th Congress, Plaintiff was only granted ex-officio status on all Ways and Means Subcommittees, but without having voting rights as other Member[s] assigned to Subcommittee[s]. [2] After the censure, it was exploited by a political opponent in the 2012 Democratic primary election (in a news release available to the public) and it is expected that the same will take place in any future election in which Plaintiff is a candidate.

Compl. ¶ 67. Neither of these allegations is a concrete and particularized manifestation of reputational injury for Article III purposes.

1. With respect to the allegations concerning the Ways and Means Committee, the relevant, judicially noticeable, facts are as follows:

- When the Rangel-ISC began its investigation, Congressman Rangel was Chairman of the Ways and Means Committee.  In March 2010, while the investigation was underway, he voluntarily stepped down as Chairman, although he remained a Member of the committee.  *See supra* p. 14.

- In the 112th Congress, each House party organization – the Republican Conference and the Democratic Caucus – was responsible for recommending the committee assignments of its respective Members.  *See* Rule X.5(b)(1), Rules of the House of Representatives (112th Cong.), *available at* http://rules.house.gov/sites/republicans.rules.house.gov/files/other%20home%20files/112th%20Rules%20Pamphlet.pdf ("Membership on a standing committee during the course of a Congress shall be contingent on . . . the party caucus or conference.").  Thus, the Democratic Caucus was responsible for recommending Congressman Rangel's assignment to the Ways and Means Committee, a recommendation approved by the House.  *See* H. Res. 31, 112th Cong. (2011).

- In the 112th Congress, subcommittee positions for Democratic Members of the Ways and Means Committee, such as Congressman Rangel, were filled in accordance with the rules of the Democratic Caucus.  *See* Rules 26, 31(C), Rules of the Democratic Caucus (112th Cong.), attached as Ex. 9.

- During the 112th Congress, the Chairman (Congressman Dave Camp) and Ranking Member (Congressman Sander Levin) of the Ways and Means Committee were not regular Members of any of that committee's subcommittees.  Instead, by committee rule they were "ex-officio Members of all Subcommittees."  Rule 9, Rules of the Comm. on Ways & Means (112th Cong.), *available at* http://waysandmeans.house.gov/uploadedfiles/rules112__1_7_2011.pdf.  This

meant that, while they could not vote in subcommittee proceedings, *id.*, they otherwise could play an active, participatory role on every subcommittee, and could "be counted for purposes of assisting in the establishment of a quorum for a Subcommittee," *id.*

- The Ways and Means Committee for the 112th Congress made Congressman Rangel an additional ex-officio Member of all of that committee's subcommittees. *See* Compl. ¶ 67; Rep. on the Legislative & Oversight Activities of the Comm. on Ways & Means During the 112th Congress at X n.1 (Comm. Print May 31 2012) ("Ways & Means Report"), *available at* http://waysandmeans.house.gov/uploadedfiles/laor_112_mid_year_2012_final.pdf. That is, Congressman Rangel was *elevated* to the same status as the Chairman and Ranking Member of the Ways and Means Committee in recognition of his past service to that committee.

- In the 112th Congress, *no vote was taken by any Ways and Means subcommittee*; rather, every vote was taken at the full committee level, *see id.*, where Congressman Rangel had a vote.

In short, what Congressman Rangel now characterizes as some sort of concrete manifestation of harm to his reputation was no such thing; it was an honor rather than a slight, and it did not result in any lost voting power in any event.

2.  With respect to Congressman Rangel's allegation that a primary opponent in the 2012 election "exploited" the House's censure of the Congressman "in a news release available to the public," the Complaint only references one CapitalNewYork.com article.  Compl. ¶ 67.  That article quotes the primary opponent, Clyde Williams, as asserting (incorrectly) that the

40

Congressman did not "have the ability to vote on his own committee anymore."  Compl., Ex. K.

The article does not quote Mr. Williams as making any direct reference to the censure vote.

Moreover, Congressman Rangel *defeated* all of his 2012 primary opponents, including Mr.

Williams, and then won reelection to the House in the November 2012 general election, *see supra*

p. 14 n.14, despite running in a redrawn electoral district with a changed constituency.[32]  Of

course, incumbent Members of Congress who seek re-election often face primary challengers –

and almost always face general election opponents – who mine the incumbent's record and press

reports for materials and issues that can be "exploited" in an election campaign.  For better or

worse, that is how our rough and tumble system of democratic electoral politics works, as

Congressman Rangel well knows.  However, we are aware of no case that suggests that a political

figure who faces the slings and arrows of his chosen profession is, as a result of that fact, injured

for purposes of Article III, particularly where, as here, that political figure triumphed electorally

over the political opponent who allegedly "exploited" his record.

### B.     Even If Congressman Rangel Had Alleged an Article III Injury-in-Fact, Defendants Did Not Cause That Injury.

The second element of the standing analysis requires "a fairly traceable connection

between [the] injury and the complained-of conduct of the defendant."  *Steel Co.*, 523 U.S. at 103.

This causation or traceability element also is lacking here for the following three reasons.

1.  As noted above, in the "Standing" section of his Complaint, Congressman Rangel says

that "[t]he House's action" in censuring him "cause[d]" the harm that he says constitutes his

Article III injury-in-fact.  Compl. ¶ 85.  However, Defendants are not the "House."  "The two

---

[32] *See* Patricia Murphy, *Charlie Rangel's Toughest Battle:  Trying to Win a Majority Latino District*, The Daily Beast (May 31, 2012) ("After 42 years of representing a mostly African-American district anchored by Harlem, Rangel is now campaigning in an expanded district that is 55 percent Latino – and where one third of the voters are entirely new to the veteran lawmaker."), *available at* http://www.thedailybeast.com/articles/2012/05/31/charlie-rangel-s-toughest-battle-trying-to-win-a-majority-latino-district.html.

houses of Congress are legislative bodies representing larger constituencies.  Power is not vested in any one individual, but in the aggregate of the members who compose the body, and its action is not the action of any separate member or number of members, but the action of the body as a whole."  *Raines*, 521 U.S. at 829 n.10 (quoting *United States v. Ballin*, 144 U.S. 1, 7 (1892)).  Indeed four of the Defendants – the Clerk, Mr. Chisam, Ms. Kim, and Ms. Sovereign – are not and never were Members of the House and never had the capacity to cast a vote in the House.

Accordingly, the House itself and not the named Defendants "cause[d]" the alleged harm upon which this Court's Article III jurisdiction must rest – i.e., the reputational harm which allegedly flowed from the censure – because the House itself censured the Congressman, and the House is not a defendant here.  *See, e.g.*, *Lujan*, 504 U.S. at 560 ("[T]he injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.").

2.  Congressman Rangel may contend that the Defendants – other than the Speaker and Clerk – were causal agents for purposes of Article III because the outcome of the censure vote would have been different had they not acted as they are alleged to have acted.  *See, e.g.*, Compl. ¶ 51 ("Had Plaintiff known of all the misconduct that preceded the Adjudicatory Hearing, it is likely he would have had a view not to leave the hearing."); ¶ 83 ("The suppressed material would probably have led to a different outcome.  Rep. Rangel, had he known the facts, would not likely have left the hearing after the unique motion for summary judgment, but would have made a motion to dismiss by reason of the wrongdoing that should been disclosed . . . .").  To the extent this is the Congressman's causation contention, it is precisely the type of speculation about the conduct of unnamed third parties – i.e., the House and/or the Committee – that Article III disallows.  *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 (2013) ("We decline to

abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors.").

The Supreme Court has applied this longstanding tenet on multiple occasions. For example, in *Allen v. Wright*, 468 U.S. 737 (1984), the Court considered a challenge to the IRS's extension of particular tax advantages to private schools allegedly engaged in racially discriminatory practices. The plaintiffs, parents of African-American students, argued that they had standing to challenge the IRS conduct because it lessened their children's opportunity to attend an integrated public school and, in particular, that the tax advantages allowed private schools to charge lower tuition, thereby allowing more Caucasian children to attend those schools, and thus depleting the diversity of the public schools. *See id.* at 746. The Court noted that the plaintiffs' theory depended on the "speculat[ed]" conduct of third party schools and parents: "The links in the chain of causation between the challenged Government conduct and the asserted injury are far too weak for the chain as a whole to sustain [plaintiffs]' standing." *Id.* at 758-59. Accordingly, the Court concluded that "the alleged injury is not fairly traceable to *the Government conduct* respondents challenge as unlawful." *Id.* at 757 (emphasis added); *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 33-34, 41 (1976) (plaintiffs – indigent individuals denied medical services by certain tax-advantaged hospitals –lacked standing to challenge IRS's extension of tax advantages to such hospitals because  their standing argument depended on "speculat[ed]" conduct of third party hospitals:  "[I]njury at the hands of a hospital is insufficient by itself to establish a case or controversy in the context of this suit, for no hospital is a defendant."); *Judicial Watch, Inc. v. U.S. Senate*, 432 F.3d 359, 362 (D.C. Cir. 2005) (Judicial Watch, which sought to show that Senate filibuster rules created court delays that affected its business of litigating in support of open government, lacked standing:  "Judicial Watch has failed

to substantiate either essential link between Rule XXII and delayed vacancy filling, and between delayed vacancy filling and delayed adjudication.").

So too here.  To the extent the Congressman contends that if certain Defendants had acted differently, the outcome of the censure vote would have been different, his alleged injury is not fairly traceable to the Defendants.  Such a contention has far too many links in the causal chain – e.g., if certain Defendants had acted differently, the Congressman would not have left the Rangel-ASC hearing; if he had not left the hearing, he would have moved to dismiss the misconduct proceedings against him; if he had moved to dismiss, the Committee would have granted his motion; if the Committee had not granted his motion, the censure vote would not have occurred or, if it did, the outcome would have been different, *see* Compl. ¶¶ 51, 83 – all of which are speculative and require the Court to assume how independent actors not before the Court (i.e., the House and/or the Ethics Committee) would have conducted themselves.

3.  Finally, Congressman Rangel has alleged no causal link between Defendants' alleged conduct and (i) the "grant[] [of] ex-officio status on all Ways and Means Subcommittees [to the Congressman in the 112th Congress]," or (ii) Clyde Williams' "exploit[ation of the censure vote] . . . in the 2012 Democratic primary election."  *Id*. ¶ 67.  Nor could he:  as discussed above, Defendants manifestly were not responsible for Congressman Rangel's assignment to the Ways and Means Committee in the 112th Congress; for that Committee's decision to make him an ex-officio Member of all of its subcommittees; or for his not being a regular Member of any of that committee's subcommittees.  *See supra* p. 39-40.[33]  And Defendants are just as manifestly were not responsible for the manner in which Clyde Williams conducted his 2012 Democratic primary election campaign.

---

[33]  No Member of the Ways and Means in the Committee in the 112th Congress is a Defendant here.  *See* Ways & Means Rep. at II.

### C.   Even If Congressman Rangel Had Alleged an Article III Injury-in-Fact, That Injury Would Not Be Redressed by a Decision Favorable to the Congressman.

"The redressability inquiry poses a simple question:  If plaintiffs secured the relief they sought, would it redress their injury?"  *Wilderness Soc'y v. Norton*, 434 F.3d 584, 590 (D.C. Cir. 2006).  The answer here is "no" because the relief Congressman Rangel demands will not remediate the injury he claims to have suffered.

1.  First, the declaration Congressman Rangel seeks, *see* Compl. ¶ 100, will not undo the House censure vote, which means that it is unlikely to remedy any reputational harm that allegedly flowed from that vote.

2.  Second, with respect to the injunction the Congressman seeks requiring "Defendants to take all necessary steps to vacate, strike and remove the recording of censure, as voted on by the House and as set forth in the Journal," *id.* ¶ 103, such an injunction would be meaningless as to four of Defendants – the Clerk, Mr. Chisam, Ms. Kim, and Ms. Sovereign – because they are not Members of the House and thus have no ability to cast votes necessary to "vacate, strike [or] remove the recording of censure."  And, with respect to the seven other Member Defendants, such an injunction would be equally meaningless because only the House itself has the ability to "vacate, strike [or] remove the recording of censure."  That is, whether Congressman Rangel's injury "would be redressed by a favorable decision in this case depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict."  *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (holding that plaintiff teachers association – which, in challenge to Arizona land use laws, claimed economic injury because granting land use rights to mineral companies

resulted in depletion of school trust fund which resulted in lower pay for teachers – lacked

standing because its claims not redressable).[34]

3.  Finally, Congressman Rangel's request for an order requiring the Speaker and Clerk "to

cause to be removed from The Journal of the House's Proceedings, any reference to the fact that

Plaintiff had been censured," Compl. ¶ 108, also would not remedy his alleged reputational harm.

Paragraph 108 of the Complaint seems to contemplate some kind of edit to the official Journal of

the House's Proceedings.  Leaving aside the constitutional crisis that might be precipitated if the

Court purported to require the Speaker and/or Clerk to do that, *see supra* p. 36, the House Journal

for the time period that includes December 2, 2010, already has been printed and copies already

have been widely distributed.  *See supra* p. 2.  The order Congressman Rangel seeks will not

change that reality.[35]

## IV.   The Complaint Fails to State a Claim.

Congressman Rangel's Complaint fails to state a claim upon which relief can be granted

because (i) the Fifth and Sixth Amendments did not apply in the context of the Rangel disciplinary

proceedings; (ii) even if the Due Process Clause of the Fifth Amendment did apply in those

proceedings, the Complaint does not plead the deprivation of a protected liberty interest; (iii) the

Congressman has not alleged an actual violation of any applicable House or Committee Rule; and

---

[34]  *See also Wilderness Soc'y*, 434 F.3d at 591 (plaintiff The Wilderness Society ("TWS") lacked standing in suit seeking to force National Park Service ("NPS") to make recommendations to President regarding protection of certain parkland because alleged injury, that its members were unable to enjoy land, would not be redressed:  "Congress has no obligation to consider the President's recommendations, should he offer any, let alone act upon them.  And no order from this court requiring NPS to submit recommendations to the President in the hope that he will in turn forward them to Congress will change this situation. . . .  In short, the judicial order that TWS requests will not afford it the redress it seeks.").

[35]  It goes without saying that the relief the Congressman seeks will have no effect on (i) the "grant[] [of] ex-officio status on all Ways and Means Subcommittees [to the Congressman in the 112th Congress]," or (ii) Clyde Williams' "exploit[ation of the censure vote] . . . in the 2012 Democratic primary election," Compl. ¶ 67, both of which events are now history.

(iv) even if he had, compliance with House and Committee Rules was not a legal predicate to the House's censure of Congressman Rangel.

### A.   The Constitutional Rights Congressman Rangel Seeks to Vindicate Do Not Apply in the Context of House Disciplinary Clause Proceedings.

As an initial matter, the premise that underlies Congressman Rangel's Complaint – that the protections of the Due Process Clause of the Fifth Amendment and/or the Sixth Amendment apply in the context of House disciplinary proceedings – is flawed.

The protections afforded by the Sixth Amendment are textually limited to "criminal prosecutions" only.  U.S. Const. amend. VI; *see also United States v. Zucker*, 161 U.S. 476, 481 (1896) (Sixth Amendment protections only apply to criminal prosecutions).  And House disciplinary proceedings self-evidently are not criminal prosecutions.  *See, e.g.*, *Brewster*, 408 U.S. at 519 ("The process of disciplining a Member in the Congress . . . is not surrounded with the panoply of protective shields that are present in a criminal case.").

Similarly, the relevant case law – the sparseness of which is telling in and of itself – indicates that the Fifth Amendment also does not apply in the context of House disciplinary proceedings.  *See, e.g.*, *id*. ("[In a Discipline Clause proceeding], [a]n accused Member is judged by no specifically articulated standards and is at the mercy of an almost unbridled discretion of the charging body . . .").

If the Fifth and Sixth Amendments do not even apply in the context of House disciplinary proceedings, then the Complaint necessarily fails to state a claim.

### B.   Congressman Rangel Has Stated No Due Process Claim Because He Has Not Pled the Deprivation of a Protected Liberty Interest.

Even if Fifth Amendment procedural Due Process protections did apply in the context of House disciplinary proceedings, the Complaint still would fail to state a claim because it does not plead the deprivation of a protected liberty interest.  *See, e.g.*, *Morrissey v. Brewer*, 408 U.S. 471,

481 (1972) (whether procedural due process requirements apply turns on "whether the nature of the interest [asserted] is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment"); *Mazaleski v. Treusdell*, 562 F.2d 701, 729 n.22 (D.C. Cir. 1977) (citing *Paul v. Davis*, 424 U.S. 693, 702 n.3 (1976)) ("[I]nterpretation of the fourteenth amendment's due process clause [and] the principles addressed therein are fully applicable to the fifth amendment's 'liberty or property' language as well.").

As Congressman Rangel correctly acknowledges, "harm to one's reputation, standing alone, is not a constitutional violation of a protected liberty interest."  Compl. ¶ 68; *see also Paul*, 424 U.S. at 699-700 (reputation alone does not implicate any "liberty" or "property" interest sufficient to invoke procedural protection of Due Process Clause); *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 121 (D.C. Cir. 2010) ("stigma alone is insufficient to invoke due process protections"); *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1105 (D.C. Cir. 1985) ("[Supreme] Court [in *Paul*] rejected the position that every government defamation infringes a constitutionally recognized liberty interest").

In the context of public official plaintiffs, reputational injury, plus something more, such as loss of employment – "stigma-plus" – may suffice to state a claim of deprivation of a protected liberty interest.  *See, e.g., id.* at 1106 (defamation accompanied by loss of government employment would support liberty interest claim); *Monserrate v. N.Y. State Senate*, 599 F.3d 148, 158 (2d Cir. 2010) (state senator who asserted due process-challenge to expulsion from office required to prove, among other things, "'(1) the utterance of a statement . . . that is injurious to . . . reputation . . . and (2) some tangible and material state-imposed burden in addition to the stigmatizing statement.'") (quoting *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005)); *McGhee v. Draper*, 639 F.2d 639, 643 (10th Cir. 1981) (reputational damage infringes on liberty interest

when "entangled with some other 'tangible interests such as employment'") (quoting *Paul*, 424 U.S. at 701).

Here, however, Congressman Rangel has not alleged – and cannot allege – any constitutionally sufficient "plus" factor.  He was not expelled from the House or otherwise removed from office (in fact, he won reelection in 2010 and 2012), and he was not deprived of his congressional salary or required to pay a fine.  Although he alleges that he was "granted ex-officio status on all Ways and Means Subcommittees [during the 112th Congress], but without having voting rights as other Member[s] assigned to Subcommittee[s]," Compl. ¶ 67, that does not constitute a constitutionally sufficient "plus" factor because, given that "the House, unlike the Senate, is not a continuing body," *Eastland*, 471 U.S. at 512, Congressman Rangel had no vested interest in being assigned to any particular committee in the 112th Congress, much less to being assigned to any Ways and Means subcommittee, once he was chosen by the House to serve on that committee.  Moreover, the Ways and Means Committee's decision to elevate Congressman Rangel to the position of ex-officio Member of all of that committee's subcommittees constituted an honor, not a slight, *see supra* p. 40, and therefore it cannot, as a matter of law, constitute a legally sufficient "plus" factor.  Finally, and in any event, no Ways and Means subcommittee took a vote during the 112th Congress, *see id.*, so that Congressman Rangel, as a factual matter, was not deprived of any voting opportunity and, therefore, cannot assert a claim based on the absence of voting rights.

Because Congressman Rangel has alleged a reputational injury and nothing more, he has not identified a protected liberty interest, the deprivation of which requires procedural due process protections; accordingly, he has failed to state a claim.

**C.     The Allegations That the House and Committee Rules Were Violated Are Insufficient as a Matter of Law.**

Congressman Rangel's claim that his constitutional rights were violated turns on the factual allegation that some Defendants violated applicable House and/or Committee Rules, *see* Compl. ¶¶ 5, 12-26; *supra* p. 3 n.3, and that allegation, in turn, hinges entirely on his assertions that improper *ex parte* communications occurred between Defendants Kim and Sovereign (both of whom served as staff to the Rangel-ISC, but not to the Rangel-ASC, Compl. ¶¶ 16, 17, 19), on the one hand, and Defendants McCaul, Conaway, Dent and Harper (all Members of the Rangel-ASC), on the other, *see* Compl. ¶¶ 18, 20, 22, 24, 25, 26.[36]

However, House disciplinary proceedings are not judicial proceedings, and the rules against *ex parte* communications that apply in the judicial context do not apply to such House proceedings. *See generally* Martin Report at 51-52. The only Committee Rule that speaks to communication by staff with Committee Members is the so-called "Bifurcation Rule." *See* 111th Ethics Comm. Rules, Rule 8(a). The Bifurcation Rule prohibits staff of an investigative subcommittee from sharing evidence collected by the investigative subcommittee with Ethics Committee Members, other than the Chair and Ranking Member of the Committee, except by vote of the investigative subcommittee. However, once an investigative subcommittee votes out a statement of alleged violations and transmits the evidence it has collected to an adjudicatory subcommittee, the Bifurcation Rule no longer is operational with respect to that investigative subcommittee. *See* Martin Report at 52 (concluding that alleged *ex parte* communications that

---

[36]   The allegations of Rules violations on the part of Defendants Chisam, Lofgren, and Bonner flow directly from the allegedly improper communications between Defendants Kim, Sovereign, McCaul, Conaway, Dent and Harper. *See* Compl. ¶ 14 (Defendant Chisam allegedly "failed to promptly notify [Congressman Rangel] of what occurred prior to the Sanction hearing," i.e., of the allegedly improper communications); *id.* ¶¶ 12, 13 (Defendants Lofgren and Bonner allegedly made misrepresentations to the full Committee before the Sanction Hearing and to the full House before censure vote concerning fairness of disciplinary proceedings; allegation that such statements were "misrepresentations" turns on the allegation that improper communications occurred earlier).

took place in connection with Waters disciplinary matter did not violate Bifurcation Rule; analyzing Ethics Committee Rules 8, 23 and 25 and concluding that "once the ISC is no longer in possession of its evidence, the bifurcation rule is no longer operable.").

Congressman Rangel's Complaint does not allege facts, even taken in the light most favorable to him, that suggest a violation of the Bifurcation Rule (or any other applicable rule). For example, his Complaint does not allege that Ms. Kim or Ms. Sovereign shared information from the Rangel-ISC with any Committee Members while the Rangel-ISC was operational. Rather, it alleges, at most, that they shared information with four Members of the Rangel-ASC (Defendants McCaul, Conaway, Dent and Harper), Compl. ¶¶ 18, 20, at a time when the Rangel-ISC had ceased to exist.

As a matter of law, therefore, the alleged *ex parte* communications that underlie Congressman Rangel's claims did not violate any applicable House Rule or Committee Rule, Rules which the Congressman has conceded fully comport with Due Process. *See* Compl. ¶ 37 ("The procedure contained in the 'Rules of its [the House's] Proceedings' . . . in all respects is fair and comports with Due Process . . . ."); *supra* p. 3 n.3.

### D. Compliance with House and Committee Rules Is Not a Predicate to the House's Imposition of Discipline on Its Members.

Finally, Congressman Rangel has not stated a claim because, even assuming counterfactually that the House and/or the Committee failed to follow applicable Rules, compliance with those Rules was not a legal predicate to the House's censure of the Congressman. As discussed above, the Discipline Clause authority is textually committed exclusively to each House of Congress, *see supra* p. 30.  Moreover, the House's Discipline Clause authority is independent of its Rulemaking Clause authority.  It follows that Congressman Rangel cannot state a claim based on the alleged failure of the House and/or the Committee to follow particular rules in the disciplinary process. *Cf. Nixon v. United States*, 506 U.S. 224, 229 (1993) (challenge to

Senate impeachment procedures nonjusticiable); *Metzenbaum*, 675 F.2d at 1287 (question "of whether the House observed the rules it had established for its own deliberations" not justiciable).

**V.     The Court Should Exercise Its Discretion to Refuse to Adjudicate Congressman Rangel's Claims.**

Even if this Court had jurisdiction (which it does not), and even if the Complaint stated a claim (which it does not), the Court nevertheless should exercise its discretion to refrain from adjudicating this case.  The Court's discretion to so refrain arises from two sources:  the Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201, *et seq.*, and the doctrine of equitable (or remedial) discretion.

**A.     The Court Should Exercise Its Declaratory Judgment Act Discretion to Decline to Reach the Merits**.

Congressman Rangel seeks declaratory relief under the DJA.  *See* Compl. ¶ 100.  That Act provides that district courts "*may* declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a) (emphasis added); *see also id.* at § 2202 ("Further necessary or proper relief based on a declaratory judgment *may* be granted.") (emphasis added).

"In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration."  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995); *see also Hanes Corp. v. Millard*, 531 F.2d 585, 591 (D.C. Cir. 1976), *superseded by statute on other grounds*, *as recognized in Nat'l R.R. Passenger Corp. v. Consol. Rail Corp.*, 892 F.2d 1066, 1072 (D.C. Cir. 1990).  That is, the DJA grants the Court substantial discretion in determining whether to entertain Congressman Rangel's action.  *See, e.g.*, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007) (DJA "has long been understood 'to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants'") (quoting *Wilton*, 515 U.S. at 286); *Wilton*, 515 U.S. at 283 ("A declaratory judgment, like other forms of equitable relief,

should be granted only as a matter of judicial discretion exercised in the public interest . . . .");

*Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 94 (D.D.C. 2008) ("[D]istrict courts possess

discretion in determining whether and when to entertain an action under the [Act] . . . .").

This Circuit has identified several factors the Court should consider in determining how to

exercise its discretion under the DJA:

> Among the factors relevant to the propriety of granting a declaratory
> judgment are the following:  whether it would finally settle the
> controversy between the parties;  whether other remedies are
> available or other proceedings pending;  the convenience of the
> parties;  the equity of the conduct of the declaratory judgment
> plaintiff; prevention of "procedural fencing"; the state of the record;
> the degree of adverseness between the parties; and the public
> importance of the question to be decided.

*Hanes Corp.*, 531 F.2d at 591 n.4; *see also POM Wonderful LLC v. F.T.C.*, 894 F. Supp. 2d 40, 44

(D.D.C. 2012) (reiterating *Hanes* factors); *Miers*, 558 F. Supp. 2d at 95 (same).

Moreover, because the Congressman is "not a traditional declaratory judgment plaintiff

who brings suit to determine the legality of a 'course of action' the plaintiff 'wishes to pursue'" in

the future, *Swish Mktg., Inc. v. F.T.C.*, 669 F. Supp. 2d 72, 77 (D.D.C. 2009) (quoting *Hanes,* 531

F.2d at 592), he "must show that the *Hanes* factors overwhelmingly cut in [his] favor," *id*.; *see*

*also Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*, 793 F. Supp. 2d 124,

132 (D.D.C. 2011) ("Consideration of the purposes of the [DJA] favor[ed] abstention [from

exercising discretion to hear suit where allegations involved past conduct].").  This Congressman

Rangel cannot do.

*First,* Congressman Rangel has alternative remedies in the House itself.  He may ask his

colleagues to pass a resolution rescinding the censure, expressing the disagreement of the current

House with the discipline imposed by the 111th Congress, or something similar.  *See supra* p. 13-

14.  Alternatively, he may seek unanimous consent to alter or amend the content of the House

Journal for December 2, 2010.  *See supra* p. 35.

*Second*, it is not clear that the declaratory relief Congressman Rangel seeks here would resolve the controversy, inasmuch as the Congressman also seeks injunctive relief, *see* Compl. ¶¶ 103, 108, the granting of which might provoke a constitutional crisis, as explained above. *See supra* p. 36. "Generally, in the interest of judicial efficiency, courts decline to hear declaratory judgment actions that would not fully resolve the parties' claims." *POM Wonderful,* 894 F. Supp. 2d at 44 (citing *Roth v. D.C. Courts*, 160 F. Supp. 2d 104, 110 (D.D.C. 2001)); *see also* 10B Charles Alan Wright & Arthur R. Miller, Fed. Practice & Proc. § 2759 (3d ed. Supp. 2013) ("One of the most important considerations that may induce a court to deny declaratory relief is that the judgment sought would not settle the controversy between the parties.").

*Third*, Congressman Rangel's own conduct strongly counsels in favor of the Court not hearing this case. As noted above, the Congressman does not contest that the Committee and House possessed "clear and convincing evidence of [his] wrongdoing" at the time of the censure vote. Compl. ¶ 72. Indeed, he did not even defend himself before the Rangel-ASC. *See supra* p. 9. And, in the debate on the censure resolution on the floor of the House, none of the Members who spoke against the resolution – including the Congressman himself – denied that the misconduct, which the Rangel-ASC concluded had occurred, had in fact occurred. Rather, each pressed only for a lesser form of discipline. *See supra* p. 11-12.

Because the remaining *Hanes* factors favor Defendants, are inapplicable, or are neutral, the "*Hanes* factors [do not] overwhelmingly cut in [Congressman Rangel's] favor." *Swish Mktg.*, 669 F. Supp. 2d at 77. Indeed, they cut very much against him and, therefore, the Court should exercise its DJA discretion to decline to hear this case.

## B.    The Equitable Discretion Doctrine Also Counsels in Favor of the Court Declining to Reach the Merits.

The Courts of this Circuit have been particularly leery of resolving disputes that effectively pit one or more Members of the Legislative Branch against their colleagues. The doctrine of

equitable (or remedial) discretion reflects that caution.  "Under the 'equitable discretion' doctrine, a federal court simply chooses not to hear a case, believing that a proper resolution of the controversy lies through the legislative process."  *Leach v. Resolution Trust Corp.*, 860 F. Supp. 868, 873 (D.D.C. 1994).

In *Vander Jagt*, 699 F.2d 1166, for example, the D.C. Circuit dismissed a suit brought by 14 minority-party Members of the House against the majority-party leadership of the House, a suit which contended that the majority discriminated against the minority in the allocation of committee seats.  The Court explained that it was "'motivated by a proper respect for the [Legislative Branch] and a disinclination to intervene unnecessarily in [its] disputes.'"  *Id.* at 1174 (quoting Carl McGowan, *Congressmen in Court:  The New Plaintiffs*, 15 Ga. L. Rev. 241, 262 (1981)); *see also Leach*, 860 F. Supp. at 871 ("Representative Leach's real dispute is with his colleagues in Congress, who are capable of providing him with substantial, if not complete relief, and the Court is thus reluctant to interfere with what should essentially be handled as an internal congressional matter."); *id.* at 875 ("[T]he Court thus concludes that it would indeed be unwise to permit the federal courts to become a higher legislature where a congressman who has failed to persuade his colleagues can always renew the battle . . . ." (quotation marks omitted)).

To the extent the equitable discretion doctrine continues to have vitality in this Circuit – and we acknowledge that that is an open question after *Raines*, 521 U.S. 811 – this Court should exercise that discretion to decline to hear this case because it pits one Member of the House against his colleagues, and because a "proper resolution of th[is] controversy lies through the legislative process."  *Leach*, 860 F. Supp. at 873.

## CONCLUSION

For all the foregoing reasons, Defendants' motion to dismiss should be granted.

Respectfully submitted,

*/s/ Kerry W. Kircher*
KERRY W. KIRCHER, D.C. Bar #386816
General Counsel
Kerry.Kircher@mail.house.gov
WILLIAM PITTARD, D.C. Bar #482949
Deputy General Counsel
William.Pittard@mail.house.gov
CHRISTINE DAVENPORT
Senior Assistant Counsel
Christine.Davenport@mail.house.gov
TODD B. TATELMAN
Assistant Counsel
Todd.Tatelman@mail.house.gov
MARY BETH WALKER, D.C. Bar #501033
Assistant Counsel
MaryBeth.Walker@mail.house.gov
ELENI M. ROUMEL
Assistant Counsel
Eleni.Roumel@mail.house.gov

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

*Counsel for Defendants John A. Boehner, Karen L.*
*Haas, Jo Bonner, Zoe Lofgren, Michael T. McCaul, K.*
*Michael Conaway, Charles W. Dent, and Gregg Harper*


*/s/ John M. Faust*
JOHN M. FAUST, D.C. Bar #433553
John@johnfaustlaw.com
LAW OFFICE OF JOHN M. FAUST, PLLC
1325 G Street, N.W., Suite 500
Washington, D.C. 20005
(202) 449.7707 (telephone)
(202) 449.7701 (facsimile)

*Counsel for Defendant R. Blake Chisam*

*/s/ Richard A. Sauber*
RICHARD A. SAUBER, D.C. Bar #385070
rsauber@robbinsrussell.com
ROBBINS, RUSSELL, ENGLERT, ORSECK,
   UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411L
Washington, D.C. 20006
(202) 775.4506 (telephone)
(202) 775.4510 (facsimile)

*Counsel for Defendants C. Morgan Kim and
Stacey Sovereign*

July 12, 2013

**CERTIFICATE OF SERVICE**

I certify that on July 12, 2013, I served the foregoing Memorandum of Points and

Authorities in Support of Defendants' Motion to Dismiss by CM/ECF and by electronic mail, .pdf

format, on the following:

Jay Goldberg, Esquire
JAY GOLDBERG, P.C.
250 Park Avenue, Suite 2020
New York, NY 10177
office@jaygoldberg.com

*/s/ Kerry W. Kircher*
Kerry W. Kircher