**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **CHARLES B. RANGEL,**<br><br>**Plaintiff,**<br><br>v.<br><br>**JOHN A. BOEHNER, et al.,**<br><br>**Defendants.** |

**Civil Action No. 13-540 (JDB)**

<u>**MEMORANDUM OPINION**</u>

Before the Court is [14] defendants' motion to dismiss plaintiff Charles Rangel's complaint, which seeks injunctive and declaratory relief related to his censure by the United States House of Representatives. Defendants have responded with a motion to dismiss plaintiff's complaint on five grounds: standing, the political question doctrine, immunity under the Speech or Debate Clause of the U.S. Constitution, failure to state a claim, and discretionary dismissal under the Declaratory Judgment Act or under the doctrine of equitable discretion. The Court will grant defendants' motion to dismiss on the first three of those grounds.

<u>**BACKGROUND**</u>

This case results from the United States House of Representatives' censure of Representative Charles Rangel ("Rangel"). Rangel is the U.S. Representative for New York's 13th congressional district. Currently the third-longest-serving member of the House, Rangel has been serving for over forty years: he was first elected in 1970 and has been re-elected in every congressional election since. From 2007 to 2010, Rangel, a Democrat, was the Chairman of the House Ways and Means Committee ("Ways and Means"). Rep. on the Legis. & Oversight

Activities of the Comm. on Ways & Means During the 112th Cong. at 131 (Comm. Print May 31, 2012) ("Ways and Means Rep.").[1]

In 2008, Rangel began facing an increasing swell of allegations that he had engaged in impropriety. Those allegations involved certain failures to report income on federal tax returns and on House financial disclosure forms; failures to pay tax on rental income from a Caribbean villa; the use of rent-stabilized apartments in Manhattan for his campaigns in contravention of state and city regulations; and the improper solicitation of donations for an academic center that will house his papers and bear his name. Rep. of the Comm. on Standards of Official Conduct, In the Matter of Rep. Charles B. Rangel, H. Rep. No. 111-661, vol. I, at 147, 267 (Nov. 29, 2010) ("Ethics Comm. Rep.").[2] Answering the growing clamor, Rangel requested that the House Ethics Committee investigate the allegations, which it agreed to do. Id. at 258, 266, 644. The Ethics Committee established an investigative subcommittee and reauthorized it when the 111th Congress began. Id. at 258, 428-29; Statement of the Chair and Ranking Republican Mem. of the [Ethics] Comm. (Feb. 10, 2009).[3]

After conducting an extensive investigation, which included witness interviews, document review, and subcommittee meetings, the investigative committee adopted and transmitted to the full Ethics Committee a thirteen-count Statement of Alleged Violation, detailing the misconduct allegations. Ethics Comm. Rep., vol. I, at 284, 287, 428. In response, the Ethics Committee convened an adjudicatory subcommittee, which held an adjudicatory hearing in November 2010. Id. at 260, 364. Concluding that eleven of the thirteen counts in the Statement of Alleged Violation were established by "clear and convincing evidence," the

---

[1] Available at http://waysandmeans.house.gov/uploadedfiles/laor_112_mid_year_2012_final.pdf.
[2] Available at http://ethics.house.gov/committee-report/matter-representative-charles-b-rangel.
[3] Available at http://ethics.house.gov/sites/ethics.house.gov/files/documents/press_statement_ rangel_subcomm_2009.pdf.

adjudicatory subcommittee then sent its report to the full Ethics Committee, which in turn held a hearing to consider what sanction to recommend that the House impose. Id. at 2, 6-14, 396-405, 429-99, 618-89. Following that hearing, the Ethics Committee presented its proposed sanction—censure—to the full House. Id. at 2, 680-81. After debate, the House voted to adopt the Ethics Committee's recommendation: Rangel then stood in the well of the House while then-Speaker Nancy Pelosi read the text of the censure resolution. 156 Cong. Rec. H7891-99 (daily ed. Dec. 2, 2010). In the normal course of the House's day-to-day proceedings, the Clerk of the House prepared a report of the day's events—including a description of the censure proceedings—for inclusion in the House Journal. J. of the H.R. ¶¶ 116.25-.27 (Dec. 2, 2010). The Speaker pro tempore approved the Journal, and thus Rangel's censure became part of the House Journal. Like much of Congress's business, portions of the proceedings were broadcast on C-SPAN. See, e.g., Debate on and Censure of Rep. Charles Rangel (Dec. 2, 2010).[4]

Had that been the end of the matter, this case might not have been filed. But several months later, a memorandum purportedly written by the chief counsel of the Ethics Committee, who is a defendant here, was posted on Politico.com, a political journalism website. See John Bresnahan, Did ethics staff taint Maxine Waters Probe?, Politico (July 18, 2011)[5]; Compl. Ex. A ("Chisam Memorandum"). In Rangel's view, that memorandum contains explosive allegations that, if true, significantly undermine the integrity of his censure proceedings. The memorandum addressed, in relevant part, purported ex parte communications between staffers and certain members of the adjudicatory committee during his disciplinary proceedings. Chisam Memorandum at 5-7. Rangel also believes that had the chief counsel notified him of the alleged improprieties before his sanctions hearing concluded, he would have moved to dismiss the

---

[4] Available at http://www.c-spanvideo.org/program/Rangl.
[5] Available at http://www.politico.com/news/stories/0711/59225.html.

proceedings—and, in his view, the House would have done so, precluding the censure altogether. Hence, after the memorandum came to light, he moved the Ethics Committee to "withdraw its actions" in his disciplinary proceedings, which the committee declined to do. Compl. Ex. I. Rather than seek redress from the full House, Rangel filed this action against: (1) the current Speaker of the House, Representative John Boehner; (2) the current Clerk of the House, Karen Haas; (3) the Chairwoman of the Ethics Committee during the 111th Congress, Representative Zoe Lofgren; (4) the Ranking Member of the Ethics Committee during the 111th Congress, Representative Jo Bonner; (5) four more members of the adjudicatory subcommittee, Representatives Michael T. McCaul, K. Michael Conaway, Charles W. Dent, and Gregg Harper; and (6) three staffers who worked for the Ethics Committee during the 111th Congress, R. Blake Chisam, C. Morgan Kim, and Stacey Sovereign. Compl. ¶¶ 9-26. Rangel has not sued the institution that censured him, the House of Representatives itself.

Some other background information is relevant to defendants' motion to dismiss. During the investigative phase of the proceedings, Rangel voluntarily stepped down as Chairman of the Ways and Means Committee, while retaining his membership on the committee. Letter from the Hon. Charles B. Rangel to the Hon. Nancy Pelosi (Mar. 3, 2010) ("Rangel Letter").[6] In 2010, the House flipped from majority Democrat to majority Republican, which resulted in lost seats on Ways and Means for House Democrats—including the Chair. Even so, after being re-elected in 2010, and again in 2012, Rangel was reassigned to the Ways and Means Committee. See Ways and Means Rep. at II. Rather than being members of any of the subcommittees, the Chair and Ranking Member of that committee were deemed "ex-officio Members" of all subcommittees. See Rules of the Comm. on Ways & Means, Rule 9 (112th Cong.) ("Ways and Means Rules").[7]

---

[6] Available at http://i2.cdn.turner.com/cnn/2010/images/03/03/0032.rangel.pdf.
[7] Available at http://waysandmeans.house.gov/uploadedfiles/rules112__1_7_2011.pdf.

Rangel alone was also deemed an ex-officio member of all Ways and Means subcommittees in the 112th Congress. <u>See</u> Ways and Means Rep. at X n.1. Although his status as only an ex-officio member would have precluded his voting on any subcommittee matter, in the 112th Congress every vote was taken at the full committee level. <u>See generally</u> <u>id.</u> at 11-93.

Rangel faced primary challengers in the 2012 election. Unsurprisingly, one opponent attempted to make hay out of the censure by wrongly asserting that Rangel no longer had "the ability to vote on his own committee anymore." Compl. Ex. K. The primary challenges were ultimately unsuccessful; Rangel defeated all of his opponents despite that particular bit of mudslinging.

Based on what he views as procedural irregularities in the course of his disciplinary proceeding in the House, Rangel seeks the following relief: a declaratory judgment to some unclear effect that, as best the Court can discern, the House must abide by its own rules before censuring one of its own;[8] an injunction requiring defendants to "take all necessary steps to vacate, strike and remove the recording of censure, as voted on by the House and as set forth in the Journal";[9] and an "Order or Writ in the nature of mandamus" that requires the Speaker and the Clerk of the House "to cause to be removed from The Journal of the House's Proceedings, any reference to the fact that Plaintiff had been censured." Compl. ¶ 108.

---

[8] Compl. ¶ 32 (seeking the following declaration: that "the textual meaning and effect of Article [I], Section 5, Clause 2 and the 'Rules of [the House's] Proceedings' require the protection of constitutional restraints and fundamental constitutional rights, where there is a knowing, intentional and willful violation of the Constitutional Provision by the Committee charged with recommending the sanction to be imposed by the House, and where the Chair of the Committee and its Ranking Member falsely and deceptively mislead the House, prior to the House's vote on December 2, 2010, to sanction the member by stating that all constitutional restraints and procedural rights had been recognized and that fundamental constitutional rights had been adhered to. As happened in Plaintiff's matter before the Committee, the House lacked the predicate to discipline Plaintiff by reason of the aforesaid violations").

[9] Compl. ¶ 103. In anticipation of the separation-of-powers difficulties that this request presents, he appears to ask in the alternative that the Court instruct defendants to fashion a suitable remedy. Pl.'s Opp'n [ECF No. 15] 4 ("[I]t may well be that what the court should do in this case . . . is to give the Defendants time to explain how they would remedy the wrongs committed. When the court recognizes that determining the relief to be ordered presents a difficult problem, the court can instruct the defendants to fashion a remedy.").

## STANDARD OF REVIEW

Defendants assert five grounds for dismissal, arguing that: (1) Rangel lacks standing to bring his claims; (2) Rangel's claims present nonjusticiable political questions; (3) defendants are absolutely immune from suit under the Speech or Debate Clause, U.S. Const. Art. I, § 6, cl. 1; (4) Rangel fails to state a claim upon which relief can be granted; and (5) even if the Court had jurisdiction and Rangel has stated a claim, the Court should exercise its discretion not to reach the merits of his suit. See Defs.' Mot. to Dism. [ECF No. 14] ("Def.'s Mot.") 4. The first two grounds challenge this Court's subject-matter jurisdiction and therefore will be evaluated under Federal Civil Rule 12(b)(1); the last three grounds will be evaluated under Rule 12(b)(6). See Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987) (stating that "the defect of standing is a defect in subject matter jurisdiction"); Gonzalez-Vera v. Kissinger, 449 F.3d 1260, 1262 (D.C. Cir. 2006) (explaining that a dismissal under the political question doctrine constitutes a dismissal for lack of subject-matter jurisdiction and "not an adjudication on the merits").

Although courts examining a Rule 12(b)(1) motion to dismiss—such as for lack of standing—will "construe the complaint in favor of the complaining party," see Warth v. Seldin, 422 U.S. 490, 501 (1975), the "'plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim," Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987)). Because the elements necessary to establish jurisdiction are "not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof; i.e., with the manner and degree of evidence required at successive stages of the

6

litigation." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). Thus, a court may consider material other than the allegations of the complaint in determining whether it has jurisdiction to hear the case, so long as the court accepts the factual allegations in the complaint as true. See Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005); EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 n.3 (D.C. Cir. 1997).

To survive a motion to dismiss under Rule 12(b)(6), a complaint need only contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,'" such that the defendant has "'fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, a plaintiff must supply "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action" to provide the "grounds" of "entitle[ment] to relief." Twombly, 550 U.S. at 555-56; see also Papasan v. Allain, 478 U.S. 265, 286 (1986). Instead, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009) (quoting Twombly, 550 U.S. at 570); Atherton v. Dist. of Columbia Office of the Mayor, 567 F.3d 672, 681 (D.C. Cir. 2009). A complaint is considered plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. This amounts to a "two-pronged approach," under which a court first identifies the factual allegations that are entitled to an assumption of truth and then determines "whether they plausibly give rise to an entitlement to relief." Id. at 679.

**DISCUSSION**

Defendants challenge Rangel's suit on three separate grounds that would each preclude the Court from reaching the merits of his claims: standing; the political question doctrine; and absolute immunity under the Speech or Debate Clause. The Court addresses each argument in turn.

## I.   RANGEL LACKS STANDING TO ASSERT HIS CLAIMS

Before this Court may entertain the merits of his claims, Rangel must establish that he has the requisite standing to sue. See Lujan, 504 U.S. at 560-61. Under Rule 12(b)(1), the party seeking to invoke the jurisdiction of a federal court—Rangel in this case—bears the burden of establishing that the court has jurisdiction to hear his claims. See U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000); Grand Lodge, 185 F. Supp. at 13 (explaining that a court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority"). Standing is a "threshold question in every federal case." Warth, 422 U.S. at 498. Article III of the U.S. Constitution "limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies,'" Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc., 454 U.S. 464, 471 (1982), and the doctrine of standing serves to identify those "'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III" and which are thus "'appropriately resolved through the judicial process,'" Lujan, 504 U.S. at 560 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth, 422 U.S. at 498. To establish the "irreducible constitutional minimum of standing," a plaintiff must allege (1) an "injury in fact" which is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"; and (3) a likelihood "that

the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 560-61 (internal quotation marks and citations omitted). The Supreme Court has stressed that the standing inquiry is "'especially rigorous' when reaching the merits of a case would raise questions about the proper scope of judicial authority"—in other words, in a case raising important separation-of-powers concerns. Chenoweth v. Clinton, 181 F.3d 112, 115 (D.C. Cir. 1999) (quoting Raines v. Byrd, 521 U.S. 811, 819-20 (1997)). "As the Supreme Court has observed, the power to declare actions of the other branches unconstitutional should be 'a tool of last resort' because it 'is . . . the ultimate threat to the continued effectiveness of the federal courts in performing that role.'" Walker v. Cheney, 230 F. Supp. 2d 51, 65 (D.D.C. 2002) (quoting Valley Forge, 454 U.S. at 474). Rangel appears[10] to assert four injuries: reputational harm resulting from the censure; a loss of status on House Ways and Means subcommittees; political exploitation of the censure; and an amorphous due process injury based on the conduct of certain defendants during the events leading up to his censure. None of these will support Article III standing.

### A.     Rangel Does Not Have Standing Based On The Alleged Injury To His Reputation

Rangel alleges that "[t]he House's action and the censure recorded in the permanent record of The Journal of the House's Proceedings [. . .] have [caused] and will cause Plaintiff reputational harm, plus public stigmatization [. . .] which is fairly and directly traceable to the [censure]." Compl. ¶ 86. "[I]njury to reputation can constitute a cognizable injury sufficient for Article III standing." Foretich v. United States, 351 F.3d 1198, 1211 (D.C. Cir. 2003) (citing Meese v. Keene, 481 U.S. 465, 473-77 (1987)). Defendants respond, however, that Rangel's claim of reputational injury is insufficiently concrete and particularized. But it is beyond peradventure that being censured by the U.S. House of Representatives concretely and

---

[10] Rangel's filings are not models of clarity, but the Court has endeavored to construe them as broadly as possible.

particularly harms a sitting Member's reputation, particularly a Member like Rangel who has demonstrated a desire to remain in the House. <u>Foretich</u>, 351 F.3d at 1213 ("[W]here reputational injury derives directly from an unexpired and unretracted government action, that injury satisfies the requirements of Article III standing to challenge that action.").[11] Accordingly, Rangel has sufficiently alleged an Article III injury-in-fact.

That is not the end of the matter, however. Rangel must also show that defendants caused his reputational injury and that this Court can redress it by granting the relief he requests. <u>Lujan</u>, 504 U.S. at 560-61. To demonstrate causation, Rangel must show that the reputational harm "is fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." <u>Lujan</u>, 504 U.S. at 560-61 (citing <u>Simon v. Eastern Ky. Welfare Rights Org.</u>, 426 U.S. 26, 41-42 (1976)). As defendants point out, Rangel has not sued the House itself. Despite his contention that defendants' argument on this point is "fruitless wordplay," Pl.'s Opp'n to Defs.' Mot. to Dism. [ECF No. 15] ("Pl.'s Opp'n") 26, Rangel's choice of defendants has real consequences for his ability to demonstrate causation. The reputational harm he suffered resulted from "[t]he House's action and the censure recorded in the permanent record of The Journal of the House's Proceedings." Compl. ¶ 86. Ultimately, it was the "independent action" (the censure) "of [a] third party not before the court" (the House) that caused harm to Rangel's reputation. <u>Lujan</u>, 504 U.S. at 560-61; Compl. ¶ 86. Four of the defendants were not Members of the House at the time and thus did not vote to censure Rangel: the three committee staff defendants, Mr. Chisam, Ms. Kim, and Ms. Sovereign, were staff members, and Ms. Haas was (and is) the Clerk of the House. Plainly, they did not censure Rangel. The other seven defendants were, and in most cases still are, Members of the House. But

---

[11] Whether this reputational harm, standing alone, supports Rangel's due process claim is another matter. <u>See</u> <u>Paul v. Davis</u>, 424 U.S. 693, 699-700 (1976); <u>Gen. Elec. Co. v. Jackson</u>, 610 F.3d 110, 121 (D.C. Cir. 2010); <u>Doe v. U.S. Dep't of Justice</u>, 753 F.2d 1092, 1108-09 (D.C. Cir. 1985); <u>infra</u> Part II.A.

individual Members are not responsible for the actions of the House as an institution, just as they cannot "represent the interests of an entire House or all of Congress." Kucinich v. Bush, 236 F. Supp. 2d 1, 11 (D.D.C. 2002). "Power is not vested in any one individual, but in the aggregate of the members who compose the body, and its action is not the action of any separate member or number of members, but the action of the body as a whole." United States v. Ballin, 144 U.S. 1, 7 (1892). Thus, for the purposes of Article III, Rangel's reputational harm was not caused by any of the defendants but by the House as an independent body—and it is not a party to this action.

Rangel counters that but for defendants' actions—excluding the Speaker and the Clerk, whom he sues only because of their purported capacity to provide relief—he would not have been censured. See Compl. ¶¶ 9-11. Rangel's argument is as follows: if he had been notified that the staffers and certain members had had improper ex parte communications, he would not have left the hearing and he would have moved to dismiss the proceedings; if he had moved to dismiss, the Committee would have granted his motion because of the misconduct; if the Committee had instead denied his motion, the House still would not have censured him; if the House had not censured him, he would not have suffered any reputational harm based on his own misconduct … and so on. This type of speculative and attenuated causation is not sufficient under Article III. Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1150 (2013) ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors."); Allen v. Wright, 468 U.S. 737, 759 (1984) ("The links in the chain of causation between the challenged . . . conduct and the asserted injury are far too weak for the chain as a whole to sustain [plaintiffs'] standing."); Simon, 426 U.S. at 33-34, 41 (injury caused by a hospital, when the hospital was not a defendant, was insufficient to support standing). Whether the Committee would have granted his motion to dismiss based on the

purported misconduct is entirely speculative. Whether, if the Committee had denied his motion, the House would not have censured him, is as well. Rangel "cannot rely on speculation about the unfettered choices made by independent actors not before the court," such as the Ethics Committee and the House itself. Clapper, 133 S. Ct. at 1150 n.5 (internal quotation marks omitted). Hence, because he cannot establish that the alleged misconduct by defendants caused his reputational harm, Rangel does not have Article III standing.

Even if Rangel could satisfactorily demonstrate causation, he cannot show redressability. Lujan, 504 U.S. at 561 (requiring a likelihood "that the injury will be redressed by a favorable decision"). Assuming that the House reversing course and striking his censure would remedy his reputational harm—although defendants contest this point, too—this Court has no power to issue an order bringing about that result. For the reasons detailed infra, Part II.B, whether the House will rescind his censure and, in Rangel's view, rehabilitate his reputation, depends entirely on the unbridled discretion of the House, and this Court cannot order the relief he seeks. In any event, the order Rangel asks for would not achieve the result he desires: any alteration of the House's Journal from a legislative day other than the previous legislative day requires unanimous consent, but an order would bind only the six current Member defendants.[12] See W. Holmes Brown, Charles W. Johnson, & John V. Sullivan, House Practice: A Guide to the Rules, Precedents & Procedures of the House, ch. 28, § 9 (2011). In other words, redressability here "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." ASARCO Inc. v. Kadish, 490 U.S. 605, 615 (1989). Thus, Rangel cannot demonstrate

---

[12] Rep. Jo Bonner resigned from the House on August 2, 2013; the remaining Member defendants are current Members. See Current Vacancies, Office of the Clerk of the House (Dec. 5, 2013), available at http://clerk.house.gov/member_info/vacancies_pr.aspx?pr=house&vid=84; Member Information, Office of the Clerk of the House (Nov. 1, 2013), available at http://clerk.house.gov/member_info/olmbr.aspx.

even a likelihood "that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at

560-61.

### B.   Rangel Does Not Have Standing Based On The Alleged Loss Of His Status On The House Ways And Means Committee

Rangel next alleges that "after the censure . . . in the 112th Congress, [he] was only

granted ex-officio status on all Ways and Means Subcommittees . . . without having voting rights

as other Member[s] assigned to the Subcommittee[s]." Compl. ¶ 67. In March 2010, while the

investigation into Rangel's misconduct was still ongoing, Rangel relinquished his responsibilities

as Chairman of the Committee on Ways and Means "until such time as the Committee on

Standards completes its findings on the review currently underway." Rangel Letter.[13] But he

retained his seat on that committee. When Democrats lost control of the House in the 2010

election, House Democrats lost several seats on Ways and Means. Compare Ways and Means

Rep. at II (22 Republicans to 15 Democrats), with Rules Adopted by the 111th Cong. at 309

(Rules Comm. Print 2009) ("111th Cong. Comm. Rules") (15 Republicans to 26 Democrats).[14]

Even so, Rangel kept his seat on Ways and Means after being re-elected in 2010 and 2012. See,

e.g., H. Res. 31, 112th Cong. (2011).

Rangel's lament concerns subcommittee assignments on Ways and Means. First, some

background: the ratio of Republicans to Democrats on each Ways and Means subcommittee was,

by committee rule, not less than the overall ratio of Republicans to Democrats on the committee

---

[13] The Court's analysis draws upon several documents—mostly from Congressional sources—not in the record. Normally, at the motion-to-dismiss stage, the Court is limited to consideration of the pleadings. But the Court nevertheless may take judicial notice of public records, see Fed. R. Evid. 201(b)-(c) ("A court may take judicial notice, whether requested or not" of any fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); Texas Border Coalition v. Napolitano, 614 F. Supp. 2d 54, 57 n.1 (D.D.C. 2009), and because the Court is determining subject-matter jurisdiction, it may consider material other than the accepted-as-true allegations of the complaint, see Lujan, 504 U.S. at 561; Jerome Stevens, 402 F.3d at 1253-54.

[14] Available at http://www.gpo.gov/fdsys/pkg/CPRT-111HPRT52561/pdf/CPRT-111HPRT52561.pdf.

itself, so Democrats lost several seats on all Ways and Means subcommittees after the 2010 election. Rule 8, Ways and Means Rules. The Chairman and Ranking Member of Ways and Means were not regular members of any particular subcommittee; instead, they were "ex-officio members" of all subcommittees. Rule 9, Ways and Means Rules. As such, they could be counted to help establish a quorum, and could play some role on every subcommittee, but they were not taken into consideration for the purposes of determining the ratio of Republicans and Democrats on the subcommittee. Id. More importantly, they could not vote in the subcommittee. Id. Rangel also was not a regular member of any Ways and Means subcommittee, but defendants maintain that the subcommittee positions for Democrats on Ways and Means were filled in accordance with the rules of the Democratic Caucus, and Rangel does not dispute this assertion. See Rules 26, 31(C), Rules of the Democratic Caucus (112th Cong.), Defs.' Mot. Ex. 9. Unlike any other Member on Ways and Means (except the Chair and Ranking Member), Rangel was an "ex[-]officio member sitting on all of the Subcommittees without voting rights in the 112th Congress." Ways and Means Rep. at X n.1. But review of the report on the activities of the Ways and Means Committee reveals that no subcommittee held a vote during the 112th Congress; the only Ways and Means votes held during the 112th Congress were taken at the full committee level. See generally id. at 11-93.

Rangel frames his injury as the loss of status he endured when defendants (in his view) wrongfully denied him a seat on Ways and Means subcommittees, although he does not specify how defendants did so—instead, he points only to his ex-officio status. He seems to argue that because he was only an ex-officio member of all subcommittees, his reputation was harmed. Maybe so. This reputational harm may constitute a cognizable injury. See supra Part I.A. Yet to the extent Rangel argues that he suffered some sort of legislative harm sufficient to support

14

legislative standing, see Raines v. Byrd, 521 U.S. 811, 829-30 (1997), the utter lack of votes held by Ways and Means subcommittees defeats any such claim. Rangel cannot assert that he was wrongfully deprived of participation in votes that simply never took place. Raines, 521 U.S. at 829-30.

Even if his purported loss of status on Ways and Means were cognizable as an injury under Article III because of reputational harm or under a theory of legislative standing, Rangel cannot demonstrate that defendants caused that injury and cannot demonstrate that this Court could redress it. Rangel does not dispute that subcommittee positions for Democrats on Ways and Means were filled in accordance with the rules of the Democratic Caucus. See Rules 26, 31(C), Rules of the Democratic Caucus (112th Cong.), Defs.' Mot. Ex. 9. Recall, too, that those subcommittees had fewer seats available for Democrats because of the 2010 election. That the committee staffer defendants and the Clerk of the House did not directly cause Rangel's failure to gain a seat on a Ways and Means subcommittee is clear. Moreover, only one of the Member defendants (Rep. Lofgren) was even a member of the Democratic Caucus in the 112th Congress: the other six are Republicans. Rangel does not allege that the Democratic Caucus somehow wrongfully precluded him from holding a subcommittee seat—and if he did, he has sued the wrong defendant, because just as Rep. Lofgren is not the House, she is not the Democratic Caucus either. Cf. Ballin, 144 U.S. at 7. What is more, to the extent Rangel considers his ex-officio status—as opposed to his lack of a seat on any subcommittee—on Ways and Means to be an injury, he cannot trace that injury to the conduct of any of the defendants here, as none of them were even members of the Ways and Means Committee in the 112th Congress. See Ways and Means Rep. at II.

Hence, Rangel cannot demonstrate that any harm was caused by defendants rather than by independent third parties not before the Court. See Lujan, 504 U.S. at 560-61. The chain of causation is just too attenuated: defendants somehow caused the censure—itself a debatable point—and because of the censure, the Democratic Caucus and the Ways and Means Committee deprived him of his seats on subcommittees. Rangel simply cannot show that defendants' purported misconduct inexorably led to that result; too many independent intervening factors exist.

Rangel also cannot show redressability. For one thing, the 112th Congress is no more. His requested relief, that the Court somehow force the House to rescind his censure, does no work to redress his asserted "injury" of being only an ex-officio member on Ways and Means subcommittees in the expired 112th Congress. And for the reasons described infra, Part II.B, the Court cannot grant his requested relief, which would in no way redress any "loss of status" on Ways and Means in the 112th Congress anyway. Hence, Rangel cannot show the required redressability, and cannot base standing on this alleged injury.

### C.    Rangel Does Not Have Standing Based On Political Exploitation Of The Censure

Rangel further alleges that after he was censured, "[the censure] was exploited by a political opponent in the 2012 Democratic primary election (in a news release available to the public) and it is expected that the same will take place in any future election in which Plaintiff is a candidate." Compl. ¶ 67. To support this allegation, Rangel references a news article, see Compl. ¶ 67; Compl. Ex. K, in which one of Rangel's 2012 primary challengers asserted that Rangel "doesn't even have the ability to vote on his own committee anymore" (referring to the Ways and Means Committee), see id. As explained above, Rangel retained his right to vote on the full Ways and Means Committee, and only lacked a vote on its subcommittees. As an attempt

to exploit electorally Rangel's censure, this (imprecise) statement fell flat: Rangel was re-elected to the House in 2012. But he cites no authority for the proposition that his political opponent's (unsuccessful and inexact) use of his failure to secure a seat on Ways and Means subcommittees somehow constitutes a cognizable injury-in-fact. And in this context, it does not. A plaintiff may not repair to a federal court to obtain a remedy for a public comment about his record made by his opponent during the innately searching electoral process—it is not as if Rangel asserts a defamation claim against that (non-defendant) opponent. As a result, the unsuccessful and inaccurate exploitation of Rangel's status on Ways and Means following the censure is not a cognizable Article III injury.

As with his first two alleged injuries, Rangel cannot demonstrate causation or redressability, even if this were a sufficient injury under Article III. By now, the analysis is familiar: this asserted injury resulted from the actions of an independent third party not before the Court (the primary challenger), and even if the Court could grant his requested relief—which it cannot—the relief would not redress his past injury. Clapper, 133 S. Ct. at 1150 n.5; Lujan, 504 U.S. at 560-61. Retroactively striking the censure will not make the long past 2012 election any easier for Rangel. Thus, he does not have standing based on his 2012 primary challenger's exploitation of the censure.[15]

### D.      Rangel Does Not Have Standing Based On The Alleged Due Process Injury

Rangel also argues that he had a "vested interest" in what he views as "guaranteed protections" of the Committee Rules on disciplinary proceedings, and that his due process rights

---

[15] Rangel responds to defendants' arguments that he did not suffer any injury-in-fact only by restating his premise: that he "maintains the claims of extensive damage caused to his reputation, exploitation by primary opponents because of this damage, and loss of powers on the Committee on Ways and Means." Pl.'s Opp'n 22. The Court finds that Rangel has conceded the points by not addressing defendants' arguments in any meaningful way. See, e.g., Bradshaw v. Office of the Architect of the Capitol, 856 F. Supp. 2d 126, 143-44 (D.D.C. 2012) (internal quotation marks and citations omitted) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

were violated when he was deprived of those "legally enforceable" interests. Pl.'s Opp'n 25-26. In other words, he argues that his injury is the purported "deprivation of a fair hearing under Committee Rules," which in his view led to his censure. Pl.'s Opp'n 12 (framing the injury as "Defendants' violation of the Committee Rules"). He views the Foreword to the Rules of the Ethics Committee as setting forth binding promises on the Committee's behalf "to carry out its advisory and enforcement responsibilities in an impartial manner," and "to provide a fair procedural framework" during investigations and hearings. Id. at 23 (arguing that the Foreword "provides in unequivocal terms [a] fair procedural framework . . . marked by impartiality" and that as a result he was "promised due process and protection of his fundamental constitutional rights, and so he has an expectation founded on a written commitment"); id. at 25 ("Plaintiff had a vested interest in each of these guaranteed protections and was deprived of these interests when these protections were violated in secret."). Alleging misconduct during his investigation and hearing, he seems to argue that the resulting deprivation of due process is itself a cognizable Article III injury. See Pl.'s Opp'n 6-7 (arguing that the Committee denied Rangel's: "due process rights to a fair and impartial hearing"; "confrontation [rights]"; "cross-examination [rights]"; "the right, as noted in the [Foreword to the Committee] Rules, that Committee Members be impartial"; that the committee staff member defendants "created a clear and present danger to the integrity of the proceedings"; that "their conduct could create problems of constitutional magnitude"; and that they failed to notify him of the alleged misconduct before the proceedings concluded).

These allegations, even taken together, do not present a cognizable Article III injury. Put otherwise, a bare assertion of a procedural due process violation is not an Article III injury. Under settled precedent, plaintiffs do not have standing based simply on allegations that their

due process rights have been violated. <u>See</u> <u>Gen. Elec. Co. v. Jackson</u>, 610 F.3d 110, 117 (D.C. Cir. 2010). The reason is straightforward: the Fifth and Fourteenth Amendments together guarantee that neither the federal government nor any state government will "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amends. V, XIV. Thus, unless a plaintiff is deprived of one of those interests without due process, that plaintiff has no claim. <u>Gen. Elec. Co.</u>, 610 F.3d at 117 ("Only after finding the deprivation of a protected interest do we look to see if the [government's] procedures comport with due process."). It is the deprivation of a liberty or property interest itself that triggers procedural due process requirements, and that deprivation is the Article III injury. <u>See</u> <u>Board of Regents v. Roth</u>, 408 U.S. 564, 570 (1972) ("[T]he range of interests protected by procedural due process is not infinite."). The deprivation is what needs to be redressed; the failure to meet the requirements of due process is what makes that deprivation redressable.

Thus, Rangel's allegations that defendants violated his due process rights, standing alone, are not cognizable as injuries-in-fact. Rather, he must allege a deprivation of some liberty or property interest to satisfy Article III. The ultimate outcome of Rangel's disciplinary proceedings was his censure by the full House. Rangel does not assert that he had a liberty or property interest in not being censured, and as a strictly reputation-based harm, it is unclear that he could. <u>See</u> <u>infra</u> Part II.A. The proceedings during which Rangel was purportedly deprived of due process—process to which he was not even due, <u>see</u> <u>infra</u> Part II.A—did not result in the deprivation of any protectable liberty or property interest. Hence, Rangel did not suffer an injury under Article III based on the purported Rules violations, even assuming the truth of his allegations about defendants' conduct.

Assuming arguendo that Rangel has sufficiently shown an Article III injury based on the purported Rules violations, he has also sufficiently demonstrated causation (by asserting that defendants violated the Rules)—except as to the Speaker and the Clerk, who are joined as defendants here only because of the relief that they can purportedly provide. Compl. ¶¶ 9-11. But as with his other alleged injuries, Rangel cannot demonstrate redressability, and thus even assuming that he has articulated a cognizable injury under Article III based on his "due process injury," he does not have standing.

At bottom, Rangel has not alleged any injury-in-fact caused by defendants that can be redressed by this Court. Hence, he does not have standing to bring any of his claims, and the Court must dismiss them for lack of subject-matter jurisdiction. Valley Forge, 454 U.S. at 471.

## II.    RANGEL'S CLAIMS PRESENT NONJUSTICIABLE POLITICAL QUESTIONS

Defendants argue that, even if Rangel has standing to sue, his claims should still be dismissed because they raise nonjusticiable political questions. The political question doctrine, like standing, is part of "the concept of justiciability, which expresses the jurisdictional limitations imposed on the federal courts by the 'case or controversy' requirement of Art[icle] III." Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 215 (1974). The political question doctrine "is 'essentially a function of the separation of powers,'" and it "'excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.'" El-Shifa Pharm. Indus. Co. v. United States, 607 F.3d 836, 840 (D.C. Cir. 2010) (en banc) (quoting Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986); Baker v. Carr, 369 U.S. 186, 217 (1962)). The precise contours of the political question doctrine remain "'murky and unsettled.'" Harbury v. Hayden, 522 F.3d 413, 418 (D.C. Cir. 2008) (quoting Tel-Oren v. Libyan Arab Repub., 726 F.2d 774, 803 n.3 (D.C. Cir. 1984) (Bork,

J., concurring)); see also Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1514 (D.C. Cir. 1984) (en banc), vacated on other grounds, 471 U.S. 1113 (1985) (describing the "shifting contours and uncertain underpinnings" of the political question doctrine).

Even so, the Supreme Court has articulated six factors which are "[p]rominent on the surface" of cases involving nonjusticiable political questions:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker, 369 U.S. at 217. The first two factors—a textual commitment to another branch of government and a lack of judicially manageable standards—are considered to be "the most important," see Harbury, 522 F.3d at 418, but in order for a case to be nonjusticiable, a court "need only conclude that one factor is present, not all," Schneider v. Kissinger, 412 F.3d 190, 194 (D.C. Cir. 2005). Defendants argue that this case involves two different textually committed issues, involving the Discipline Clause and the Journal Clause. See U.S. Const. Art. I, § 5, cls. 2, 3. Defendants also argue that it is impossible for the Court to resolve the case or grant Rangel his requested relief without expressing a profound lack of due respect for the House of Representatives.

### A.       Whether The House Properly Disciplined Rangel Is A Political Question

Rangel claims that the House was without power to discipline him because, he contends, complying with House Rules is a condition precedent to the constitutional imposition of internal House discipline, such as his censure. Thus, the argument goes, because defendants violated certain House and Ethics Committee Rules—though Rangel does not specify which, see infra

note 22—the House improperly censured him. Rangel's claim appears to be entirely novel: the Court has not discovered any case in which a Senator or House Member claimed that Congress violated the Discipline Clause in Article I, section 5, clause 2 of the U.S. Constitution by censure or by violating the Rules of their respective chamber.

To evaluate his claim, the Court first examines the adjacent Rulemaking Clause because of the relative dearth of judicial authority interpreting the Discipline Clause. Article I, section 5, clause 2 of the Constitution provides that: "Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member." The first part of this provision grants the House the power to make its own Rules about its internal proceedings; that power "only empowers Congress to bind itself." INS v. Chadha, 462 U.S. 919, 955 n.21 (1983); United States v. Rostenkowski, 59 F.3d 1291, 1306 (D.C. Cir. 1995) ("[T]he Rulemaking Clause . . . clearly reserves to each House of the Congress the authority to make its own rules."). It is a "broad grant of authority," Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n, 515 F.2d 1341, 1343 (D.C. Cir. 1975), but it is not without limits. The D.C. Circuit "has found no absolute prohibition of judicial review in the clause." Morgan v. United States, 801 F.2d 445, 449 (D.C. Cir. 1986) (Opinion of Scalia, J.) (citing Art. I, § 5, cl. 2.); see Vander Jagt v. O'Neill, 699 F.2d 1166 (D.C. Cir. 1983), cert. denied, 464 U.S. 823 (1983); CNN v. Anderson, 723 F. Supp. 835, 837 (D.D.C. 1989).

Normally, judicial intervention in this context is only "appropriate where rights of persons other than members of Congress are jeopardized by Congressional failure to follow its own procedures." Metzenbaum v. FERC, 675 F.2d 1282, 1287 (D.C. Cir. 1982) (citing Yellin v. United States, 374 U.S. 109 (1963); Christoffel v. United States, 338 U.S. 84 (1949); United

<u>States v. Smith</u>, 286 U.S. 6, 33 (1932)). The propriety of such intervention was addressed by the

Supreme Court as early as 1892 in <u>United States v. Ballin</u>, where the Court explained that:

> The Constitution empowers each house to determine its rules of proceedings. It may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained. But within these limitations all matters of method are open to the determination of the house, and it is no impeachment of the rule to say that some other way would be better, more accurate, or even more just. It is no objection to the validity of a rule that a different one has been prescribed and in force for a length of time. The power to make rules is not one which once exercised is exhausted. It is a continuous power, always subject to be exercised by the house, and, within the limitations suggested, absolute and beyond the challenge of any other body or tribunal.

144 U.S. 1, 5 (1892). Thus, judicial review of House[16] Rules can take place only within a limited

set of circumstances and may concern only a similarly limited set of constraints on the Rules.

Here, Rangel does not challenge a particular House or Committee Rule as violative of the

Constitution or of his fundamental rights. Instead, he maintains that defendants violated

unspecified House Rules by engaging in the misconduct he alleges, and that those violations

transformed his censure into an unconstitutional violation of the Discipline Clause.

 As the Court explained in <u>Ballin</u>, the authority possessed by the House to make its own

rules is bounded only by "constitutional restraints and fundamental rights." 144 U.S. at 5. Within

those limitations, a court may not review whether the House has abused the considerable

discretion granted by the Clause. <u>Id.</u> ("within these limitations all matters of method are open to

the determination of the house . . . and, within the limitations suggested, absolute and beyond the

challenge of any other body or tribunal"). This is a classic example of a demonstrable textual

commitment to another branch of government, although that does not ineluctably mean that a

court may not review House Rules for congruence with the Constitution. <u>Kurtz v. Baker</u>, 829

---

[16] While the Court will refer to the House here, the principles discussed under the Rulemaking and Discipline Clauses apply with equal force to the Senate.

F.2d 1133, 1149 (D.C. Cir. 1987) (R. Ginsburg, J., concurring) ("Congress' Rules and their implementation 'may not . . . ignore constitutional restraints or violate fundamental rights,' and on that score—and that score only—they are subject to judicial review." (quoting Ballin, 144 U.S. at 5)); CNN, 723 F. Supp. at 837 ("House rules may be scrutinized by federal courts for compliance with constitutional requirements."); Michel v. Anderson, 817 F. Supp. 126, 138 (D.D.C. 1993), aff'd, 14 F.3d 623 (D.C. Cir. 1994) (same). The House may not, by enacting and enforcing its own rules of procedure, violate another constitutional provision or an individual's rights under the Constitution, but the exercise of its discretion under the Clause is otherwise boundless—at least as far as this Court is concerned. Smith, 286 U.S. at 48 ("The Constitution commits to the Senate the power to make its own rules; and it is not the function of the Court to say that another rule would be better."); Vander Jagt, 699 F.2d at 1173 ("Art. I simply means that neither we nor the Executive Branch may tell Congress what rules it must adopt. Article I does not alter our judicial responsibility to say what rules Congress may not adopt because of constitutional infirmity.").

Challenges to the exercise of discretion under the Rulemaking Clause have most frequently arisen in the context of criminal proceedings against individuals who testified before Congress. See, e.g., Yellin, 374 U.S. at 120-21 (in contempt proceeding, failure of committee to comply with certain committee rules was defense precluding prosecution); Christoffel, 338 U.S. at 88-90 (where House committee failed to maintain a quorum under committee rules, perjury conviction was not by "competent tribunal," and thus worked a denial of a fundamental right); see Smith, 286 U.S. at 33 ("As the construction to be given to the rules affects persons other than members of the Senate, the question presented is of necessity a judicial one."); Metzenbaum, 675 F.2d at 1287 ("[J]udicial intervention may be appropriate where rights of persons other than

members of Congress are jeopardized by Congressional failure to follow its own procedures."
(citing <u>Yellin</u>, 374 U.S. at 109)). In those cases, defendants identify either violations of Rules or
the application of Rules that violated their rights during the course of their testimony. <u>See, e.g.</u>,
<u>Yellin</u>, 374 U.S. at 120-21; <u>Christoffel</u>, 338 U.S. at 88-89. Courts do not as a result strike down
those Rules as they might an unconstitutional statute; rather, courts hold that either the violation
of the Rules or the application of Rules violating individual rights means that the individual has a
defense to contempt or perjury charges. Simply taking cognizance of a Rule promulgated under
the Rulemaking Clause or examining whether its violation or application impacts a third party's
constitutional rights does not thereby transform a court's inquiry into a prohibited intrusion on
Congress's discretion—in other words, into a political question. Instead, it is better thought of as
a threshold inquiry into whether a political question is implicated at all.

For example, whether "some other way [to achieve the purpose of a Rule] would be
better, more accurate, or more just . . . [or] that a different [rule] has been prescribed and in force
for a length of time" is a "power . . . to be exercised by the house." <u>Ballin</u>, 144 U.S. at 5. Put
another way, a challenge to the wisdom of a particular House Rule would be barred by the
political question doctrine if it did not implicate other constitutional restraints—think of a
Member challenging a Rule granting the Democratic Caucus the power to make
recommendations regarding committee assignments, or of a Member asserting a violation of that
Rule. <u>See</u> <u>Vander Jagt</u>, 699 F.2d at 1176-77 (internal quotation marks omitted) (finding it "a
startlingly unattractive idea, given our respect for a coequal branch of government, for [the court]
to tell the Speaker of the . . . House of Representatives how many Democrats, and perhaps even
which Democrats, he is to appoint to the standing committees, and perhaps to each such
committee" and thereby refusing to reach the merits under related doctrine of equitable

discretion);  <u>Metzenbaum</u>, 675 F.2d at 1287 (internal quotation marks omitted) ("[W]hether the House observed the rules it had established for its own deliberations . . . is political in nature . . . and is therefore nonjusticiable."). It is only when the challenge concerns a Rule or the violation of a Rule that exceeds constitutional restraints that the issue may become justiciable: imagine a Rule effectively circumscribing the right of Members from New York to participate in House votes.

Several considerations indicate that the scope of the House's unreviewable discretion under the Discipline Clause is similarly broad.[17] <u>See</u> <u>In re Grand Jury Subpoenas</u>, 571 F.3d 1200, 1204 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (internal quotation marks and citations omitted) ("[The Discipline] Clause gives both houses broad official powers to hold investigations . . . even [for] purely private conduct by a Member that, in the House's opinion, reflects badly on it as an institution."); <u>see</u> <u>Brewster</u>, 408 U.S. at 544 (Brennan, J., concurring) ("[The expulsion power in Article I, section 5, clause 2] has a broad reach, extending 'to all cases where the offence is such as in the judgment of the (House or) [S]enate is inconsistent with the trust and duty of a member.'" (quoting <u>In re Chapman</u>, 166 U.S. 661, 669-670 (1897))); <u>cf.</u> <u>Harrington v. Bush</u>, 553 F.2d 190, 214 (D.C. Cir. 1977) ("In deference to the fundamental constitutional principle of separation of powers, the judiciary must take special care to avoid intruding into a constitutionally delineated prerogative of the Legislative Branch." (citing the Rulemaking Clause)). Like the adjacent Rulemaking Clause, the Discipline Clause deals with matters internal to the legislative branch, rather than with matters affecting third parties—except perhaps

---

[17] One court recently held that the Discipline Clause is textually committed to each house of Congress. <u>Haan v. Noem</u>, 13-1009, 2013 WL 5701638, at *2 (D.S.D. Oct. 17, 2013) ("The authority to discipline Members of the House and to remove them from office is textually committed by the Constitution to each house of congress, and not the judiciary."); <u>see also</u> <u>Sissel v. U.S. Dep't of Health & Human Servs.</u>, No. 10-1263, 2013 WL 3244826, at *11 (D.D.C. June 28, 2013) (internal quotation marks and citation omitted) ("Indeed, the second clause of Article I, section 5 is a textually demonstrable constitutional commitment of [an] issue to a coordinate political department if ever there was one.").

tangentially, as in the contempt and perjury cases. In other words, the second clause of section five deals only with Congress's power to regulate itself as a body. See Chadha, 462 U.S. at 955 n.21 (Article I, section 5, clause 2 "only empowers Congress to bind itself" and "[e]ach House has the power to act alone in determining specified internal matters"); Kilbourn v. Thompson, 103 U.S. 168, 189 (1880) ("[T]he Constitution expressly empowers each House to punish its own members for disorderly behavior."). In some respects, moreover, there is a lack of judicially manageable standards. See Brewster, 408 U.S. 501, 519 (1972) ("An accused Member is judged by no specifically articulated standards and is at the mercy of an almost unbridled discretion of the charging body."). What is meant, for example, by "disorderly Behaviour"?

Defendants argue that the House's authority in this realm is "exclusive." Def.'s Mot. 30. But just as the House's power to make rules of its proceedings is limited by other constitutional provisions, the House's wide discretion to discipline its Members is surrounded on all sides by other constitutional limitations. See Brewster, 408 U.S. at 544 (Brennan, J., concurring) ("[J]udicial review of the legislative inquiry is not completely foreclosed; the power of the House and Senate to discipline the conduct of Members is not exempt from the 'restraints imposed by or found in the implications of the Constitution.' (quoting Barry v. U.S. ex rel. Cunningham, 279 U.S. 579, 614 (1929))); cf. Common Cause v. Biden, 909 F. Supp. 2d 9, 28 (D.D.C. 2012) ("[I]n order to present a justiciable challenge to congressional procedural rules, Plaintiffs must identify a separate provision of the Constitution that limits the rulemaking power."). To take defendants' argument to its logical extreme, imagine the House locking a Member in the basement of the Capitol for one year based only on an internal disciplinary vote. If the House's disciplinary power were truly unbridled, such a case would be nonjusticiable. But as the Court explained in the closely related context of the Rulemaking Clause in Ballin, the Constitution empowers each

27

House to discipline its Members, but it may not by doing so "ignore constitutional restraints or violate fundamental rights." 144 U.S. at 5; see also Brewster, 408 U.S. at 544 (Brennan, J., concurring) ("Nor is the Member at the mercy of his colleagues, free to adjust as they wish his rights to due process and free expression." (citing Bond v. Floyd, 385 U.S. 116 (1966))).

Hence, to determine whether the alleged conduct here is beyond the authority of this Court, it is necessary to determine whether members of the House have acted outside of the zone of their discretion under the Discipline Clause—i.e., whether they have, by disciplining Rangel and by engaging in the alleged misconduct, ignored constitutional restraints. Ballin, 144 U.S. at 5; Metzenbaum, 675 F.2d at 1287 ("Although judicial intervention is appropriate when the failure of Congress to adhere to its own rules implicates constitutional rights, 'Congressional practice in the transaction of ordinary business is of course none of (the Court's) concern . . . .'" (quoting Christoffel, 338 U.S. at 88)); Exxon Corp. v. FTC, 589 F.2d 582, 590 (D.C. Cir. 1978) ("[W]here constitutional rights are not violated, there is no warrant for the judiciary to interfere with the internal procedures of Congress." (citing Consumers Union, 515 F.2d at 1347-48)). If they have not acted outside of that zone, then the conduct of which Rangel complains is unreviewable because it is a political question: this Court may not sit as an appellate tribunal, reviewing whether the House has properly disciplined a Member. Because the Court finds that Rangel has not even alleged a viable constitutional claim, it is unnecessary to proceed any further to determine whether the facts he has pleaded support such a claim.

As some courts and several prominent scholars have noted, "inquir[ing] into whether other branches [have] acted within the bounds of their constitutionally permissible discretion . . . [may] collapse . . . into an argument on the merits about how the Constitution should be applied to a particular, challenged action by a non-judicial official." Henry M. Hart, Jr. & Herbert

Wechsler, The Federal Courts and the Federal System 237 (Foundation, 6th ed. 2009); see Nixon v. United States, 506 U.S. 224, 251 n.4 (1993) (White, J., concurring) ("The judgment [the Court] wishes to avoid—and the attendant disrespect and embarrassment—will inevitably be cast because the courts still will be required to distinguish cases on their merits."); see generally Louis Henkin, Is There A Political Question Doctrine?, 85 Yale L.J. 597 (1976). Here, this may be particularly true because the House's discretion is broad and constrained only by other constitutional limits: determining whether the House has acted within its discretion, then, is by nature congruent with determining whether the House has violated another provision of the Constitution in the course of disciplining a Member. An alternative construct, to avoid a determination on the merits that precludes a determination on the merits,[18] would require the Court to hold that, because Rangel has simply stated in his complaint that his constitutional rights have been violated, by definition the issue is outside the realm of discretion granted the House under the Discipline Clause and hence not a political question. That path would then lead to an assessment whether Rangel has stated a plausible claim under Federal Civil Rule 12(b)(6).

The better result is to inquire at the outset whether Rangel has asserted a viable constitutional claim and, if he has not, conclude that his claim raises a political question. Cf. Brewster, 408 U.S. at 544 (Brennan, J., concurring) (internal quotation marks and citation omitted) ("Courts are not the place for [resolving legislative bribery issues]. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses."). Determining preliminarily whether Rangel has identified a constitutional violation in this case has the ancillary benefit of being a strictly legal question, thus avoiding undue inspection of the House's actual conduct. Cf. Common Cause, 909 F. Supp. 2d at 31 (reaching the merits of

---

[18] See Nixon, 506 U.S. at 251 n.4 (White, J., concurring) ("[O]n the basis of a preliminary determination that the Senate has acted within the 'broad boundaries' of the Impeachment Trial Clause, it is concluded that we must refrain from making that determination.").

dispute over Senate rule "would require an invasion into internal [House] processes at the heart of the [House's] constitutional prerogatives," thereby expressing a lack of due respect). Assessing whether Rangel has sufficiently alleged that he was deprived of a cognizable liberty or property interest does not require an intrusive analysis of whether the House acted appropriately here. As a result, the Court avoids expressing disrespect for a coordinate branch by focusing solely on whether Rangel has asserted a viable constitutional violation. And if a threshold showing of a constitutional violation is required, plaintiffs may not simply plead around the political question doctrine by asserting plainly meritless constitutional violations. At bottom, because the House only exceeds its discretion under the Discipline Clause when it violates constitutional rights—and because acts within that discretion are unreviewable as political questions—if Rangel has not even identified a constitutional right that the House has allegedly violated, whether the House properly disciplined him remains a political question.

As in Ballin, here "there is no 'constitutional restraint' or 'fundamental right' at issue." 144 U.S. at 5. And unlike in Powell v. McCormack, 395 U.S. 486 (1969), where the plaintiff identified a constitutional provision limiting the House's discretion on the issue at hand, see 395 U.S. at 531-41 (identifying Article I, section 2, clause 2), Rangel has not identified any constitutional provision expressly limiting the House's discretion to discipline him. The closest he comes is arguing that the House violated his due process rights under the Fifth and Fourteenth Amendments, but this does not wash. Unless the House deprived Rangel of his "life, liberty, or property" without due process, Rangel has not identified a constitutional bound that the House overstepped. "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property.' Only after finding the deprivation of a protected interest do we look to see if the [government's] procedures comport with due process."

Gen. Elec. Co., 610 F.3d at 117. Rangel argues that the defendants deprived him of a liberty or property interest when they unfairly and based on bias violated the House's rules of proceedings in the course of disciplining him. See Pl.'s Opp'n 25, 28, 29 ("Plaintif[f] was denied due process when [the] fact finders were biased as a matter of law"; "bias [of some defendants] as a matter of law depriv[ed] Plaintiff of his Due Process rights"; "the Committee Rules guaranteed a 'fair procedural framework' which included several common trial protections . . . [and] Plaintiff had a vested interest in each of these guaranteed protections and was deprived of these interests when these protections were violated").

To the extent he argues that he had a recognizable interest in the disciplinary process itself, Rangel is incorrect. In Discipline Clause proceedings, the Supreme Court has explicitly recognized that "[a]n accused Member is judged by no specifically articulated standards and is at the mercy of an almost unbridled discretion of the charging body . . . ." Brewster, 408 U.S. at 519 (characterizing the House as acting under Clause "as accuser, prosecutor, judge, and jury from whose decision there is no established right to review"). In other words, the discipline power is "not surrounded with the panoply of protective shields that are present in a criminal case," despite Rangel's insistence to the contrary. Id. Recounting the expulsion case of William Blount in 1797, the Supreme Court has noted without disapproval that "[i]n the [expulsion] resolution, the [S]enate declared him guilty of a high misdemeanor, though no presentment or indictment had been found against him, and no prosecution at law was ever commenced upon the case; and it seems no law existed to authorize such prosecution.'" Chapman, 166 U.S. at 681 (citation and internal quotation marks omitted). Even the greater power of expulsion is arguably bounded only by the requirement of a two-thirds vote, for "[t]he right to expel extends to all cases where the offense is such as in the judgment of the [S]enate is inconsi[s]tent with the trust

31

and duty of a member." <u>Chapman</u> (citing 1 Story, Const. § 838). The procedural protections to which Rangel argues he was due are thus not guarantees. <u>Brewster</u>, 408 U.S. at 519. And even if they were, those procedural protections would constitute the "due process of law" to which he would be entitled, not the "liberty" or "property" interest that the government cannot deprive him of without due process. Procedural rights are not in and of themselves causes of action in this context. <u>See</u> <u>Gen. Elec. Co.</u>, 610 F.3d at 117.

If Rangel is arguing that when he was censured he was deprived of a liberty or property interest because of defendants' conduct, he hits closer to the mark. Still, however, he does not identify a cognizable liberty or property interest in not being censured. True, he alleges reputational harm. It is well settled, though, that reputational harm alone is not enough: a plaintiff needs to allege "stigma-plus" in this context. <u>Paul v. Davis</u>, 424 U.S. 693, 699-70 (1976); <u>Doe v. U.S. Dep't of Justice</u>, 753 F.2d 1092, 1105-06 (D.C. Cir. 1986). Rangel has not alleged any sufficient "plus" factor. As explained above, the political exploitation of his censure was not caused by a defendant before this Court, and in any event it would be strange indeed to hold that a politician has the right to avoid being aggressively challenged on his record as a Member during the electoral process. The alleged loss of status on the Ways and Means Committee was likewise not caused by defendants, and as defendants point out, the House is not a continuing body—vitiating any claim that he has a vested interest in any particular committee assignment. <u>See</u> <u>Eastland v. U.S. Servicemen's Fund</u>, 421 U.S. 491, 512 (1975). Hence, because Rangel has not alleged a sufficient "plus" factor, his allegation of bare reputational harm cannot constitute a liberty or property interest in this context.

Strictly on the basis of what Rangel has alleged, then, even accepting it all as true as this Court must do on a Rule 12(b)(1) motion, he has not identified any constitutional violation.

Thus, he has not even plausibly claimed that the House acted outside of its considerable discretion under the Discipline Clause, making it a political question whether Rangel was "properly" disciplined, even assuming the violation of House Rules. Whether discipline of a Member was "proper" is textually committed to the House, and this Court may step in only to remedy constitutional violations, which are not implicated here.

Rangel insists that his claims do not involve political questions by comparing his case with <u>Nixon v. United States</u>, 506 U.S. 224 (1993). There, the Supreme Court held that the Senate had the sole power to determine its impeachment procedures, thus transforming an impeached former district court judge's claim that he had not been properly "tried" into a political question. <u>Id.</u> at 238. Rangel contends that because the Rulemaking and Discipline Clauses do not contain the word "sole," as the Impeachment Clause does, they are not textually committed to the legislative branch. That is true, so far as it goes: the Impeachment Clause contains particularly explicit support for the conclusion that it is textually committed to the Senate. But <u>Ballin</u> largely forecloses Rangel's argument about the implications of the absence of the word "sole." The Court there described the wide discretion granted to the houses of Congress under the Rulemaking Clause. 144 U.S. at 5. The word "sole" appears only in the Impeachment Clause, yet courts have repeatedly found textual commitments in other clauses. <u>See, e.g.</u>, <u>Luther v. Borden</u>, 48 U.S. (7 How.) 1, 42 (1849) (finding Guarantee Clause textually committed to political branches); <u>Gonzalez-Vera</u>, 449 F.3d at 1262-63 (finding foreign policy and national security claims nonjusticiable because of textual commitments to political branches). Rangel also maintains that the redress he seeks does not present the same dangers as the relief sought in <u>Nixon</u>. But although the consequences of ordering what he seeks are perhaps not as weighty as an ex-President challenging his impeachment in the courts, they are still quite problematic. <u>See</u>

infra Part II.B. Rangel further argues that because, in his view, the requested order would embarrass only the defendants who purportedly engaged in misconduct, the order would not express disrespect towards the House as a whole. But this misperceives the doctrine and perhaps the nature of what he seeks. Such an order would express a profound lack of disrespect towards the House as a whole because the Court would be injecting itself into review of the House's internal disciplinary process, and the Constitution does not permit that result in these circumstances.

**B.**    **This Court Cannot Grant Rangel's Requested Relief Because Issues Arising Under The Journal Clause Are Textually Committed To The House**

The nature of the relief Rangel requests also requires dismissal on separation-of-powers grounds. Rangel essentially requests an order from this Court requiring the defendants to somehow cause the House to rescind his censure. Any order from this Court requiring either the defendants or the House itself to act in a fashion consistent with his desires would be severely problematic from a separation-of-powers perspective.

Article I, section 5, clause 3 of the Constitution "requires that each House 'keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy . . . .' This Clause has not been the subject of extensive judicial examination." Gravel v. United States, 408 U.S. 606, 626 (1972) (citing Ballin, 144 U.S. at 4; Marshall Field & Co. v. Clark, 143 U.S. 649, 670-671 (1892)). Nonetheless, the Supreme Court noted in Marshall Field & Co. v. Clark that matters relating to the Journal are "left to the discretion of the respective houses of [C]ongress." 143 U.S. at 671. In so noting, the Court singled out the possibility of expressing disrespect "due to a co-ordinate branch of the government." Id. at 673. The D.C. Circuit has concluded that "because the Court based its holding [in Marshall Field] in part upon separation of powers concerns," this rule could fairly be

viewed as deriving from the political question doctrine. Public Citizen v. U.S. Dist. Ct. for the Dist. of Columbia, 486 F.3d 1342, 1348 (D.C. Cir. 2007). The D.C. Circuit has also noted, based on an examination of the Journal Clause and the Rulemaking Clause, that "[i]t is manifest that no action that the President could take, no formality whatsoever, could force the House to make any particular entry upon its journal. . . . The President has no control over the Congressional Record [or] the Journal." Prevost v. Morgenthau, 106 F.2d 330, 335, n.10 (D.C. Cir. 1939). The Court cannot conceive of—and Rangel has not made—any principled argument to distinguish the President's distinct lack of power over the House's Journal from this Court's corresponding lack of power, particularly where no constitutional rights have been violated.

As defendants point out, any other conclusion with an accompanying order that the defendants somehow bring about the editing of the House's Journal to strike any reference to Rangel's censure would not only express a profound lack of disrespect for a coordinate branch but also could trigger a constitutional crisis.[19] Under specific House Rules—which Rangel does not challenge here—any alteration of the House's Journal from a legislative day other than the previous legislative day requires unanimous consent. See Brown, Johnson, Sullivan, House Practice, ch. 28, § 9. How, then, would an injunction requiring defendants to cause the censure's removal from the Journal bring about Rangel's desired result, particularly where Rangel has only sued seven Members, three staffers, and the Clerk? Does Rangel ask this Court to order defendants to violate House Rules? Altering the House Journal is clearly within the discretion of the House, subject only to the possible limit that the House may not violate other provisions of the Constitution when exercising its discretion under the Clause. This Court has the same ability to order the House to edit its own Journal as it does to order the House to discipline one of its

---

[19] Perhaps in recognition of the difficulties of such an order, Rangel appears to scale back his desired remedy somewhat, see supra note 9, but that remedy presents similar difficulties.

Members or to promulgate a particular Rule—none. See Vander Jagt, 699 F.2d at 1173. Hence,

because the Constitution vests broad discretion as to the House Journal in the House itself, with a

possible constitutional exception not applicable here, Rangel's desired relief involves a political

question and the Court must dismiss his claims. [20]

## III.   DEFENDANTS ARE ABSOLUTELY IMMUNE FROM SUIT UNDER THE SPEECH OR DEBATE CLAUSE

### A.   Immunity Under The Speech Or Debate Clause

Defendants also move to dismiss on the basis that they are absolutely immune from suit

under the Speech or Debate Clause. "[T]he [Speech or Debate] Clause shields federal legislators

with absolute immunity 'not only from the consequences of litigation's results but also from the

burden of defending themselves.'" Davis v. Passman, 442 U.S. 228, 235 n.11 (1979) (quoting

Dombrowski v. Eastland, 387 U.S. 82, 85 (1967)). Article I, section 6, clause 1 of the U.S.

Constitution provides in relevant part that Senators and Representatives:

> shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged
> from Arrest during their Attendance at the Session of their respective Houses, and
> in going to and returning from the same; and for any Speech or Debate in either
> House, they shall not be questioned in any other Place.

Id. "Without exception, [the Supreme Court has] read the Speech or Debate Clause broadly to

effectuate its purpose[]," which "is to insure that the legislative function the Constitution

allocates to Congress may be performed independently." Eastland, 421 U.S. at 501 (citing cases);

Gravel, 408 U.S. at 616 ("The Speech or Debate Clause was designed to assure a co-equal

---

[20] Because the Court determines that Rangel's claims involve political questions, it is unnecessary to consider whether to exercise equitable discretion in order not to decide the case. Courts in this circuit have often expressed unwillingness to interfere in intra-Congress disputes. See, e.g., Vander Jagt, 699 F.2d at 1174 (noting "a disinclination to intervene unnecessarily in [the legislative branch's] disputes"); Leach v. Resolution Trust Corp., 860 F. Supp. 868, 871 (D.D.C. 1994) (expressing the court's "reluctan[ce] to interfere with what should essentially be handled as an internal congressional matter"). The D.C. Circuit has labeled this hesitancy "equitable discretion," but what life remains in that doctrine is hazy after Raines v. Byrd, 521 U.S. 811 (1997). See Campbell v. Clinton, 52 F. Supp. 2d 34, 40 (D.D.C. 1999) ("the separation of powers considerations previously evaluated under the rubric of ripeness or equitable or remedial discretion now are subsumed in the standing analysis").

branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch."); Brewster, 408 U.S. at 507 (purpose of the Clause is "to protect the integrity of the legislative process by insuring the independence of individual legislators"); United States v. Johnson, 383 U.S. 169, 178 (1966) ("In the American governmental structure the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders.").

To that end, the Clause confers on members of Congress immunity for all actions "within the 'legislative sphere,' even though their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." Brown & Williamson Tobacco Corp. v. Williams, 62 F.3d 408, 415 (D.C. Cir. 1995) (quoting Doe v. McMillan, 412 U.S. 306, 312-13 (1973)). But only acts performed within the legitimate legislative sphere are protected. Eastland, 421 U.S. at 503 ("[O]nce it is determined that Members are acting within the 'legitimate legislative sphere' the Speech or Debate Clause is an absolute bar to interference."). To determine whether particular activities other than literal speech or debate fall within the "legitimate legislative sphere," courts examine "whether the activities took place 'in a session of the House by one of its members in relation to the business before it.'" Id. (quoting Kilbourn, 103 U.S. at 204). As the Supreme Court explained in Gravel, covered legislative acts consist of matters that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." 408 U.S. at 625; Fields v. Office of Eddie Bernice Johnson, 459 F.3d 1, 10-11 (D.C. Cir. 2006) (Opinion of Randolph, J.) (citations, quotation marks, and footnotes omitted) ("The legislative process at

the least includes delivering an opinion, uttering a speech, or haranguing in debate; proposing legislation; voting on legislation; making, publishing, presenting, and using legislative reports; authorizing investigations and issuing subpoenas; and holding hearings and introducing material at Committee hearings.").

Discipline Clause activities are plainly within that sphere. As discussed above, the Constitution places the discretion to discipline House Members firmly within the jurisdiction of the House. See Brewster, 408 U.S. at 519; In re Grand Jury Subpoenas, 571 F.3d at 1205 (Kavanaugh, J., concurring) ("[T]he House or Senate's disciplinary proceedings are official 'Proceedings' of the House or Senate. And a Member's speech in such an official congressional proceeding constitutes 'Speech . . . in either House.'"). Generally speaking, the Rangel disciplinary proceedings included activities typically thought of as "deliberative and communicative processes by which Members participate in committee and House proceedings": an investigative subcommittee investigated Rangel's conduct, then an adjudicatory subcommittee held a hearing and made recommendations, next the Ethics Committee recommended a censure to the House, and after debate the House voted to censure Rangel. See Gravel, 408 U.S. at 625. Each of these activities falls well within the legitimate legislative sphere because they took place "'in a session of the House [by] its members in relation to the business before it,'" that business being the disciplinary proceedings against Rangel. Brown & Williamson, 62 F.3d at 415 (quoting Kilbourn, 103 U.S. at 204). Actions performed in furtherance of authorized congressional investigations like the one here—and Rangel does not dispute that the investigation into his misconduct was authorized—are "integral and indispensable parts of the legislative process." CNN, 723 F. Supp. at 841 (citing Eastland, 421 U.S. at 505-06).

**B.     Each Defendant Is Absolutely Immune From Suit Under The Speech Or Debate Clause**

Close examination of the precise conduct that Rangel complains of reveals that all of defendants' activities fall within the legitimate legislative sphere. The Court focuses only on whether the alleged conduct comes within the legitimate legislative sphere because the Speech or Debate Clause provides immunity from suit for all such actions "even though the[] conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." McMillan, 412 U.S. at 312-13 (citing Gravel, 408 U.S. at 624-25).

**1.     The Chair and Ranking Member are immune from suit**

Rangel has sued Rep. Zoe Lofgren based on actions taken while she was Chair of the Ethics Committee[21] and Chair of the adjudicatory subcommittee dealing with Rangel. Similarly, he has sued former Rep. Jo Bonner based on actions taken while he was Ranking Member and subsequently Chair of the Ethics Committee. Rangel bases his claims against these two defendants on certain statements made to the Committee and the House: specifically, that they made misrepresentations when they told each body that Rangel's "pre-[censure]-vote proceedings were conducted fairly, honestly, without bias and according to the law." Compl. ¶¶ 12, 13. Zofgren and Bonner's actions arose from their positions on the Ethics Committee and on the Rangel adjudicatory subcommittee. That the Committee and the subcommittee were authorized is not in dispute. See Ethics Comm. Rep. at 258, 266, 644 (Rangel entreating committee to investigate allegations of misconduct). Rangel's claims are based on statements that Zofgren and Bonner made in the course of the disciplinary proceeding and on the floor of the House itself: in other words, on their speech. This is a classic example of

---

[21] The Ethics Committee was known as the Committee on Standards of Official Conduct during the 111th Congress—i.e., when Lofgren was Chair. See 111th Cong. Comm. Rules at 247.

conduct protected by the Speech or Debate Clause—literal speech or debate during official House proceedings. <u>See</u> <u>Gravel</u>, 408 U.S. at 616 ("Senator Gravel may not be made to answer . . . for the events that occurred at the Subcommittee meeting"); <u>In re Grand Jury Subpoenas</u>, 571 F.3d at 1205 (Kavanaugh, J., concurring) ("[A] Member's speech in . . . an official congressional proceeding constitutes 'Speech . . . in either House.'" (quoting Speech or Debate Clause)). Hence, Zofgren and Bonner are absolutely immune from suit under the Speech or Debate Clause.

2.      <u>The adjudicatory subcommittee Member defendants are immune from suit</u>

Rangel has also sued four members of the adjudicatory subcommittee. Against defendant McCaul, who was the Ranking Member of that subcommittee, he bases his claim on an allegation that McCaul received improper communications from staff member defendants Kim and Sovereign, "rendering him[] biased." Compl. ¶ 22. Against the other three Member defendants, Conaway, Dent, and Harper, Rangel alleges that they too received those improper communications, and that all four improperly failed to disclose them to "all of the Members of the Adjudicatory Subcommittee, or Members of the [Ethics] Committee, or to Plaintiff, or to Members of the House." Compl. ¶¶ 24-26. To the extent Rangel alleges that certain communications made during the adjudicatory subcommittee's proceedings were improper, those communications were "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings . . . with respect to other matters which the Constitution places within the jurisdiction of either House," as disciplinary proceedings are well within that jurisdiction. <u>Gravel</u>, 408 U.S. at 625; <u>see</u> <u>supra</u> Part II.A. The receipt of information by a Member "in preparation for [a] subcommittee hearing," the conduct alleged here, is similarly a protected legislative activity. <u>Gravel</u>, 408 U.S. at 629. And any failure

40

to notify committed by defendants during those proceedings can be fairly characterized as "speech" under the Speech or Debate Clause; just as defendants are immune from suits based on speech within the legislative sphere, so are they protected for any failure to speak within the same sphere. Hence, Rangel's claims against these four Member defendants are barred by the Speech or Debate Clause.

3.    The staff member defendants are immune from suit

Rangel's allegations against the staff member defendants concern their activities in preparing the adjudicatory subcommittee for his sanction hearing. He alleges that defendant Chisam, Chief Counsel for the Ethics Committee and for the adjudicatory subcommittee, failed "to fulfill his constitutional obligation to timely advise" Rangel "of what had occurred prior to the Sanction Hearing": namely, that the other staff member defendants had allegedly engaged in improper communications with members of the subcommittee. Compl. ¶ 14. He charges defendants Kim and Sovereign, both members of Chisam's Ethics Committee staff at the time, with the alleged improper communications with the defendant Members of the adjudicatory subcommittee.

As a threshold matter, these staff members are covered by the Speech or Debate Clause despite not being Members of Congress. Under the Clause, courts are to draw "no distinction between . . . Members" and their aides, Eastland, 421 U.S. at 507, because "the day-to-day work of such aides is so critical to the Members' performance that they must be treated as (the Members') alter egos . . . [,]" Gravel, 408 U.S. at 616-17. See also Consumers Union, 515 F.2d at 1350 (so long as their "actions would have been immune from inquiry . . . had they been performed by Members of Congress," aides are entitled to immunity). Had Members taken the alleged actions here, they would be immune from suit because such actions are within the

legitimate legislative sphere. As with the adjudicatory subcommittee member defendants, Rangel alleges only that the staff members engaged in deliberative and communicative processes in preparation for a disciplinary proceeding, which the Constitution places within the jurisdiction of the House. See Gravel, 408 U.S. at 629. Like the receipt of information in preparation for those proceedings, communicating information to Members in preparation for the proceedings is a protected legislative act. Gravel makes clear that aides are to be treated as Members' alter egos, and if a Member had communicated information to another Member on the adjudicatory subcommittee, that communication would be protected by the Speech or Debate Clause. 408 U.S. at 616-17. Hence, so are the staff members' similar communications. See MINPECO, S.A. v. Conticommodity Servs., Inc., 844 F.2d 856 (D.C. Cir. 1988) (protecting staff communications regarding alleged alteration of investigative hearing transcript). Like the adjudicatory subcommittee member defendants, Chisam's purported failure "to timely advise" Rangel of conduct occurring during preparation for the hearing is also protected as the lack of speech. Rangel does not predicate his claims against the staff member defendants on any actions taken outside their capacities as Committee aides. Because he bases his claims only on actions within the legitimate legislative sphere taken by aides to the authorized subcommittee, Rangel's claims against the staff member defendants are barred by the Speech or Debate Clause.

        4.      The Speaker of the House is immune from suit

Rangel does not allege that defendant Boehner, Speaker of the House, engaged in any misconduct. Rather, he joins him as a defendant solely because "in his absence . . . the court cannot accord complete relief as prayed for." Compl. ¶ 9. Setting aside the implications for standing against Boehner, the Speech or Debate Clause provides him with absolute immunity from suit for actions taken in the legitimate legislative sphere. Because Rangel has not alleged

that Boehner engaged in <u>any</u> conduct, let alone any outside of the legislative sphere, Rangel's claims against Boehner are barred by the Speech or Debate Clause.

        5.      <u>The Clerk of the House is immune from suit</u>

Similarly, Rangel does not allege that defendant Haas, as Clerk of the House, engaged in any misconduct; he joins her only because she is "essential to effectuate relief" as the keeper of the House Journal. Compl. ¶ 10-11. Like the staff member defendants, the Clerk is entitled to absolute immunity under the Speech or Debate Clause if her "actions would have been immune from inquiry . . . had they been performed by Members of Congress." <u>Consumers Union</u>, 515 F.2d at 1350. Asking whether a Member would have been immune for the Clerk's actions here is a non sequitur: Rangel does not base his claims against the Clerk on <u>any</u> of her actions. But even assuming that the action complained of is recording the censure in the House Journal, the Clerk is entitled to immunity. As discussed above, maintenance of the Journal is a "matter which the Constitution places within the jurisdiction of either House." <u>Gravel</u>, 408 U.S. at 625; <u>see</u> <u>Marshall Field</u>, 143 U.S. at 671. And here, the Clerk was "acting by virtue of an express delegation of authority as [an] aide[] or assistant[] of Congress" when she recorded Rangel's censure in the House Journal: it is the Clerk's duty to enter the day's business in the Journal, which Rangel does not dispute. <u>Consumers Union</u>, 515 F.2d at 1350; Def.'s Mot. 12. Hence, to the extent Rangel argues that the Clerk engaged in any misconduct—and the only fairly alleged actions taken by the Clerk here relate to recording the censure in the Journal—that conduct falls within the "legitimate legislative sphere," so Rangel's claims against the Clerk are barred by the Speech or Debate Clause.

6.      Alleged Rules violations do not defeat immunity

Rangel's claims against each defendant, then, are absolutely barred by the Speech or Debate Clause. Eastland, 421 U.S. at 501-02 (where the Clause applies, "'the prohibitions of the Speech or Debate Clause are absolute,'" barring both criminal and civil liability (quoting McMillan, 412 U.S. at 312-13)). Thus, it is unnecessary to consider the extent to which the Clause would preclude discovery or the introduction of evidence. Def.'s Mot. 25-26; Pl.'s Opp'n 19-20; see, e.g., Helstoski, 442 U.S. at 489-90 (discussing non-evidentiary use privilege); Brown & Williamson, 62 F.3d at 418 (discussing non-disclosure privilege).

Rangel insists that because certain defendants took actions that violated House Rules or Committee Rules,[22] their activities cannot as a matter of law have been within the legitimate legislative sphere. Pl.'s Opp'n 17-19. This proposition has been soundly rejected. If courts were permitted to examine and question Members' conduct once a plaintiff alleged that such conduct violated Rules or even criminal or civil statutes or the Constitution itself, the Speech or Debate Clause would be a nullity. CNN, 723 F. Supp. at 841 ("[A]n allegation [of a constitutional violation] is insufficient to overcome the broad coverage of the Speech or Debate Clause." (citing Eastland, 421 U.S. at 508-09)); Porteous v. Baron, 729 F. Supp. 2d 158, 165 (D.D.C. 2010) (rejecting identical argument because acceptance would "entirely eviscerate the protections afforded by the privilege"); see Eastland, 421 U.S. at 508-09 ("If the mere allegation that a valid legislative act was undertaken for an unworthy purpose would lift the protection of the Clause, then the Clause simply would not provide the protection historically undergirding it."); Tenney v. Brandhove, 341 U.S. 367, 377-78. Similarly, inquiry is not permitted based upon

---

[22] Note, though, that Rangel does not identify any specific Rules violated by defendants, referencing only the "Foreword" to the Ethics Committee Rules and alleging violations of unspecified rules. Pl.'s Opp'n 2, 18, 22, 25. ("Plaintiff has alleged egregious violations of [House Rules]" and "any actions taken by Defendants in violation of the Rules Congress has adopted . . . are outside the legitimate legislative sphere.").

an allegation of an improper or unconstitutional motive for protected conduct. Tenney, 341 U.S. at 377 ("The claim of an unworthy purpose does not destroy the privilege. . . . The privilege would be of little value if [Members] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives."). Hence, defendants are entitled to absolute immunity notwithstanding Rangel's allegations of rule violations.

C.     **Neither The House Nor The Defendants Have Waived The Protections Of The Speech Or Debate Clause**

Rangel also urges that either the House as an institution or each of the individual defendants have waived the protections of the Speech or Debate Clause. The idea that a Member may waive the protections of the Speech or Debate Clause appears to have had its genesis in Gravel, where the Supreme Court noted in passing that because the privilege of an aide really belongs to the member of Congress, "an aide's claim of privilege can be repudiated and thus waived by the [Member]." 408 U.S. at 622 n.13. But only a few years later, the Court cast doubt on this proposition in United States v. Helstoski, 442 U.S. 477 (1979). There, the Court held that even if a Member could waive the privilege—and the Court explicitly declined to decide whether individual waiver is possible—"waiver can be found only after explicit and unequivocal renunciation of the protection" and "[t]he ordinary rules for determining the appropriate standard of waiver do not apply in this setting." 442 U.S. at 490-91. Such a "clear and unambiguous" waiver must also be distinct from a waiver of one's Fifth Amendment rights. Id. Thus, the Court rejected the government's argument in Helstoski that a former Member had waived his rights by voluntarily testifying in front of grand juries and by voluntarily producing documents in the course of a corruption investigation, even though the Member "indicated a willingness to waive the protection of the Fifth Amendment." Id. at 492; see also Brown & Williamson, 62 F.3d at

415 (no waiver where Congressman voluntarily made statements during a radio interview regarding the subject matter of plaintiffs' claims); Pittston Coal Grp., Inc. v. Int'l Union, United Mine Workers of Am., 894 F. Supp. 275, 278 n.5 (W.D. Va. 1995) (no waiver where Senator voluntarily disclosed documents in litigation).

No court has ever held that a Representative or Senator waived their absolute immunity from suit under the Speech or Debate Clause. Given the case law, if waiver is at all possible in this context, it must be pellucidly clear. Here, Rangel argues that defendants somehow individually waived the protections of the Speech or Debate Clause through publication of the "Chisam memorandum." To begin with, he does not allege that any particular defendant caused the memorandum to be published. And even if he had, such publication is manifestly insufficient to support a finding that any defendant made an "explicit and unequivocal renunciation of the [Clause's] protection." Helstoski, 442 U.S. at 490-91. Other cases in which Members waived their Fifth Amendment rights or disclosed documents in discovery present far stronger cases for waiver than the mere public release of information. See, e.g., Helstoski, 442 U.S. at 492; Pittston Coal, 894 F. Supp. at 278 n.5. Yet no court has found an individual waiver even in those cases.

What is more, even if Rangel were correct that defendants waived their protections here through publication of the Chisam memorandum, it is significantly in doubt whether that waiver would extend so far as Rangel claims. He appears to contend that the publication of the memorandum abrogates defendants' absolute immunity from suit. A more likely result—though one never decided by a court—is that defendants would merely have waived their non-disclosure or non-evidentiary use privileges under the Clause relating to the memorandum, leaving intact their immunity from suit. See, e.g., Helstoski, 442 U.S. at 489-90 (non-evidentiary use privilege); Brown & Williamson, 62 F.3d at 418 (non-disclosure privilege).

Still more dubious is the proposition that the House as an institution somehow waived defendants' absolute immunity. As with individual waiver, the Supreme Court has left undecided whether Congress—or one house—may as an institution waive the Clause's protections on behalf of individual members. See Helstoski, 442 U.S. at 492-93. But the Court has articulated serious concerns about the possibility of institutional waiver, noting that the purpose of the Clause is "to protect the integrity of the legislative process by insuring the independence of individual legislators." Eastland, 421 U.S. at 502 (quoting Brewster, 408 U.S. at 507). In other words, the privilege "is not so much the privilege of the house as an organized body, as of each individual member composing it, who is entitled to this privilege, even against the declared will of the house." Helstoski, 442 U.S. at 493 (quoting Coffin v. Coffin, 4 Mass. 1, 27 (Mass. 1808)). Moreover, the Court held that even assuming the possibility of institutional waiver, it likewise "could be shown only by an explicit and unequivocal expression." Id.

Here, Rangel appears to argue that the House waived the Clause's protections for all members simply by authorizing the broadcast of its proceedings on C-SPAN.[23] C-SPAN is authorized to broadcast those proceedings by generally applicable House and Committee Rules. See 111th House Rules, Rule V.2(a); 111th Ethics Comm. Rules, Rules 5(d), 12. In light of the serious doubt cast by the Supreme Court on the prospect of institutional waiver, and the Court's corresponding requirement that any such waiver must be explicit and unequivocal, general authorization of a public broadcast of the House's proceedings falls far short of institutional waiver. Moreover, that waiver would likely work only an abnegation of defendants' non-disclosure or non-evidentiary use privileges under the Clause for statements actually broadcast on C-SPAN. See, e.g., Helstoski, 442 U.S. at 489-90; Brown & Williamson, 62 F.3d at 418.

---

[23] To the extent he argues that authorizing the C-SPAN broadcast somehow constituted an individual waiver, Rangel has not alleged action by any specific defendant authorizing that broadcast, and thus the Court construes his argument on the point as relating only to an institutional waiver.

Hence, this Court finds that there has been neither an individual nor an institutional waiver of the Speech or Debate Clause's protections in this case, and all defendants are absolutely immune from suit under the Clause.

*    *    *    *    *    *    *

Rangel wants this Court to decree that the House somehow lacked the authority under the Constitution and its own Rules to censure him; to sit in review of decisions made by the Ethics Committee, its subcommittees, and the House itself; and to rewrite the House Journal (or to order defendants to do so). In the end, everything on Rangel's wish list implicates insurmountable separation-of-powers barriers to the Court's exercise of authority. This Court is a court of limited jurisdiction under Article III, and Rangel has not properly asserted any claim within the bounds of that jurisdiction. The House has wide discretion to discipline its Members under the Discipline Clause, and this Court may not lightly intrude upon that discretion. Moreover, Members of Congress (along with their aides) are entitled to broad—although not unlimited—immunity under the Speech or Debate Clause. And perhaps most problematic is Rangel's unprecedented view that this Court may order the House to, in effect, un-censure him. Rangel's quarrel is with the House, and it must stay there; he may not under these circumstances enlist the Court's involvement in that quarrel.[24]

## **CONCLUSION**

For all these reasons, the Court will grant defendants' motion to dismiss. A separate order has issued on this date.

---

[24] Because the Court is precluded from reaching the merits of Rangel's case for several reasons—standing, the political question doctrine, and immunity from suit under the Speech or Debate Clause—the Court need not, and indeed may not, decide whether to exercise its discretion under the Declaratory Judgment Act to consider the merits, or, if it should, to decide whether Rangel has stated a claim. See Zivotofsky ex rel. Zivotofsky v. Clinton, 132 S. Ct. 1421, 1427 (2012) ("In [cases involving political questions], we have held that a court lacks the authority to decide the dispute before it.").

/s/
JOHN D. BATES
United States District Judge

Dated:  December 11, 2013